## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**WALTER RITTER, JEANETTE GORDON,**          Case No.:
**DEMARCUS HARVEY, ELI HARVEY,**             Hon.:
**MORGAN TATE & BREWER LLC,**
**SHEILA TODD,  CLARENCE DAY,**
**DARIN McLESKY, and**
**CHRISTOPHER FEALA,**

      Plaintiffs,

vs.                                          **<u>JURY TRIAL DEMANDED</u>**

**THE CITY OF DETROIT, a municipal corporation, and**
**THE DETROIT LAND BANK AUTHORITY, a public**
**body corporate,**

      Defendants.

_____

Ian T. Cross (P83367)
Laurence H. Margolis (P69635)
Attorneys for Plaintiffs
402 W. Liberty St.
Ann Arbor, MI  48103
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

_____/

## CLASS-ACTION COMPLAINT

1

**Introduction**

1.      As part of a crusade to eradicate urban blight, the Detroit Land Bank Authority has operated a municipal program that, a) takes people's houses, b) sells them, and c) keeps the money. Since its inception in 2014, this program has seized over 1,300 allegedly "blighted" homes in Detroit, sold at least 451 of them to private parties, and generated millions of dollars in sales revenue for the Detroit Land Bank Authority. None of this money has been turned over to the people whose houses were taken; in fact, the former property owners have received no compensation at all.

2.      Plaintiffs are former owners of single-family homes in Detroit whose property was taken by the defendants through the aforementioned municipal program. They seek compensation for their property under the Takings Clause of the United States Constitution, Article X, § 2 of the Michigan Constitution, and bring claims against the Detroit Land Bank Authority for common-law unjust enrichment.  They also seek to represent a class of similarly-situated Detroit property owners who lost their houses through this program and were not compensated.

**The Parties**

3.      Plaintiff Walter Ritter owned the house at 8189 Bliss Avenue in Detroit, Michigan. Mr. Ritter's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. On September 30, 2024, the Detroit Land Bank Authority sold Mr. Ritter's house via an online auction for $16,500.00. The Detroit Land Bank Authority retained 100% of the proceeds from the sale of 8189 Bliss Avenue for itself, and paid nothing to Mr. Ritter for his property.

4.      Plaintiff Jeannette Gordon is a retired nurse. Ms. Gordon moved to Detroit from Tennessee in 1968, and she purchased the home at 18541 Fielding Street in Detroit on October 10th, 1988. Ms. Gordon owned her house on Fielding Street for over thirty-five years. On or about May 3, 2024, Ms. Gordon's house was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 18541 Fielding Street and has not listed it for sale. The Detroit Land Bank Authority did not compensate Ms. Gordon after it took her property.

5.      Plaintiff Demarcus Harvey is the adult son of Plaintiff Eli Harvey. On or about July 22, 2022, Eli and Demarcus Harvey purchased the house at 9346 Auburn Street in Detroit. On or about December 10, 2022, less than five months after the Harveys bought their new house, the Detroit Land Bank Authority placed

a poster on the Auburn Street house directing the property owner to contact the Detroit Land Bank Authority. The Harveys called the phone number on the poster and were placed in contact with Leor Barak, an in-house attorney employed by the Detroit Land Bank Authority. Mr. Barak pressured the Harveys to sign a contract that would have given the Detroit Land Bank Authority the right to confiscate their home if the Harveys failed to renovate it to the Detroit Land Bank Authority's satisfaction within 180 days. The Harveys refused to sign the document, but on or about April 26, 2024, their house was nevertheless taken from them for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 9346 Auburn Street and has not listed it for sale. The Detroit Land Bank Authority did not compensate the Harveys after it took their house.

6.     Plaintiff Morgan, Tate, & Brewer LLC is an Oklahoma limited liability company that owned the house at 1421 Webb Street in Detroit, Michigan. The house at 1421 Webb was taken from Morgan, Tate, & Brewer LLC for no consideration through the Detroit Land Bank Authority's NAP program. On December 14, 2018, the Detroit Land Bank Authority sold the house at 1421 Webb Street to an Alabama-based investor for $12,000.00. The Detroit Land Bank

Authority retained 100% of the proceeds from the sale of 1421 Webb Street for itself, and paid nothing to Morgan, Tate & Brewer LLC for its property.

7.     Plaintiff Sheila Todd owned the house at 961 East Savannah Street in Detroit, Michigan. Ms. Todd's house was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. On August 15, 2024, the Detroit Land Bank Authority sold Ms. Todd's house via an online auction for $2,100.00. The Detroit Land Bank Authority retained 100% of the proceeds from the sale of 961 East Savannah Street for itself, and paid nothing to Ms. Todd for her property.

8.     Plaintiff Darin McLesky owned the house at 14128 Orleans Street in Detroit, Michigan. On or about June 28, 2024, Mr. McLesky's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 14128 Orleans St. and has not listed it for sale. The Detroit Land Bank Authority did not compensate Mr. McLesky after it took his property.

9.     Plaintiff Clarence Day owned the house at 5163 Garland Street in Detroit, Michigan. On or about June 14, 2024, Mr. Day's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 5163 Garland St.

and has not listed it for sale. The Detroit Land Bank Authority did not compensate Mr. Day after it took his property.

10.   Plaintiff Christopher Feala owned the house at 4428 Harding Street in Detroit, Michigan. On or about January 23, 2024, Mr. Feala's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 4428 Harding St. and has not listed it for sale. The Detroit Land Bank Authority did not compensate Mr. Feala after it took his property.

11.   Defendant City of Detroit is a Michigan municipal corporation that acted and continues to act under color of state law at all relevant times.

12.   Defendant Detroit Land Bank Authority is a public body corporate formed by the City of Detroit as a local land bank fast track authority pursuant to the Land Bank Fast Track Act, MCL § 124.751 *et. seq*. The Detroit Land Bank Authority acted and continues to act under color of state law at all relevant times.

## Jurisdiction and Venue

13.   Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

14.   Defendants have their principal places of business in the Eastern District of Michigan and are subject to the Court's personal jurisdiction.

15.     A substantial part of the events and omissions giving rise to these claims occurred in Wayne County, in the Eastern District of Michigan.

16.     Venue in this District is proper per 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## The Nuisance Abatement Program

17.     Since March of 2014, the Detroit Land Bank Authority ("DLBA") and Mike Duggan have filed hundreds of identical lawsuits against thousands of owners of homes in the City of Detroit that they believe to be unoccupied. Each of these lawsuits names as defendants approximately ten to twenty owners of single-family or duplex residential properties. The defendants typically have no relationship to each other; each Defendant owns a separate house. The lawsuits contain identical boilerplate allegations that every one of the defendants' houses is both a common-law public nuisance and a statutory public nuisance per MCL § 600.3801, Michigan's nuisance-abatement forfeiture statute.

18.     This campaign of mass litigation is known as the DLBA's "Nuisance Abatement Program," or "NAP." The Nuisance Abatement Program is based on a similar Wayne County program run by Mike Duggan in the early 2000s, when Mike Duggan was the Wayne County Prosecutor. The standard complaint used in the NAP program is based off of the complaint used in Duggan's earlier Wayne

County program, and large portions of the pleadings used in the current program are verbatim identical to portions of the pleadings used in the earlier Wayne County program.

19.     On information and belief, despite a decade of litigation against thousands of defendants through the NAP program, not one lawsuit filed by Duggan and the DLBA against any Detroit homeowner has ever proceeded to a trial on the merits. The vast majority of these cases remain pending for years without the assignment of a trial date, or even entry of a scheduling order.

20.     Rather than litigating any of the thousands of claims they file, the DLBA and Duggan pursue one of two outcomes. For defendants who do not timely respond to the complaint, the plaintiffs seek default judgments transferring title to the defendants' properties to the DLBA for no consideration.

21.     When a defendant timely responds to the complaint, a DLBA staff attorney attempts to pressure the defendant to sign a standard settlement agreement compelling the defendant to renovate their home within 180 days. The form settlement agreement provides that if the homeowner fails to renovate their house to the DLBA's satisfaction in 180 days, the DLBA is granted a contractual right to confiscate the home.

22.    If a defendant does not agree to sign the settlement agreement, the Court will schedule a "sua sponte" pretrial hearing at which the defendant is pressured to sign the agreement. If the defendant does not appear at the pretrial, a default is entered and the house is taken. If the defendant appears but refuses to sign, the pretrial hearing is adjourned to a new date, when the defendant will again be pressured to sign the settlement agreement. If the defendant again appears and still refuses to sign, the pretrial will be adjourned again. This process can be repeated indefinitely.

23.    The DLBA typically stops prosecuting, or voluntarily dismisses, their claims against defendants who timely answer its complaint, appear at three pretrials, and consistently refuse to sign the settlement agreement. By abandoning or dismissing their claims against any defendant who answers the complaint and steadfastly refuses to settle, the DLBA is able to continue fishing for default judgments[1] without exposing the legal theories underlying its Nuisance Abatement Program to appellate review.

---

1  On occasion, after voluntarily dismissing its claims against a defendant who timely answers the complaint and refuses to settle, the DLBA will file a new, identical lawsuit against the same defendant regarding the same property. Property owners are often served via alternate service orders permitting service by posting the complaint in three public buildings in downtown Detroit (the Frank Murphy Hall of Justice at 1441 St. Antoine St., the Coleman A. Young Municipal Center at 2 Woodward Ave., and the post office at 1401 W Fort St.), so even after one NAP lawsuit has terminated in their favor, owners of unoccupied Detroit houses must continue to maintain constant vigilance to avoid being defaulted.

24.     Under its standard settlement agreement, if the DLBA is unsatisfied with the owner's efforts to renovate the property and chooses to exercise its right to take title, the DLBA has no duty to compensate the owner, either for the land itself, or for any improvements or repairs the owner has made subsequent to signing the settlement agreement in an attempt to satisfy the DLBA.

25.     The vast majority of defendants in the NAP program are not represented by counsel. Many are low-income Detroiters who have inherited modest, low-value homes that they cannot obtain financing to renovate. Financing is generally unavailable to these owners, either because their credit scores and/or incomes are too low, because they lack a track record of success as real estate developers, or because their properties are located in neighborhoods with weak real-estate markets where home values are not high enough to provide an institutional lender with sufficient collateral. Often, the cost of renovation exceeds the expected after-renovation value of the home, making the projects prohibitively high-risk for institutional lenders.

26.     The DLBA and Mike Duggan also prevent the NAP defendants from either cashing out their equity by selling their homes, or borrowing against their homes to finance renovations, because in every case, the DLBA and Mike Duggan also seek and obtain an ex-parte order preventing every defendant from transferring or

encumbering their house during the pendency of the NAP lawsuit. These orders are always entered before the defendants are served with the NAP lawsuit.

27.    Unfortunately, many unrepresented homeowners give in to the pressure to sign the DLBA's form settlement agreement, committing themselves to undertake major renovation projects that they cannot afford in an effort to avoid losing their houses. These settling defendants often expend thousands of dollars of their limited resources in a futile effort to avoid the loss of their houses, only to have their property and the improvements they have made to it confiscated once they deplete their savings and lack the money to continue renovation work.

28.    While over 1,300 Detroit property owners have suffered devastating losses of their houses (and often their personal or retirement savings) as a result of the Nuisance Abatement Program, the DLBA has reaped a windfall. After it seizes the homes, the DLBA does not "abate the nuisance" by making any repairs or improvements to the properties.[2] Instead, it sells the confiscated houses, in "as-is"

---

[2]  With one limited exception: City of Detroit hired contractors to renovate sixteen of the confiscated homes using funds it received from the Canadian government as part of a complex deal to construct a new international bridge between the United States and Canada. After each renovation was complete, the DLBA sold the home, for $1, to the owner of a residential property in Detroit's Delray neighborhood. The U.S. side of the new international bridge, including the U.S. customs plaza and the new interchange with I-75, will be located in Delray. In exchange for the opportunity to buy a freshly-renovated home in another part of Detroit from the DLBA for $1, the Delray property owners transferred their Delray real estate to the City of Detroit.

condition, to private buyers. Through the end of 2024, the DLBA has sold at least four hundred and fifty one homes it acquired through the Nuisance Abatement Program. The average sales price of a NAP home was approximately $11,348.54, and the total sales revenue that DLBA generated from these transactions was approximately $5,118,193.00. (**Ex. 1**: Table of Properties Taken by DLBA via NAP and Resold to Private Buyers).

29.     The DLBA has actually generated more than $5.1 million in revenue via sales of homes it confiscated through NAP, because each sale that DLBA makes to a private buyer triggers a statutory entitlement to 50% of the property taxes paid by the new owner in the subsequent five-year period. MCL § 211.1025(4)(b); MCL § 211.7gg. For lower-valued properties, the DLBA's 50% cut of future property tax proceeds can constitute the majority of the revenue it generates from the transaction.

30.     $5.1 million is also an understatement of the total home equity that the DLBA has confiscated from Detroit property owners. The DLBA generally allows the properties it seizes to sit vacant and continue deteriorating for several years before it sells them, so it is always holding a large backlog of unsold, unlisted NAP-sourced inventory. The DLBA has sold less than half of the houses it has acquired through NAP, and it currently possesses hundreds of these homes.

31.     In response to a July 2024 request for information from Detroit City Council Member Mary Waters, the DLBA disclosed that it had confiscated at total of 1,309 houses through NAP as of July 2024. (**Ex. 2**). If the average value of the confiscated, but currently unsold, NAP-acquired houses matches the average sale price ($11,348.54) of the four hundred and fifty one NAP-acquired houses that the DLBA has sold to date, the total value of the 1309 houses that the DLBA has taken via the Nuisance Abatement Program is approximately $14,855,238.86.

32.     If the City of Detroit's tax assessments are assumed to be accurate, the total value of the real estate taken via the Nuisance Abatement Program is considerably higher than $14.8 million. Per the City of Detroit's 2022, 2023, and 2024 tax assessments, the aggregate market value of the 368 houses the DLBA has taken since 2022 and is presently holding in its inventory is not less than $14,210,150.00. (**Ex. 3**- Table of Properties Taken 2022-2025 and Held in DLBA Inventory). Adding the value of the unsold post-2021 acquisitions to the $5,101,693.00 of sales revenue generated via dispositions of NAP properties to date yields at least $19,311,853.00 in value captured from Detroit property owners over the course of the program, before even considering the value of approximately 490 houses taken prior to 2022 that the DLBA has not yet sold.

**The overwhelming majority of NAP takings are not civil forfeitures**

33.    In his statements to the media announcing the program in 2014, Mike Duggan said, "we're going to sue the owner of every single abandoned house," adding, "either you can fix it up, or the city will seize the property and get it into the hands of someone who will." At the time that he made these statements, Mike Duggan was the Mayor of the City of Detroit.

34.    In the course of operating the program, the DLBA placed posters on targeted homes, which read as follows:



35.    Duggan and the DLBA name the parcels of real property themselves as defendants in their NAP lawsuits, in addition to naming the owners, in the style of an *in rem* civil forfeiture proceeding. They also bring claims under MCL § 600.3801, which "is a forfeiture statute." *Mobley v. City of Detroit,* 938 F. Supp. 2d 669, 681 (E.D. Mich. 2012); *see also, Ingram v. Wayne County,* 81 F.4th 603, 607 (6th Cir. 2023).

36.    Yet while the DLBA openly threatens property owners with "seizure" of their houses, proceeds *in rem* against the property, and bring their claims under a forfeiture statute, the DLBA denies that its NAP actions are civil forfeiture actions. (**Ex. 4**- Response to Request to Admit #3, pg. 4).

37. In Michigan, "civil asset-forfeiture cases are unique because the government must prove that the asset to be forfeited is the product of a crime or was used to further a criminal act." *Long Lake Twp. v. Maxon*, 2024 Mich. LEXIS 841 at *25. A violation of a municipal nuisance or zoning ordinance is not a criminal act, *see Id.* at *26, and Michigan's nuisance forfeiture statute does not permit forfeiture of any property used in the maintenance of any public nuisance. Instead, the statute limits the forfeiture remedy to a specific set of activities that constitute both public nuisances and crimes.

38.     Michigan's nuisance forfeiture statute provides that, "if the plaintiff seeks abatement of a nuisance by forfeiture," then the plaintiff "has the burden of proving by clear and convincing evidence that the vehicle, boat, aircraft, or property was used for or in furtherance of the activity or conduct that constituted the nuisance as described in section 3801." MCL § 600.3815(4).

39.     The "conduct that constituted the nuisance as described in section 3801" of the nuisance forfeiture statute is limited to seven enumerated types of criminal activity: prostitution, illegal gambling, drug trafficking, illegal manufacturing or sale of liquor, dogfighting, human trafficking, and "armed violence in connection with the unlawful use of a dangerous weapon." *See* MCL § 600.3801(1)(a)-(g).

40.     On rare occasions, the DLBA actually does have specific evidence that a house it targets through NAP "was used for or in furtherance of" one of the types of criminal activity enumerated in MCL § 600.3801(1). This special subset of NAP cases are known as "Drug House Unit" ("DHU") cases.

41.     DHU cases use a modified version of the standard NAP complaint. DHU NAP complaints have search warrant applications for the property and warrant returns showing seized contraband attached as exhibits. DHU cases are also are filed individually, against only one property per case, rather than against groups of 10-20 defendant properties as is the standard practice for regular NAP cases.

16

42.    However, DHU NAP cases comprise less than 5% of the properties targeted by the Nuisance Abatement Program. In the first quarter of the DLBA's 2025 fiscal year, of the 150 houses targeted by the DLBA through NAP, only six were DHU houses. In the fourth quarter of the DLBA's 2024 fiscal year, of the eighty-eight houses targeted by the DLBA through NAP, only one was a DHU house. In the third quarter of 2024, only 3 out of 372 houses targeted that quarter were DHU houses. (**Ex. 5**; **Ex. 6**; **Ex. 7**).

43.    The overwhelming majority of NAP-targeted properties are selected for inclusion in the program not because of any evidence of criminal activity, but rather based on data collected in citywide "blight surveys" that are commissioned by the DLBA and/or the City of Detroit.

44.    During the blight surveys, field surveyors visit and photograph thousands of residential properties that the DLBA believes to be unoccupied. For each house, office-based DLBA staff then review the photographs and any notes submitted by the field surveyor. The office staff then decide whether the house should be classified as "blighted," and, if so, whether it should be demolished, referred for code enforcement activities, i.e., "blight tickets," or placed in NAP.

45.    The DLBA office staff who determine whether to refer houses from the citywide blight surveys to the Nuisance Abatement Program make those

determinations without any information about the interior condition of the houses, and without any information about whether each house is "being used for or in furtherance of" any of the criminal conduct described in MCL § 600.3801.

46.    On information and belief, after the DLBA's legal department receives a batch of NAP referrals from a blight survey, their post-referral, pre-filing investigations of non-DHU, NAP-candidate houses are limited to, a) title searches and TLOxp[3] searches to identify owners/leinholders their addresses for service, and b) a single visit to the house by a DLBA contractor.

47.    During the contractor's visit, the contractor takes photographs of all four sides of the house, completes a "visual inspection affidavit," which is a form affidavit with check-marks for various property maintenance code violations, and affixes a poster to the house threatening the owner with an impending seizure action. These contractors are instructed to affix the poster regardless of whether they identify any property maintenance code violations. The only circumstance in which the contractors are told not to affix the poster is when they are able to confirm that the house is occupied.

_____

3   TLOxp is a skip-tracing database product sold by Transunion, one of the three major credit reporting agencies.

48.   On information and belief, once the house has been "postered," if no one calls the DLBA regarding the house, the DLBA includes the property and its owner in a NAP lawsuit with no further investigation.

49.   The visual inspection affidavits completed by the DLBA's postering contractors are attached as exhibits to the DLBA's NAP complaints. A comparison of several of these visual inspection affidavits reveals that the DLBA lacks any coherent, discernible criteria for when it considers a vacant house to be "blighted;" Detroit property owners appear to be at risk of being targeted by NAP no matter what they do with their property.

50.   For example, the DLBA will allege that a home is blighted because the doors and windows are sealed with plywood. (**Ex. 8**; **Ex. 9**; **Ex. 10**). But when a house is professionally sealed with steel panels, the DLBA will still sue the owner. (**Ex. 11**). An immaculately-maintained property with intact doors and windows, that is not sealed with boards or steel panels, where the only code violation the DLBA's inspector identified was, "failure to clear snow," similarly warranted a nuisance abatement lawsuit. (**Ex. 12**; **Ex. 13**). Yet clearing the snow is not enough either: as demonstrated by the photograph of 2215 Edison Street attached to the NAP complaint seeking title to that property, the owner of a well-maintained home cannot avoid a lawsuit by ensuring that their walk has been shoveled on the date

the DLBA's investigator visits. (**Ex. 14**). The DLBA will even file a NAP suit when their investigator writes "work in prog," and the photographs clearly demonstrate that the owner is renovating the home. (**Ex. 15**).

51.    On numerous occasions, the DLBA has sued property owners where "vacant" is the only alleged defect that their investigator observed at the property. (**Ex. 11**, **Ex. 16**, **Ex. 17**).

52.    It is not a violation of any Detroit municipal ordinance for a house in Detroit to be vacant. The City of Detroit requires registration of houses that will remain vacant for an extended period of time, and provides that the owner must schedule, and pass, an exterior-only inspection once a year. The maximum fine for failing to register a vacant house is $250 for a first offense, rising to $500 for a third or subsequent offense.

53.    On information and belief, the DLBA does not check whether a vacant house has been registered as vacant or passed an exterior inspection in compliance with the vacant property registration ordinance prior to initiating a NAP lawsuit against the property owner.

54.    The DLBA admits that it pursues NAP actions against owners of vacant property regardless of whether or not the owner has complied with Detroit's vacant

property registration ordinance. As the DLBA has previously represented to this court:

> "there is no requirement that a property be registered as vacant with BSEED before the DLBA may initiate a nuisance abatement action. **Nor does a property being registered as vacant affect whether the DLBA will begin nuisance abatement proceedings against a property.**"

> **Ex. 18**, pg. 5, n.2 (emphasis added).

55.    On information and belief, at no point in its process does the DLBA conduct any pre-filing investigation into whether individual non-DHU houses that are included in its NAP lawsuits are being used for any of the illegal activities enumerated in MCL § 600.3801(1), and it files each non-DHU NAP lawsuit without having any knowledge of which the approximately 10-20 defendant properties in the lawsuit, if any, are being used for criminal activity.


### A February 7, 2014 Detroit City Council Resolution is the moving force behind the DLBA's Nuisance-Abatement Program

56.    Michigan's nuisance forfeiture statute, MCL § 600.3801 *et. seq.,* requires local governmental entities that engage in seizure and forfeiture activities under the nuisance statute to "report all seizure and forfeiture activities under this chapter to the department of state police as required under the uniform forfeiture reporting

act." MCL § 600.3841(1). Local governments are further required to remit the excess proceeds from the sale of forfeited property "to the state treasurer to be credited to the general fund of this state." MCL § 600.3825(3)(d).

57.    On information and belief, the DLBA and the City of Detroit do not report any seizure and forfeiture activities under the Nuisance Abatement Program to the department of state police, and they do not remit any proceeds from the sale of NAP-acquired property to the state treasurer.

58.    Michigan's nuisance forfeiture statute, MCL § 600.3801 *et. seq.,* does not even authorize forfeitures of real property. Whenever the statute mentions forfeiture, it explicitly refers to personal property. *See* MCL 600.3815(d) ("forfeiture or sale of a vehicle, boat, aircraft, or other personal property"); MCL 600.3825(3) ("[o]n the sale of any furniture, fixtures, contents, vehicle, boat, or aircraft as provided in this section,"); MCL 600.3830(1) ("For removing and selling the movable property,"); MCL 600.3835 (describing distribution of, "[t]he proceeds of the sale of personal property"). The statute does not set forth any procedures for the forfeiture or sale of real property, or provide any guidance as to how the proceeds from the sale of forfeited real estate are to be distributed. The remedy that the statute provides for public nuisances on real property is padlocking the building, "for a period of 1 year, unless sooner released as provided in this

chapter." MCL 600.3825(1)(c). "Padlocking is not forfeiture: it involves no loss of title." *Rental Prop. Owners Ass'n v. City of Grand Rapids*, 455 Mich. 246, 264 (1997).

59.     In addition to denying that its NAP actions are forfeiture actions, the DLBA disclaims reliance on the nuisance forfeiture statute to take title to land through the Nuisance Abatement Program. Instead, the DLBA takes the position that:

> "because each property has been adjudicated to be a common-law public nuisance, **the DLBA need not rely on the nuisance abatement statute to take title**, and reporting requirements that apply to property taken under the statute, such as those imposed by MCL 600.3841, do not apply to the DLBA."

**Ex. 19**, pg. 8, n.2 (emphasis added).

60.     However, state law does not provide for the direct seizure of land from a defendant as an available remedy in a common-law public nuisance action. The remedies available to a prevailing plaintiff in a common-law public nuisance action are set forth in another Michigan statute, MCL § 600.2940.

61.     MCL § 600.2940 provides that abatement of common-law public nuisances shall be carried out by an officer, pursuant to a warrant, although the court may grant the defendant property owner an opportunity to abate the nuisance on his land himself if he posts a bond. *See* MCL § 600.2940(3). If the defendant does not post a bond, then the expenses of abatement may only be recovered from the

defendant landowner via the collection procedures set forth in Chapter 60 of the Revised Judicature Act, MCL 600.6001 et seq. *See Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. 251, 283 (2008).

62.    Chapter 60 of the Revised Judicature Act, among other things, prohibits plaintiffs from executing against a defendant's land without first attempting to execute against the defendant's personal property, *see* MCL § 600.6004; *Kircher*, 281 Mich. App. at 283, **and requires any excess proceeds of a judicial sale of Defendant's real property to be paid to the defendant, rather than retained by the plaintiff.** *See* MCL § 600.6044; *Kircher*, 281 Mich. App. at 285 n.13.

63.    Given that the DLBA disclaims reliance on the nuisance forfeiture statute, MCL §§ 600.3801-600.3841, and state law restricts the methods available for recovering abatement expenses in a common-law public nuisance action to the collection procedures set forth in Chapter 60 of the Revised Judicature Act, the only potential legal basis for the DLBA's practice of seizing allegedly "blighted" real property without compensating the owner, thereafter selling the property, and keeping all of the sales proceeds for itself is a Detroit City Council resolution approved on February 7, 2014. (**Ex. 20**).

64.    The February 7, 2014 Detroit City Council resolution authorizes the Detroit Land Bank Authority to exercise the City's power to bring public nuisance actions

24

against local property owners. The resolution provides that, "[i]n the event that the outcome of the legal proceedings is in favor of the Detroit Land Bank, title shall vest with the Detroit Land Bank." (**Ex. 20**, ¶ 4).

65.    The February 7, 2014 Detroit City Council resolution also provides:

"The Detroit Land Bank shall be entitled to retain any and all proceeds from the disposition or abatement of the properties that were acquired by the Detroit Land Bank through the nuisance abatement proceedings."

(**Ex. 20**, ¶ 5).

## The February 7, 2014 Detroit City Council Resolution authorizing the DLBA's Nuisance Abatement Program is facially unconstitutional

66.    The Takings Clause of the Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V.

67.    The Takings Clause prohibits state and local governments from taking private property for other than a public purpose, regardless of whether the property owner is compensated. *See Haw. Hous. Auth. v. Midkiff,* 467 U.S. 229, 241 (1984). If a taking is for a public purpose, the Takings Clause "imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021).

68.    It is not unconstitutional for a municipality to take land from private owners for the purpose of eradicating urban blight. *See, e.g. Berman v. Parker,* 348 U.S. 26, 33-36 (1954). The eradication of blight is unquestionably a "public purpose" under the Fifth Amendment, for which government entities may exercise their power to take land from private owners, provided they tender just compensation. *See Kelo v. City of New London,* 545 U.S. 469, 484 n.13 (2005).

69.    The February 7, 2014 Detroit City Council Resolution is facially unconstitutional because it authorizes the DLBA to take title to land from private landowners for the public purpose of eradicating blight, to sell the land it acquires, and retain the sale proceeds for itself, all while never compensating the former landowner. Taking title to property without paying compensation at the time of the taking or shortly thereafter violates the Takings Clause. *See Horne v. Dep't of Agric.,* 576 U.S. 351, 361-62 (2015). Selling the confiscated land and then retaining the sales proceeds, rather than turning the proceeds over to the former owner, also violates the Takings Clause. *See Tyler v. Hennepin County,* 598 U.S. 631, 638-39 (2023).

70.    In the alternative, if the Court finds that the DLBA's takings of property under the NAP program amount to civil forfeitures, despite the DLBA's denials that its NAP program is a civil forfeiture program, then the February 7, 2014

Detroit City Council Resolution is facially unconstitutional because it authorizes excessive fines in violation of the Eighth Amendment to the United States Constitution.

71.    The Excessive Fines Clause of the Eighth Amendment is incorporated against States and municipal governments through the Due Process Clause of the Fourteenth Amendment. *See Timbs v. Indiana*, 139 S. Ct. 682 (2019).

72.    The Excessive Fines Clause of the Eighth Amendment "limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.'" *Austin v. United States*, 509 U.S. 602, 609-10 (1993). A punitive forfeiture "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

73.    Many of the property maintenance code violations cited in the DLBA's visual inspection affidavits are minor and punishable only by small fines. For example, the fine for allowing weeds or plant growth in excess of eight inches in height, Ordinance 8-15-104, is $80. The fine for "failure to clear snow" at a one or two-family dwelling, Ordinance 8-15-104, is $50. Even the fine for "failure to maintain a vacant building or structure in accordance with the requirements

of Section 8-15-113 of this Code," for a one or two-family dwelling, is only $500;

this is less than 5% of the average sale price of the houses expropriated via NAP.

74.    Forfeiture of a person's house merely because the house is vacant, or

because the person has committed a municipal civil infraction by failing to comply

with a local property maintenance ordinance, is a grossly disproportionate

punishment given the gravity of the homeowner's offense.

### Class Action Allegations

75.    Plaintiffs bring this action on their own behalf and on behalf of the following

Classes and Subclasses pursuant to Federal Rules of Civil Procedure 23(a), (b)(2),

(b)(3) and/or (c)(4):

76.    **Class Definition.** Plaintiffs bring this claim for damages, equitable relief and

disgorgement, on behalf of a class of former owners of real estate in Detroit. The

Class shall be defined as former owners of real estate in the City of Detroit who

meet each of the following criteria:

a) had their real property transferred to the Detroit Land Bank Authority as a
result of a nuisance-abatement lawsuit brought by DLBA and Mike Duggan,
either i) within six years and 101 days prior to the filing of this Complaint, *or*
ii) at any time since February 7 of 2014, *and* their former property was then
sold by the DLBA within six years and 101 days prior to the filing of this
Complaint;

b) whose real property was never included in DLBA's "Drug House Unit"
(DHU) program;

c) who did not sign any pre-litigation or post-litigation settlement agreement or stipulated dismissal agreement with DLBA or cause a deed to be recorded conveying their interest in the property to the DLBA;

d) any residential structure on their former property was not demolished while the property was owned by the DLBA;

e) whose property has not been returned to the former owner by the DLBA;

f) who have not received compensation from the DLBA or the City of Detroit for their property, and have not received any portion of the proceeds from any subsequent sale of their property by the DLBA.

77.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), and, as applicable, (c)(4) and (c)(5), Plaintiffs seek certification in the alternative of the following separate Subclasses, defined as follows:

"**Fifth-Amendment Auction-Proceeds Subclass**" means members of the Class whose real property was sold by DLBA to a third party within three years prior to the date this Complaint was filed, through one of the following DLBA sales programs: "Own-It-Now" or "Auction."

"**Unjust Enrichment Subclass**" means members of the Class whose real property was sold to a third party, for a price greater than $500, by the DLBA within six years and 101 days prior to the date this Complaint was filed.

**"Fifth Amendment Equity Subclass"** means members of the Class for whom both of the following apply:

> a) had their real property transferred to the Detroit Land Bank Authority as a result of a default judgment in a nuisance-abatement lawsuit brought by DLBA and Mike Duggan within three years prior to the date of filing of this Complaint;

> b) whose real property has not been sold or transferred by the DLBA, *or* was sold for a price of $1 to a Delray property owner in exchange for that purchaser conveying real estate in Detroit's Delray neighborhood to the City of Detroit.

**"Michigan Constitutional Takings Equity Subclass"** means members of the Class for whom both of the following apply:

> a) had their real property transferred to the Detroit Land Bank Authority as a result of a nuisance-abatement lawsuit brought by DLBA and Mike Duggan within six years and 101 days prior to the date of filing of this Complaint;

> b) whose real property has not been sold or transferred by the DLBA since the date of its acquisition by the DLBA, *or* was sold for a price of $1 to a Delray property owner in exchange for that purchaser conveying real estate in Detroit's Delray neighborhood to the City of Detroit.

Excluded from the Class and these Subclasses are the Detroit Land Bank Authority, the City of Detroit, any of their respective officers, directors, or employees, the judicial officers and their immediate family members, and Court staff assigned to

this case. Plaintiffs reserve the right to modify or amend the Class Definitions, as appropriate, during the course of this litigation.

## Numerosity

78.   Plaintiffs have been able to identify substantially all of affected residential properties that fall into each class by cross-referencing various DLBA sales data from Detroit's Open Data Portal[4] with a dataset that the DLBA produced in response to a request from Detroit City Counsel Member Mary Waters (**Ex. 2**). The Class consists of the owners of approximately 635 houses, excluding any owners who signed settlement agreements with the DLBA, and any owners whose houses were seized through the DLBA's Drug House Unit ("DHU") program. Per the data in the DLBA's quarterly reports, DHU properties should amount to less than 2% of the affected properties.

79.   Plaintiffs have been able to identify 367 properties whose former owners are likely to be members of the Fifth Amendment Equity Subclass, 387 properties whose former owners are likely to be members of the Michigan Constitutional Equity Subclass, 37 properties whose former owners are likely to be members of the Fifth Amendment Auction Proceeds Subclass, and 248 properties whose former owners are likely to be members of the Unjust Enrichment Subclass. All properties whose former owners fall within the Fifth Amendment Auction Proceeds Subclass

---

4   Available at: https://data.detroitmi.gov/

will also fall into the Unjust Enrichment Subclass. All properties whose former owners fall within the Fifth Amendment Equity Subclass will also fall within the Michigan Constitutional Equity Subclass.

80.    The number of current members of each subclass is expected to be higher than the number of affected properties, given that it is common for multiple persons to share ownership of a single-family residential property. The sizes of all four classes are also expected to grow over the pendency of this litigation, as the DLBA continues to take houses via its NAP program, and continues to sell the expropriated houses in its inventory without remitting the sales proceeds to the former owners.

81.    Given the accessible and available public data, Plaintiffs have been able to identify the residential properties affected by Defendants' program, rather than the individual former owners of those properties. Identifying the former owners requires a paid title search for each affected property. The class members will be readily identifiable from Defendant DLBA's records, because the DLBA, a) completes title searches for each property in its Nuisance Abatement Program prior to filing suit, b) possesses records of which properties were part of the Drug House Unit program, and c) possesses records of all settlement agreements it entered into with the property owners that it sued.

## Commonality and Predominance

82. As to each Class and Subclass, this action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. The answers to questions common to the Class will drive the resolution of this litigation. Specifically, the common questions include:

a) Whether the Takings Clause of the Fifth Amendment to the United States Constitution is violated when the government takes title to blighted real property without thereafter compensating the owner;

b) Whether the Takings Clause of the Fifth Amendment to the United States Constitution is violated when the government sells blighted real property that it has taken without compensating the owner, and retains all of the sale proceeds for itself;

c) Whether the Detroit Land Bank Authority's Nuisance Abatement Program is a civil forfeiture program, such that its seizures of privately-owned houses under the program constitute "punishment" for purposes of the Excessive Fines Clause of the Eighth Amendment;

d) Whether the Excessive Fines Clause of the Eighth Amendment prohibits seizure of a house as punishment for a municipal civil infraction;

e) Whether a February 7, 2014 Resolution passed by the Detroit City Council was the moving force behind the DLBA's violations of the Class Members' constitutional rights, such that the City of Detroit is liable for the DLBA's conduct;

f) Whether Article I, § 16 of the Constitution of Michigan is violated when the government seizes a house as punishment for a municipal civil infraction;

g) Whether Article X, § 2 of the Constitution of Michigan is violated when the government takes real property "for the eradication of blight" without compensating the property owner;

h) If the government sells property that has been taken without compensation in violation of Article X, § 2 of the Constitution of Michigan via a process other than a public auction, whether the proper measure of damages is the sale proceeds actually received and retained by the government, or the fair-market value of the property on the date of the taking;

i) Whether the Detroit Land Bank Authority was unjustly enriched when it retained the proceeds from the sales of real estate it seized under its Nuisance Abatement Program.

83. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** As to the Class and Subclasses, Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way. Each Plaintiff suffered an uncompensated seizure of their residential real estate in the City of Detroit through the DLBA's Nuisance Abatement Program, and each Plaintiff seeks to be compensated for the government's taking of their house. Plaintiffs' damages and injuries are akin to those of other Class Members and Plaintiffs seek relief consistent with the relief of the Class.

84. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against the City of Detroit and the Detroit Land Bank Authority to obtain

relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs'

Counsel are competent and experienced in complex civil-rights litigation and in

Michigan public-nuisance litigation. Plaintiffs' counsel have dedicated substantial

resources to investigating the DLBA's Nuisance Abatement Program, intend to

vigorously prosecute this case, and will fairly and adequately protect the Class's

interests.

85.    **Predominance & Superiority: Federal Rule of Civil Procedure 23(b)(3).**

Consistent with Rule 23(b)(3), a class action is superior to any other available

means for the fair and efficient adjudication of this controversy, and no unusual

difficulties are likely to be encountered in the management of this class action.

Common issues in this litigation also predominate over individual issues because

those issues discussed in the above paragraph on commonality are more important

to the resolution of this litigation than any individual issues. The purpose of the

class action mechanism is to permit litigation against wrongdoers even when

damages to individual plaintiffs may not be sufficient to justify individual

litigation. Here, the damages suffered by Plaintiffs and the Class are relatively

small compared to the burden and expense required to individually litigate their

claims against the DLBA and the City of Detroit.

86.    For example, in the Fifth Amendment Auction Proceeds Subclass, the average winning bid to purchase a seized property at public auction was only $16,233.78. While sixteen thousand dollars is undoubtedly a significant sum for many of the hundreds of low-income Detroiters whose houses were confiscated through the DLBA's program, it is a relatively modest potential recovery compared to the cost of litigating the complex legal questions at issue in this case. Given the potential damages sustained by each Class Member, individual litigation to redress the Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

87.    **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for the DLBA, or would be dispositive of the interests of members of the proposed Class.

36

88.   **Ascertainability.** The Class and Subclasses are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. The Class and Subclasses consist of the titleholders of 635 identified parcels of real estate on the dates that the properties were taken from their owners through the DLBA's Nuisance Abatement Program (less certain categories of excluded owners, such as those who signed settlement agreements with the DLBA). Because the DLBA conducts title searches on each property included in the Nuisance Abatement Program prior to filing suit, the members of the Class and all Subclasses can be readily ascertained from the DLBA's own records.

## Count I: § 1983 Uncompensated Taking of Property in Violation of the Takings Clause of the Fifth Amendment to the United States Constitution (Fifth Amendment Equity Subclass and Auction Proceeds Subclass against All Defendants)

89.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

90.   Plaintiffs bring this claim individually and on behalf of the other members of the Fifth Amendment Equity Subclass and the Fifth Amendment Auction Proceeds Subclass.

91.    From February of 2014 to the present, Defendant DLBA has operated and continues to operate its Nuisance Abatement Program, which transfers title to privately-owned residential properties in the City of Detroit to the DLBA, because the properties are allegedly vacant and blighted and for the purpose of eradicating blight.

92.    On or about December 5, 2014, Defendant DLBA took title to Plaintiff Walter Ritter's house at 8189 Bliss Avenue via its Nuisance Abatement Program, because the house at 8189 Bliss Avenue was allegedly vacant and blighted.

93.    After taking title, Defendant DLBA did not renovate or demolish the house at 8189 Bliss Avenue. Instead, Defendant DLBA left the house at 8189 Bliss Avenue to sit vacant and continue deteriorating for nearly ten years.

94.    On or about September 30, 2024, Defendant DLBA sold the house at 8189 Bliss Avenue via an online auction for $16,500.00.

95.    Defendant DLBA kept all of the proceeds from the sale of 8189 Bliss Avenue for itself and did not remit any of the auction proceeds to Plaintiff Walter Ritter.

96.    Defendant DLBA has not compensated Plaintiff Walter Ritter for his house at 8189 Bliss Avenue.

97.   On or about May 3, 2024, Defendant DLBA took title to Plaintiff Jeannette Gordon's house at 18541 Fielding Street via its Nuisance Abatement Program, because the house at 18541 Fielding Street was allegedly vacant and blighted.

98.   Since taking title, Defendant DLBA has not renovated or demolished the house at 18541 Fielding Street, and the house at 18541 Fielding Street remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

99.   Defendant DLBA has not compensated Plaintiff Jeannette Gordon for her house at 18541 Fielding Street.

100.  On or about April 26, 2024, Defendant DLBA took title to Plaintiffs' Eli and Demarcus Harvey's house at 9346 Auburn Street via its Nuisance Abatement Program, because the house at 9346 Auburn Street was allegedly vacant and blighted.

101.  Since taking title, Defendant DLBA has not renovated or demolished the house at 9346 Auburn Street, and the house at 9346 Auburn Street remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

102.  Defendant DLBA has not compensated Plaintiff Eli Harvey or Plaintiff Demarcus Harvey for their house at 9346 Auburn Street.

103.   On or about July 17, 2014, Defendant DLBA took title to Plaintiff Sheila Todd's house at 961 E. Savannah Street via its Nuisance Abatement Program, because the house at 961 E. Savannah Street was allegedly vacant and blighted.

104.   After taking title, Defendant DLBA did not renovate or demolish the house at 961 E. Savannah Street. Instead, Defendant DLBA left the house at 961 E. Savannah Street to sit vacant and continue deteriorating for approximately ten years.

105.   On or about August 15, 2024, Defendant DLBA sold the house at 961 E. Savannah Street via an online auction for $2,100.00.

106.   Defendant DLBA kept all of the proceeds from the sale of 961 E. Savannah Street for itself and did not remit any of the auction proceeds to Plaintiff Sheila Todd.

107.   Defendant DLBA has not compensated Plaintiff Sheila Todd for her house at 961 E. Savannah Street.

108.   On or about June 28, 2024, Defendant DLBA took title to Plaintiff Darin McLeskey's house at 14128 Orleans Street via its Nuisance Abatement Program, because the house at 14128 Orleans Street was allegedly vacant and blighted.

109.   Since taking title, Defendant DLBA has not renovated or demolished the house at 14128 Orleans Street, and the house at 14128 Orleans Street remains

40

vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

110.   Defendant DLBA has not compensated Plaintiff Darin McLeskey for his house at 14128 Orleans Street.

111.   On or about June 14, 2024, Defendant DLBA took title to Plaintiff Clarence Day's house at 5163 Garland Street via its Nuisance Abatement Program, because the house at 5163 Garland Street was allegedly vacant and blighted.

112.   Since taking title, Defendant DLBA has not renovated or demolished the house at 5163 Garland Street, and the house at 5163 Garland Street remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

113.   Defendant DLBA has not compensated Plaintiff Clarence Day for his house at 5163 Garland Street.

114.   Defendant City of Detroit authorized Defendant DLBA to take title to blighted houses in Detroit, to sell them, and to retain the sales proceeds for itself in a February 7, 2014 Resolution of the Detroit City Council. The City's policy, as embodied in the February 7, 2014 Resolution, was the moving force behind the violations of the Plaintiffs' Fifth Amendment rights.

## Count II: § 1983 Violation of the Right to be Free of Excessive Fines in Violation of the Eighth Amendment to the United States Constitution (Fifth Amendment Equity Subclass and Auction Proceeds Subclass against All Defendants)

115.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

116.   Plaintiffs bring this claim individually and on behalf of the other members of the Fifth Amendment Equity Subclass and the Fifth Amendment Auction Proceeds Subclass.

117.   In the alternative, if the seizures of property effectuated through Defendant DLBA's Nuisance Abatement Program constitute punitive civil forfeitures, then they are subject to constitutional scrutiny under the Eighth Amendment's Excessive Fines Clause. *See Austin v. United States*, 509 U.S. 602, 622 (1993).

118.   In October of 1988, Plaintiff Jeannette Gordon purchased the home at 18541 Fielding Street in Detroit for $5,700.00.

119.   Ms. Gordon owned the Fielding Street home for over thirty-five years, until it was taken from her in May of 2024 via the DLBA's Nuisance Abatement Program.

120.   The City of Detroit Assessor set the assessed value of 18541 Fielding for tax year 2024 at $30,900.00. Michigan law provides that the assessed value of real

property cannot exceed 50% of the true cash value of the real property, so the City of Detroit's 2024 tax assessment for 18541 Fielding indicates that the City believed that the true cash value of the house was not less than $61,800.00 in 2024.

121.   The house at 18541 Fielding Street is a detached single-family home. Ms. Gordon allegedly committed a municipal civil infraction by failing to maintain a vacant building or structure in accordance with the requirements of Section 8-15-113 of the Detroit City Code.

122.   The applicable fine for failing to maintain a vacant building or structure in accordance with the requirements of Section 8-15-113 of the Detroit City Code, for a single-family dwelling, is $500. This is less than 1% of the City of Detroit's estimate of the true cash value of the house at 18541 Fielding.

123.   On or about May 3, 2024, to punish Ms. Gordon for committing a municipal civil infraction, Defendant DLBA took Ms. Gordon's house at 18541 Fielding.

124.   On information and belief, except for the small percentage of seized homes in the "Drug House Unit" program, the DLBA lacked any specific evidence that any of the property owners whose houses it took via the Nuisance Abatement Program had either purchased their houses with the proceeds of criminal activity, or had used their houses to commit any offense more serious than a municipal civil infraction.

125.   Forfeiture of a person's house is a grossly-disproportionate punishment for a municipal civil infraction. Municipal civil infractions are among the least serious violations of the law that it is possible to commit, and houses are typically the most valuable assets that average people own. If a local government could forfeit a person's house as punishment for offenses as minor as covering a window with a plywood board, or failing to mow the lawn, then there would be virtually no government conduct prohibited by the Excessive Fines Clause.

126.   Defendant City of Detroit expressly authorized Defendant DLBA to violate the Excessive Fines Clause via the February 7, 2014 Resolution of the Detroit City Council. The City's policy, as embodied in the February 7, 2014 Resolution, was the moving force behind the violations of the Plaintiffs' Eighth Amendment rights.

### Count III: Violation of Article X, § 2 of the Michigan Constitution via Uncompensated Taking of Real Estate for the Eradication of Blight (Michigan Constitutional Equity Subclass and Unjust Enrichment Subclass against All Defendants)

127.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

128.   Plaintiffs bring this claim individually and on behalf of the other members of the Michigan Constitutional Equity Class and the Unjust Enrichment Subclass.

44

129.   Article X, § 2 of the Constitution of Michigan of 1963 provides that "[p]rivate property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law[,]" and that, ""Public use" does not include the taking of private property for transfer to a private entity for the purpose of economic development or enhancement of tax revenues."

130.   Michigan's Constitution also provides:

In a condemnation action, the burden of proof is on the condemning authority to demonstrate, by the preponderance of the evidence, that the taking of a private property is for a public use, **unless the condemnation action involves a taking for the eradication of blight, in which case the burden of proof is on the condemning authority to demonstrate, by clear and convincing evidence, that the taking of that property is for a public use.**

Mich. Const. Art. X, § 2 (emphasis added).

131.   The Detroit Land Bank Authority took Plaintiffs' property for the purpose of eradicating blight.

132.   Municipal governments in Michigan may lawfully take title to blighted private property for the purpose of eradicating blight. *See, e.g. County of Wayne v. Hathcock,* 471 Mich. 445, 475-76 (2004). A taking of private property for the eradication of blight is a taking for a "public use" under Article X, § 2 of the Michigan Constitution.

133.   If a government entity takes private property for the purpose of eradicating blight, the Michigan Constitution requires the government entity to compensate the former owner of the property.

134.   After the Detroit Land Bank Authority took Plaintiffs' properties for the purpose of eradicating blight, it did not tender compensation to the Plaintiffs.

135.   In addition to the property rights that the Plaintiffs held in their real property at the time it was taken, Michigan recognizes an additional, separate property right in the proceeds of any subsequent sale of real property that the government has taken. *See Bowles v. Sabree,* 121 F.4th 539, 549-50 (6th Cir. 2024). The proceeds of such a sale are personal property, not real property, and belong to the former owner of the land. *Id.* at 550.

136.   After the Detroit Land Bank Authority took houses away from Plaintiffs Walter Ritter, Sheila Todd, and Morgan Tate & Brewer LLC, it sold the houses it took from these Plaintiffs for $16,500.00, $2,100.00, and $12,000.00, respectively.

137.   The Detroit Land Bank Authority kept all of the proceeds of these sales and did not remit any of the sale proceeds to Plaintiffs Walter Ritter, Sheila Todd, or Morgan Tate & Brewer LLC. For properties taken via the Nuisance Abatement Program and sold within the past six years and 101 days, the Detroit Land Bank Authority has retained for itself more than $3.4 million in sales proceeds.

46

138.    The Detroit Land Bank Authority's retention of the proceeds from the sale of Plaintiffs' and Class Members' real property violates Article X, § 2 of the Michigan Constitution.

139.    The City of Detroit expressly authorized the Detroit Land Bank Authority to violate the Michigan Constitution in this manner via a February 7, 2014 City Council Resolution. The Resolution declared a "blight emergency" in the City of Detroit, and authorized the Detroit Land Bank Authority "to retain any and all proceeds from the disposition" of real property it acquired through the Nuisance Abatement Program.

## Count IV: Violation of Article I, § 16 of the Michigan Constitution
### (Michigan Constitutional Equity Subclass and Unjust Enrichment Subclass against All Defendants)

140.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

141.    Plaintiffs bring this claim individually and on behalf of the other members of the Michigan Constitutional Equity Subclass and the Unjust Enrichment Subclass.

142.    In the alternative, if the seizures of property effectuated through Defendant DLBA's Nuisance Abatement Program constitute punitive civil forfeitures, then

they are subject to constitutional scrutiny under Article I, § 16 of the Michigan

Constitution of 1963, which provides that "excessive fines shall not be imposed."

143.   Defendants' forfeitures of Plaintiffs' houses as punishment for municipal

civil infractions violate Article I, § 16 of the Michigan Constitution of 1963 for the

same reasons that they violate the Excessive Fines Clause of the United States

Constitution, as set forth in Count II.

## Count V: Unjust Enrichment
### (Unjust Enrichment Subclass vs. Defendant DLBA)

144.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set

forth herein.

145.   Plaintiffs bring this claim individually and on behalf of the other members of

the Unjust Enrichment Subclass.

146.   The Detroit Land Bank Authority obtained a benefit, to wit: $30,600.00,

when it retained for itself the proceeds of the sales of the three houses it took from

Plaintiffs Walter Ritter, Sheila Todd, and Morgan Tate & Brewer LLC.

147.   The Detroit Land Bank Authority obtained a benefit, to wit: more than $3.4

million dollars, when it retained for itself the proceeds of the sales of several

hundred houses that it took from private owners via NAP and sold in the six years

and 101 days prior to the filing of this Complaint.

148.   The Detroit Land Bank Authority also obtained and continues to obtain an additional benefit in the form of 5/50 revenue, or 50% of the property taxes paid on a parcel for a five-year period, for the five years following each sale of a NAP-acquired property to a private owner.

149.   The Detroit Land Bank Authority received a benefit from Plaintiffs Walter Ritter, Sheila Todd, and Morgan Tate and Brewer LLC, because the three houses it sold for a total of $30,600.00 had belonged to those Plaintiffs, and the Detroit Land Bank Authority never compensated Mr. Ritter, Ms. Todd, or Morgan Tate & Brewer LLC for their real property.

150.   The Detroit Land Bank Authority received a benefit from each member of the Unjust Enrichment Subclass, because the hundreds of homes it sold for several million dollars had belonged to the members of the Unjust Enrichment Subclass, and the Detroit Land Bank Authority never compensated any of the members of the Unjust Enrichment Subclass for their real property.

151.   An inequity results to Plaintiffs Walter Ritter, Sheila Todd, Morgan Tate & Brewer LLC, and all other members of the Unjust Enrichment Subclass as a result of the retention of millions of dollars of sales proceeds by the Detroit Land Bank Authority.

**Prayer For Relief**

WHEREFORE, Plaintiffs request that judgment be entered against Defendants on all claims and request the Court order the following relief:

(a.) A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

(b.) Designation of each of Plaintiffs as a Class Representative and designation of Plaintiffs' counsel as Class Counsel;

(c.) A Declaration that the Defendants, and each of them, have violated the Fifth Amendment to the United States Constitution and Article X, § 2 of the Michigan Constitution by failing to compensate Plaintiffs for their property after taking it from Plaintiffs via the Nuisance Abatement Program;

(d.) A Declaration that the Defendants, and each of them, have violated the Fifth Amendment to the United States Constitution and Article X, § 2 of the Michigan Constitution by retaining, or authorizing the retention, of the proceeds of subsequent dispositions of real property that was taken from Plaintiffs via the Nuisance Abatement Program;

(e.) An Order requiring Defendants to pay restitution to each Class Member whose property was taken and subsequently sold to a third party, in the amount of the sales proceeds received by the Detroit Land Bank Authority for that Class

Member's former property, as well as prejudgment interest from the date of the sale;

(f.) An Order requiring Defendants to pay just compensation to each Class Member whose former property either remains in the possession of the Detroit Land Bank Authority, or whose former property was transferred to a Delray property owner for $1, in the amount of the true cash value of the property on the date it was taken as determined from the City of Detroit's tax assessment in the year of the taking, as well as prejudgment interest from the date of the taking;

(g.) An award of an incentive fee to the named Plaintiffs for having the courage to come forward and challenge the DLBA's unlawful practices;

(h.) Award the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and costs; and

(i.) Award any such other and further declaratory, injunctive, and equitable relief as the Court deems appropriate, just and proper.


Dated: February 1, 2025                          Respectfully Submitted,

                                                 */s/ Ian T. Cross*
                                                 Ian T. Cross (P83367)
                                                 Laurence H. Margolis (P69635)
                                                 Attorneys for Plaintiffs

402 W. Liberty St.
Ann Arbor, MI  48103
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

## DEMAND FOR TRIAL BY JURY

NOW COME Plaintiffs, by and through their counsel, and hereby demand a trial

by jury as to all those issues triable as of right.


Dated: February 1, 2025                              Respectfully Submitted,

                                                                    */s/ Ian T. Cross*
                                                                    Ian T. Cross (P83367)
                                                                    Laurence H. Margolis (P69635)
                                                                    Attorneys for Plaintiffs
                                                                    402 W. Liberty St.
                                                                    Ann Arbor, MI  48103
                                                                    (734) 994-9590
                                                                    larry@lawinannarbor.com
                                                                    ian@lawinannarbor.com