## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**KASSANDRA LUDINGTON,**         Case No.: 25-cv-10307
**RUBY WASHINGTON,**                Hon:  Jonathan J.C. Grey
**WARD'S HOUSE, LLC,**              Mag:  David R. Grand
**TREMAYNE TERRELL, as Personal**
**Respresentative of the Estate of Mary Terrell,**
**DARNELL JACKSON, ANDRE BAKER,**
**JEANETTE GORDON, PEGGY STARKS,**
**MORGAN TATE & BREWER LLC,**
**SHEILA TODD,  CLARENCE DAY,**
**DARIN McLESKY, and**
**CHRISTOPHER FEALA,**

        Plaintiffs,

vs.                              **JURY TRIAL DEMANDED**

**THE CITY OF DETROIT, a municipal corporation, and**
**THE DETROIT LAND BANK AUTHORITY, a public**
**body corporate,**

        Defendants.

---

## FIRST AMENDED CLASS-ACTION COMPLAINT

### Introduction

1.    As part of a crusade to eradicate urban blight, the Detroit Land Bank

Authority has operated a municipal program that, a) takes people's houses, b) sells

them, and c) keeps the money. Since its inception in 2014, this program has seized over 1,400 allegedly "blighted" homes in Detroit, sold at least 455 of them to private parties, and generated millions of dollars in sales revenue for the Detroit Land Bank Authority. None of this money has been turned over to the people whose houses were taken; in fact, the former property owners have received no compensation at all.

2.     Plaintiffs are former owners of single-family homes in Detroit whose property was taken by the defendants through the aforementioned municipal program. They seek compensation for their property under the Takings Clause of the United States Constitution, Article X, § 2 of the Michigan Constitution, and bring claims against the Detroit Land Bank Authority for common-law unjust enrichment.  They also seek to represent a class of similarly-situated Detroit property owners who lost their houses through this program and were not compensated.

**The Parties**

3.     Plaintiff Kassandra Ludington is an EMT. She purchased the house at 8205 Dexter Avenue in Detroit, Michigan in July of 2017. Ms. Ludington moved into her new home and resided there for several years while she worked on an ambulance

in Detroit. Ms. Ludington did not own any other real estate, and her house at 8205 Dexter was her primary residence.

4.      In 2022, Ms. Ludington went to Oregon to care for her ailing grandfather. Ms. Ludington's grandfather needed her help because Ms. Ludington's grandmother had recently died, leaving him without a caregiver. On June 22, 2023, while she was in Oregon, Ms. Ludington's house was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority did not compensate Ms. Ludington after it took her property.

5.      Plaintiff Ruby Washington is a U.S. Navy veteran who grew up in Detroit. Ms. Washington purchased the home at 20016 Santa Rosa Street in Detroit in 1995, and she raised her daughter there. Ms. Washington was often away from her home for extended periods due to her military service obligations. But except for a two-year period when her daughter also left Detroit to go to college, Ms. Washington's daughter, Tiquana Hill, and the father of her sister's children, Jared Bynum Sr., continued residing in her home even when Ms. Washington was away.

6.      On October 10, 2015, while Ms. Washington was in Mississippi, her house was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. On February 5, 2019, the Detroit Land Bank Authority sold the

house at 20016 Santa Rosa Street in an online auction for $7,000.00. The Detroit Land Bank Authority retained 100% of the proceeds from the sale of 20016 Santa Rosa for itself, and paid nothing to Ms. Washington for her property.

7.     Plaintiff Ward's House, LLC is a Michigan limited liability company. In October of 2017, Ward's House, LLC purchased the house at 6094 Evergreen Street in a tax foreclosure auction for $5,100.00. Ward's House, LLC made substantial improvements to the property, including replacing the collapsing roof and damaged siding on the south wall, as can be seen in the photographs below:

 

*6094 Evergreen in November of 2018        6094 Evergreen in June of 2019*

On June 5, 2019, Ward's House, LLC's property was taken from it for no consideration through the Detroit Land Bank Authority's NAP program. On January 31, 2023, the Detroit Land Bank Authority sold the house at 6094 Evergreen Street in an online auction for $25,100.00. The Detroit Land Bank Authority retained 100% of the proceeds from the sale of 6094 Evergreen for itself, and paid nothing to Ward's House, LLC for the property.

4

8.      Plaintiff Tremayne Terrell is the personal representative of the Estate of Mary Terrell. In 2009, Mary Terrell purchased the home at 17213 Forrer Street in Detroit for $7,900.00 and moved in. Mary Terrell suffered from multiple sclerosis, and by approximately 2013, Mary's disease caused her to lose the ability to walk significant distances. Mary's disease also caused lesions to develop on her brain which resulted in progressive cognitive impairment. By about 2015, Mary Terrell was forgetting who some of her family members were. Mary's children eventually determined that it was unsafe for her to live alone, so they moved her from her home at 17213 Forrer to her daughter's home a few miles away.

9.      On or about May 16, 2017, Mary's home at 17213 Forrer was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. Although she was staying with her daughter at the time, all of Mary's furniture and personal belongings were still inside her home at 17213 Forrer when it was taken.

10.      Mary Terrell died in 2018. On January 10, 2019, the Detroit Land Bank Authority sold the house at 17213 Forrer Street in an online auction for $13,750.00. The Detroit Land Bank Authority retained 100% of the proceeds from the sale of 17213 Forrer for itself, and paid nothing to Mary Terrell or to her estate for the property.

11.    Plaintiff Andre Baker purchased the house at 15891 Holmur Street in Detroit for $5,000.00 on July 9, 2021. On March 8, 2024, Mr. Baker's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 15891 Holmur. It did not compensate Mr. Baker after it took his property.

12.    Plaintiff Darnell Jackson owned the home at 14294 Roselawn Street in Detroit. On April 12, 2024, Mr. Jackson's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 14294 Roselawn. It did not compensate Mr. Jackson after it took his property.

13.    Plaintiff Jeannette Gordon is a retired nurse. Ms. Gordon moved to Detroit as a child in 1968, and she purchased the home at 18541 Fielding Street in Detroit on October 10th, 1988. Ms. Gordon owned her house on Fielding Street for over thirty-five years. On or about May 3, 2024, Ms. Gordon's house was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 18541 Fielding Street and has not listed it for sale. The Detroit Land Bank Authority did not compensate Ms. Gordon after it took her property.

14.     Plaintiff Morgan, Tate, & Brewer LLC is an Oklahoma limited liability company that owned the house at 1421 Webb Street in Detroit, Michigan. On or about December 19, 2018, the house at 1421 Webb was taken from Morgan, Tate, & Brewer LLC for no consideration through the Detroit Land Bank Authority's NAP program. On or about January 19, 2021, the Detroit Land Bank Authority sold the house at 1421 Webb Street to an Alabama-based investor for $12,000.00. The Detroit Land Bank Authority retained 100% of the proceeds from the sale of 1421 Webb Street for itself, and paid nothing to Morgan, Tate & Brewer LLC for its property.

15.     Plaintiff Sheila Todd owned the house at 961 East Savannah Street in Detroit, Michigan. Ms. Todd's house was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. On August 15, 2024, the Detroit Land Bank Authority sold Ms. Todd's house via an online auction for $2,100.00. The Detroit Land Bank Authority retained 100% of the proceeds from the sale of 961 East Savannah Street for itself, and paid nothing to Ms. Todd for her property.

16.     Plaintiff Darin McLesky owned the house at 14128 Orleans Street in Detroit, Michigan. On or about June 28, 2024, Mr. McLesky's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The

Detroit Land Bank Authority is still in possession of the house at 14128 Orleans St. and has not listed it for sale. The Detroit Land Bank Authority did not compensate Mr. McLesky after it took his property.

17.     Plaintiff Clarence Day owned the house at 5163 Garland Street in Detroit, Michigan. On or about June 14, 2024, Mr. Day's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 5163 Garland St. and has not listed it for sale. The Detroit Land Bank Authority did not compensate Mr. Day after it took his property.

18.     Plaintiff Christopher Feala owned the house at 4428 Harding Street in Detroit, Michigan. On or about January 23, 2024, Mr. Feala's house was taken from him for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 4428 Harding St. and has not listed it for sale. The Detroit Land Bank Authority did not compensate Mr. Feala after it took his property.

19.     Plaintiff Peggy Starks owned the house at 5250 Bewick Street in Detroit, Michigan. On or about March 8, 2024, Ms. Starks' house was taken from her for no consideration through the Detroit Land Bank Authority's NAP program. The Detroit Land Bank Authority is still in possession of the house at 5250 Bewick St.

and has not listed it for sale. The Detroit Land Bank Authority did not compensate Ms. Starks after it took her property.

20.     Defendant City of Detroit is a Michigan municipal corporation that acted and continues to act under color of state law at all relevant times.

21.     Defendant Detroit Land Bank Authority ("DLBA") is a public body corporate formed by the City of Detroit as a local land bank fast track authority pursuant to the Land Bank Fast Track Act, MCL § 124.751 *et. seq*. The Detroit Land Bank Authority acted and continues to act under color of state law at all relevant times.

## Jurisdiction and Venue

22.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

23.     Defendants have their principal places of business in the Eastern District of Michigan and are subject to the Court's personal jurisdiction.

24.     A substantial part of the events and omissions giving rise to these claims occurred in Wayne County, in the Eastern District of Michigan.

25.     Venue in this District is proper per 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## The Nuisance Abatement Program

26.     Since March of 2014, the Detroit Land Bank Authority ("DLBA") and Mike Duggan have filed hundreds of identical lawsuits against thousands of owners of

homes in the City of Detroit that they believe to be unoccupied. Each of these lawsuits names as defendants approximately ten to twenty owners of single-family or duplex residential properties. The defendants typically have no relationship to each other; each Defendant owns a separate house. The lawsuits contain identical boilerplate allegations that every one of the defendants' houses is both a common-law public nuisance and a statutory public nuisance per MCL § 600.3801, Michigan's nuisance-abatement forfeiture statute.

27.   This campaign of mass litigation is known as the DLBA's "Nuisance Abatement Program," or "NAP." The Nuisance Abatement Program is based on a similar Wayne County program run by Mike Duggan in the early 2000s, when Mike Duggan was the Wayne County Prosecutor. The standard complaint used in the NAP program is based off of the complaint used in Duggan's earlier Wayne County program, and large portions of the pleadings used in the current program are verbatim identical to portions of the pleadings used in the earlier Wayne County program.

28.   On information and belief, despite a decade of litigation against thousands of defendants through the NAP program, not one lawsuit filed by Duggan and the DLBA against any Detroit homeowner has ever proceeded to a trial on the merits. The vast majority of these cases remain pending for years without the assignment

of a trial date, or even entry of a scheduling order. And unlike almost all other civil actions filed in the Wayne County 3rd Circuit Court, NAP lawsuits are not randomly assigned by lot among the eighteen judges in the civil division. Instead, every NAP lawsuit is assigned to the same judge.[1]

29.    Rather than litigating any of the thousands of claims they file, the DLBA and Duggan pursue one of two outcomes. For defendants who do not timely respond to the complaint, the plaintiffs seek default judgments transferring title to the defendants' properties to the DLBA for no consideration.

30.    When a defendant timely responds to the complaint, a DLBA staff attorney attempts to pressure the defendant to sign a standard settlement agreement compelling the defendant to renovate their home within 180 days. The form settlement agreement provides that if the homeowner fails to renovate their house to the DLBA's satisfaction in 180 days, the DLBA is granted a contractual right to confiscate the home.

31.    If a defendant files an answer and does not agree to sign the settlement agreement, the DLBA will cause the Court to schedule a "sua sponte" pretrial hearing at which the defendant is pressured to sign the agreement. If the defendant does not appear at the pretrial, a default is entered and the house is taken. If the

---

[1]The original NAP judge was Robert Colombo Jr., who heard all NAP cases for approximately six years. Responsibility for the NAP docket has been reassigned several times since Judge Colombo's retirement in 2019.

defendant appears but refuses to sign, the pretrial hearing is adjourned to a new date, when the defendant will again be pressured to sign the settlement agreement. If the defendant again appears and still refuses to sign, the pretrial will be adjourned again. This process can be repeated indefinitely.

32.     The DLBA typically stops prosecuting, or voluntarily dismisses, their claims against defendants who timely answer its complaint, appear at three pretrials, and consistently refuse to sign the settlement agreement. By abandoning or dismissing their claims against any defendant who answers the complaint and steadfastly refuses to settle, the DLBA is able to continue fishing for default judgments[2] without exposing the legal theories underlying its Nuisance Abatement Program to appellate review.

33.     Under its standard settlement agreement, if the DLBA is unsatisfied with the owner's efforts to renovate the property and chooses to exercise its right to take title, the DLBA has no duty to compensate the owner, either for the land itself, or for any improvements or repairs the owner has made subsequent to signing the settlement agreement in an attempt to satisfy the DLBA.

---

[2]On occasion, after voluntarily dismissing its claims against a defendant who timely answers and refuses to settle, the DLBA will file a new, identical lawsuit against the same defendant regarding the same property.  Property owners are often served via alternate service orders permitting service by posting the complaint in three public buildings in downtown Detroit, so even after one NAP lawsuit has terminated in their favor, owners of unoccupied Detroit houses must continue to maintain constant vigilance to avoid being defaulted.

34.     The vast majority of defendants in the NAP program are not represented by counsel. Many are low-income Detroiters who have inherited modest, low-value homes that they cannot obtain financing to renovate. Financing is generally unavailable to these homeowners, either because their credit scores and/or incomes are too low, because they lack a track record of success as real estate developers, or because their properties are located in neighborhoods with weak real-estate markets where home values are not high enough to provide an institutional lender with sufficient collateral. Often, the cost of renovation exceeds the expected after-renovation value of the home, making the projects prohibitively high-risk for institutional lenders.

35.     The DLBA and Mike Duggan also prevent the NAP defendants from either cashing out their equity by selling their homes, or borrowing against their homes to finance renovations, because in every case, the DLBA and Mike Duggan also seek and obtain an ex-parte order preventing every defendant from transferring or encumbering their house during the pendency of the NAP lawsuit. These orders are always entered before the defendants are served with the NAP lawsuit.

36.     Unfortunately, many unrepresented homeowners give in to the pressure to sign the DLBA's form settlement agreement, committing themselves to undertake major renovation projects that they cannot afford in an effort to avoid losing their

property. These settling defendants (and some non-settling defendants who attempt to satisfy the DLBA by renovating without signing the settlement agreement) often expend thousands of dollars of their limited resources in a futile effort to avoid the loss of their houses, only to have their property and the improvements they have made to it confiscated once they deplete their savings and lack the money to continue renovation work.

37.     Plaintiff Andre Baker is one such individual. A Detroit resident of modest means, Mr. Baker purchased the house at 15891 Holmur St. for $5000 in July of 2021. The DLBA took Mr. Baker's property via the NAP program in March of 2024. Mr. Baker made substantial improvements to his Holmur Street house between the date he purchased it and the date the house was taken from him, as can be seen in the photographs below:



*15891 Holmur in August 2021, one month after Mr. Baker purchased it*

*15891 Holmur in April 2024, one month after the DLBA took the house from Mr. Baker*

38.     While over 1,400 Detroit property owners have suffered devastating losses of their houses (and often their personal or retirement savings) as a result of the Nuisance Abatement Program, the DLBA has reaped a windfall. After it seizes the homes, the DLBA does not "abate the nuisance" by making any repairs or improvements to the properties.[3] Instead, it sells the confiscated houses, in "as-is" condition, to private buyers. Through the end of 2024, the DLBA has sold at least four hundred and fifty five homes it acquired through the Nuisance Abatement Program. The average sales price of a NAP home was approximately $11,416.58, and the total sales revenue that DLBA generated from these transactions was approximately $5,194,543.00. (**Ex. 1**: Table of Properties Taken by DLBA via NAP and Resold to Private Buyers).

39.     The DLBA has in fact generated substantially more than $5.2 million in revenue via sales of homes it confiscated through NAP, because each sale that DLBA makes to a private buyer triggers a statutory entitlement to 50% of the

---

[3]With one limited exception: City of Detroit hired contractors to renovate sixteen of the confiscated homes using funds it received from the Canadian government as part of a complex deal to construct a new international bridge between the United States and Canada. After each renovation was complete, the DLBA sold the home, for $1, to the owner of a residential property in Detroit's Delray neighborhood. The U.S. side of the new international bridge, including the U.S. customs plaza and the new interchange with I-75, will be located in Delray. In exchange for the opportunity to buy a freshly-renovated home in another part of Detroit from the DLBA for $1, the Delray property owners transferred their Delray real estate to the City of Detroit.

property taxes paid by the new owner in the subsequent five-year period. MCL § 211.1025(4)(b); MCL § 211.7gg. For lower-valued properties, the DLBA's 50% cut of future property tax proceeds can constitute the majority of the revenue it generates from the transaction.

40.    $5.2 million is also an understatement of the total home equity that the DLBA has confiscated from Detroit property owners. The DLBA generally allows the properties it seizes to sit vacant and continue deteriorating for several years before it sells them, so it is always holding a large backlog of unsold, unlisted NAP-sourced inventory. The DLBA has sold less than half of the houses it has acquired through NAP, and it currently possesses hundreds of these homes.

41.    In response to a request for information from Detroit City Council Member Mary Waters, the DLBA disclosed that it had confiscated at total of 1,309 houses through NAP as of July 12, 2024. (**Ex. 2**). Per the DLBA's quarterly reports for the quarters ending September 30, 2024, December 31, 2024, and March 31, 2025, an additional 184 houses were taken between July 13, 2024 and March 31, 2025. If the average value of the confiscated, but currently unsold, NAP-acquired houses matches the average sale price ($11,416.58) of the four hundred and fifty five NAP-acquired houses that the DLBA has sold to date, the total value of the 1,493

houses that the DLBA has taken via the Nuisance Abatement Program is approximately $17,044,953.94.

42.     If the City of Detroit's recent tax assessments are assumed to be accurate, the total value of the real estate taken via the Nuisance Abatement Program is even higher than $17 million. Per the City of Detroit's 2022, 2023, and 2024 tax assessments, the aggregate market value of the 368 houses the DLBA took between January 1, 2022 and July 12, 2024 and is presently holding in its inventory is at least $14,210,150.00. (**Ex. 3**- Table of Properties Taken 2022-2024 and Held in DLBA Inventory). Adding the value of the unsold 2022-2024 acquisitions to the $5,194,543.00 of sales revenue generated via dispositions of NAP properties to date yields at least $19,404,693.00 in value captured from Detroit property owners over the course of the program, before even considering the value of approximately 487 houses taken prior to 2022 that the DLBA has not yet sold, or the value of the 184 houses that it has taken since July 13th of 2024.

43.     The DLBA's pleadings, motions, and briefs in NAP cases are template-based and standardized. The in-house DLBA staff attorneys who work in the NAP program have been trained to submit the same brief in support of their motions for default judgment in every case. The DLBA staff attorneys simply insert details like

the property address, the defendant's name, and the case number, and file the standard brief. (*See* **Ex. 21**- Standard NAP DJM Template).

44.    The standard brief in support of the DLBA's motions for default judgment misleadingly argues that the DLBA should be awarded title to the defendant's land in order to, a) partially compensate the DLBA for the cost of demolishing the house, and b) to allow the DLBA to maintain the vacant lot after the house is demolished.

45.    Section 4 of the standard brief cites a number of cases for the propositions that nuisance structures can be lawfully abated by demolition, and that the plaintiff in a nuisance case can obtain a money judgment against the defendant landowner for the plaintiff's demolition costs. (**Ex. 21**, pg. 6-7). The plaintiffs then "propose that the Defendant Owner and Interest Holder's interest in the Defendant Property be transferred to the Detroit Land Bank Authority as partial compensation for the costs incurred in abating the nuisance or for demolition." (**Ex. 21**, pg. 7). The brief further argues that the DLBA should simply be awarded title to the land, instead of receiving a money judgment for its demolition expenses, because "such relief avoids protracted, multiple litigation **to gain title to a vacant lot.**" (**Ex. 21**, pg. 7) (emphasis added).

46.    In fact, the DLBA has no intention of demolishing any of the houses it acquires via NAP.  The DLBA does not include houses in the Nuisance Abatement Program that it has determined should be demolished. When it identifies such houses in its blight surveys, it refers them to the City of Detroit's demolition department. The only homes that the DLBA targets via NAP are those that it believes it will be able to sell, in as-is condition, to third parties.

47.    In essence, the DLBA's standard brief in support of its motions for default judgment seeks awards of the entirety of the NAP defendants' home equity to "compensate" the DLBA for a) unspecified attorney fees, and b) unspecified future demolition or renovation costs that the DLBA never quantifies, and that it knows it is not likely to ever actually incur.

48.    In the majority of cases, the DLBA never incurs any demolition or renovation expenses after it acquires a house via NAP. Nor do transfers of title to the DLBA result in "prompt abatement of the nuisance," as the DLBA promises in its brief. (**Ex. 21**, pg. 9). Instead, the DLBA allows most NAP-acquired houses to sit vacant for several years in the same condition they were in at the time title was transferred. The DLBA eventually sells the houses and uses the sale proceeds to fund its own operations.

49.     Plaintiff Sheila Todd's house at 961 E. Savannah St. illustrates how the DLBA neglects its properties after taking title. The DLBA argues in its standard default-judgment brief that, "residents of the City of Detroit deserve to have these hazardous conditions removed from their neighborhoods immediately." (**Ex. 21**, pg. 9). Yet after its default judgment motion was granted with respect to Ms. Todd's house at 961 East Savannah Street, the DLBA left the house to sit vacant and continue deteriorating for more than nine years:



*961 E. Savannah in Oct. 2015, after three months of DLBA ownership*     *961 E. Savannah in Oct. 2023, after more than eight years of DLBA ownership*

50.     While the DLBA may incur attorney fees and court costs to bring NAP actions, these costs are minimal on a per-property basis. Per the data provided in DLBA's quarterly reports[4], the DLBA filed NAP lawsuits against 1,963 property owners between January 1, 2023 and December 31, 2023. These suits were handled by approximately 4.75 full-time-equivalent[5] DLBA staff attorneys. The

_____
[4]Available at: https://buildingdetroit.org/dlba-reports

[5]The number of DLBA staff attorneys assigned to NAP fluctuated between three and six over the course of 2023. There were four NAP attorneys at the beginning of the year, which fell to three in March due to the resignation of

average DLBA staff attorney assigned to NAP handled approximately 413 NAP claims in 2023, or 1.65 NAP claims per workday.

51.    The DLBA staff attorneys assigned to NAP are salaried. In 2023, their salaries varied between approximately $79,300 and $101,133 per year, except for Chief Litigation Counsel Amy Barnard, who had additional responsibilities outside of NAP and who on information and belief was paid $120,000. These attorney salaries amount to approximately $192 per NAP claim for claims handled by the lowest-paid DLBA staff attorney, up to roughly $290 per claim for NAP claims handled by Amy Barnard.

52.    On information and belief, the DLBA's NAP staff attorneys do not keep contemporaneous records of the amount of attorney time expended on each claim. Most of the DLBA staff attorneys' time is devoted to negotiating with defendants who contact the DLBA in response to DLBA's NAP lawsuits or the posters DLBA places on their houses, and pressuring those defendants to sign the form settlement agreement.[6] DLBA staff attorneys also spend considerable time negotiating with

DLBA staff attorney Jennifer Douglas. Two more staff attorneys, John Hilla and Niccole Hudson, were assigned to NAP in May, and a sixth, David Coppiellie, was assigned in October.

[6] DLBA staff attorneys also signed 771 form settlement agreements in 2023, many of which were pre-suit settlements. The DLBA placed NAP posters on 2,341 homes in calendar year 2023, which is 378 more than the number of claims filed. Including these likely pre-suit settlements increases the average number of NAP claims handled by each DLBA staff attorney to 492 per year, or 1.97 per workday.

defendants who have signed the settlement agreement, but have failed to renovate their houses to the DLBA's satisfaction within 180 days.

53.     On a per-property basis, obtaining default judgments against defendants who do not contact DLBA or respond to the complaint requires far less attorney time than dealing with the responsive defendants. The complaint, alternative service motions, and default judgment briefing are all standardized and template-based. Court appearances via Zoom for default judgments are scheduled en masse, so that titles to a dozen or more homes can be transferred to the DLBA over the course of a single half-hour long remote hearing.

54.     The DLBA's court costs to bring NAP cases are also minimal on a per-property basis. The DLBA reduces its filing fees by bringing actions against ten to twenty properties per case, so rather than paying a $150 filing fee for each homeowner it sues, its per-property filing cost ranges from $15 to $7.50. The DLBA also has to pay two motion fees on its way to obtaining title: a $20 fee for its standard motion for alternative service, and a $20 fee for its standard motion for default judgment. The per-homeowner filing cost for the alternative service motion ranges from $1 to $2, because the DLBA brings a single alternative-service motion for all defendant properties in each case. However, the DLBA does need to pay a separate $20 default judgment motion fee for each house it takes. In total, the

DLBA's court costs to obtain title to a property via NAP thus range from approximately $28.50 to $37.

55. On occasion, the DLBA will request that a NAP defendant reimburse it for its attorneys fees and court costs associated with bringing a NAP action. When it does so, the DLBA typically requests $500.

**The overwhelming majority of NAP takings are not civil forfeitures**

56. In his statements to the media announcing the program in 2014, Mike Duggan said, "we're going to sue the owner of every single abandoned house," adding, "either you can fix it up, or the city will seize the property and get it into the hands of someone who will." At the time that he made these statements, Mike Duggan was the Mayor of the City of Detroit.

57. In the course of operating the program, the DLBA placed posters on targeted homes, which read as follows:



58.    Duggan and the DLBA name the parcels of real property themselves as defendants in their NAP lawsuits, in addition to naming the owners, in the style of an *in rem* civil forfeiture proceeding. They also bring claims under MCL § 600.3801, which "is a forfeiture statute." *Mobley v. City of Detroit,* 938 F. Supp. 2d 669, 681 (E.D. Mich. 2012); *see also, Ingram v. Wayne County,* 81 F.4th 603, 607 (6th Cir. 2023).

59.    Yet while the DLBA openly threatens property owners with "seizure" of their houses, proceeds *in rem* against the property, and bring their claims under a

forfeiture statute, the DLBA denies that its NAP actions are civil forfeiture actions. (**Ex. 4**- Response to Request to Admit #3, pg. 4).

60.     In Michigan, "civil asset-forfeiture cases are unique because the government must prove that the asset to be forfeited is the product of a crime or was used to further a criminal act." *Long Lake Twp. v. Maxon*, 15 N.W.3d 118, 128 (Mich. 2024). A violation of a municipal nuisance or zoning ordinance is not a criminal act, *see Id.* at 128, and Michigan's nuisance forfeiture statute does not permit forfeiture of *any* property used in the maintenance of *any* public nuisance. Instead, the statute limits the forfeiture remedy to a specific set of activities that constitute both public nuisances and crimes.

61.     Michigan's nuisance forfeiture statute provides that, "if the plaintiff seeks abatement of a nuisance by forfeiture," then the plaintiff "has the burden of proving by clear and convincing evidence that the vehicle, boat, aircraft, or property was used for or in furtherance of the activity or conduct that constituted the nuisance as described in section 3801." MCL § 600.3815(4).

62.     The "conduct that constituted the nuisance as described in section 3801" of the nuisance forfeiture statute is limited to seven enumerated types of criminal activity: prostitution, illegal gambling, drug trafficking, illegal manufacturing or

sale of liquor, dogfighting, human trafficking, and "armed violence in connection with the unlawful use of a dangerous weapon." *See* MCL § 600.3801(1)(a)-(g).

63.     On rare occasions, the DLBA actually does have specific evidence that a house it targets through NAP "was used for or in furtherance of" one of the types of criminal activity enumerated in MCL § 600.3801(1). This special subset of NAP cases are known as "Drug House Unit" ("DHU") cases.

64.     DHU cases use a modified version of the standard NAP complaint. DHU NAP complaints have search warrant applications for the property and warrant returns showing seized contraband attached as exhibits. DHU cases are also are filed individually, against only one property per case, rather than against groups of 10-20 defendant properties as is the standard practice for regular NAP cases.

65.     However, DHU NAP cases comprise less than 5% of the properties targeted by the Nuisance Abatement Program. In the first quarter of the DLBA's 2025 fiscal year, of the 150 houses targeted by the DLBA through NAP, only six were DHU houses. In the fourth quarter of the DLBA's 2024 fiscal year, of the eighty-eight houses targeted by the DLBA through NAP, only one was a DHU house. In the third quarter of 2024, only 3 out of 372 houses targeted that quarter were DHU houses. (**Ex. 5**; **Ex. 6**; **Ex. 7**).

66.    The overwhelming majority of NAP-targeted properties are selected for inclusion in the program not because of any evidence of criminal activity, but rather based on data collected in citywide "blight surveys" that are commissioned by the DLBA and/or the City of Detroit.

67.    The blight surveys involve a team of field surveyors visiting and photographing thousands of residential properties that the DLBA believes to be unoccupied. On information and belief, the DLBA uses U.S. Postal Service vacancy data to select the houses to include in the surveys. For each house visited, office-based DLBA staff then review the photographs and any notes submitted by the field surveyor. The office staff then decide whether the house should be classified as "blighted," and, if so, whether it should be demolished, referred for code enforcement activities, i.e., "blight tickets," or placed in NAP.

68.    The DLBA office staff who determine whether to refer houses from the citywide blight surveys to the Nuisance Abatement Program make those determinations without any information about the interior condition of the houses, and without any information about whether each house is "being used for or in furtherance of" any of the criminal conduct described in MCL § 600.3801.

69.    On information and belief, after the DLBA's legal department receives a batch of NAP referrals from a blight survey, their post-referral, pre-filing

investigations of non-DHU, NAP-candidate houses are limited to, a) title searches and TLOxp[7] searches to identify owners/leinholders and their addresses for service, and b) a single visit to the house by a DLBA contractor.

70.    During the contractor's visit, the contractor takes photographs of all four sides of the house, completes a "visual inspection affidavit," which is a form affidavit with check-marks for various property maintenance code violations, and affixes a poster to the house threatening the owner with an impending seizure action. These contractors are instructed to affix the poster regardless of whether they identify any property maintenance code violations. The only circumstance in which the contractors are told not to affix the poster is when they are able to confirm that the house is occupied.

71.    On information and belief, once the house has been "postered," if no one calls the DLBA regarding the house, the DLBA includes the property and its owner in a NAP lawsuit with no further investigation.

72.    The visual inspection affidavits completed by the DLBA's postering contractors are attached as exhibits to the DLBA's NAP complaints. A comparison of several of these visual inspection affidavits reveals that the DLBA lacks any coherent, discernible criteria for when it considers a vacant house to be "blighted;"

---

[7]TLOxp is a skip-tracing database product sold by Transunion, one of the three major credit reporting agencies.

Detroit property owners appear to be at risk of being targeted by NAP no matter what they do with their property.

73.   For example, the DLBA will allege that a home is blighted because the doors and windows are sealed with plywood. (**Ex. 8**; **Ex. 9**; **Ex. 10**). But when a house is professionally sealed with steel panels, the DLBA will still sue the owner. (**Ex. 11**). An immaculately-maintained property with intact doors and windows, that is not sealed with boards or steel panels, where the only code violation the DLBA's inspector identified was, "failure to clear snow," similarly warranted a nuisance abatement lawsuit. (**Ex. 12**; **Ex. 13**). Yet clearing the snow is not enough either: as demonstrated by the photograph of 2215 Edison Street attached to the NAP complaint seeking title to that property, the owner of a well-maintained home cannot avoid a lawsuit by ensuring that their walk has been shoveled on the date the DLBA's investigator visits. (**Ex. 14**). The DLBA will even file a NAP suit when their investigator writes "work in prog," and the photographs clearly demonstrate that the owner is renovating the home. (**Ex. 15**).

74.   On numerous occasions, the DLBA has sued property owners where "vacant" is the only alleged defect that their investigator observed at the property. (**Ex. 11**, **Ex. 16**, **Ex. 17**).

75.     The NAP action filed against Plaintiff Kassandra Ludington shows that the DLBA targets homes simply because they are vacant, and that its focus on purported defects in the physical condition of the targeted properties is mostly pretextual. Ms. Ludington purchased the home at 8205 Dexter from the DLBA in 2017. She bought the home subject to purchase agreement that required her to rehabilitate the home to DLBA's satisfaction, with a deed restriction that provided that title would revert to the DLBA if Ms. Ludington failed to complete the requested renovations. After closing on the property, Ms. Ludington moved in, and over the next two years, she renovated the home in compliance with the DLBA's minimum standards.

76.     On or about May 10, 2019, the DLBA conducted a final inspection of Ms. Ludington's home at 8205 Dexter, determined that she had successfully rehabilitated the property, and recorded a release of its reverter interest. (**Ex. 22**; **Ex. 23**). Then, on or about May 16, 2022, the DLBA placed a poster on Ms. Ludington's home indicating that her home was a public nuisance and threatening to seize it. (*see* **Ex. 2**, pg. 21).

77.     There was no material change in the physical condition of the house at 8205 Dexter between May of 2019 and May of 2022. The only difference between 8205 Dexter when the DLBA deemed it a rehabilitation success story, and 8205 Dexter

when the DLBA deemed it a public nuisance, was whether the homeowner was living at the property.[8]

78.   It is not a violation of any Detroit municipal ordinance for a house in Detroit to be vacant. The City of Detroit requires registration of houses that will remain vacant for an extended period of time, and provides that the owner must schedule, and pass, an exterior-only inspection once a year. The maximum fine for failing to register a vacant house is $250 for a first offense, rising to $500 for a third or subsequent offense.

79.   On information and belief, the DLBA does not check whether a vacant house has been registered as vacant or passed an exterior inspection in compliance with the vacant property registration ordinance prior to initiating a NAP lawsuit against the property owner.

80.   The DLBA admits that it pursues NAP actions against owners of vacant property regardless of whether or not the owner has complied with Detroit's vacant property registration ordinance. As the DLBA has previously represented to this court:

> "there is no requirement that a property be registered as vacant with BSEED before the DLBA may initiate a nuisance abatement action. **Nor**

---

[8]The DLBA was also in communication with Ms. Ludington at the time it took her property. (**Ex. 24**: Emails between DLBA staff attorneys and Kassandra Ludington).

**does a property being registered as vacant affect whether the DLBA will begin nuisance abatement proceedings against a property.**"

**Ex. 18**, pg. 5, n.2 (emphasis added).

81.     On information and belief, at no point in its process does the DLBA conduct any pre-filing investigation into whether individual non-DHU houses that are included in its NAP lawsuits are being used for any of the illegal activities enumerated in MCL § 600.3801(1), and it files each non-DHU NAP lawsuit without having any knowledge of which of the approximately 10-20 defendant properties in the lawsuit, if any, are being used for criminal activity.

### A February 7, 2014 Detroit City Council Resolution is the moving force behind the DLBA's Nuisance-Abatement Program

82.     Michigan's nuisance forfeiture statute, MCL § 600.3801 *et. seq.,* requires local governmental entities that engage in seizure and forfeiture activities under the nuisance statute to "report all seizure and forfeiture activities under this chapter to the department of state police as required under the uniform forfeiture reporting act." MCL § 600.3841(1). Local governments are further required to remit the excess proceeds from the sale of forfeited property "to the state treasurer to be credited to the general fund of this state." MCL § 600.3825(3)(d).

83.     On information and belief, the DLBA and the City of Detroit do not report any seizure and forfeiture activities under the Nuisance Abatement Program to the department of state police, and they do not remit any proceeds from the sale of NAP-acquired property to the state treasurer.

84.     Michigan's nuisance forfeiture statute, MCL § 600.3801 *et. seq.*, does not even authorize forfeitures of real property. Whenever the statute mentions forfeiture, it explicitly refers to personal property. *See* MCL 600.3815(d) ("forfeiture or sale of a vehicle, boat, aircraft, or other personal property"); MCL 600.3825(3) ("[o]n the sale of any furniture, fixtures, contents, vehicle, boat, or aircraft as provided in this section,"); MCL 600.3830(1) ("For removing and selling the movable property,"); MCL 600.3835 (describing distribution of, "[t]he proceeds of the sale of personal property"). The statute does not set forth any procedures for the forfeiture or sale of real property, or provide any guidance as to how the proceeds from the sale of forfeited real estate are to be distributed. The remedy that the statute provides for public nuisances on real property is padlocking the building, "for a period of 1 year, unless sooner released as provided in this chapter." MCL 600.3825(1)(c). "Padlocking is not forfeiture: it involves no loss of title." *Rental Prop. Owners Ass'n v. City of Grand Rapids*, 455 Mich. 246, 264 (1997).

85.     In addition to denying that its NAP actions are forfeiture actions, the DLBA

disclaims reliance on the nuisance forfeiture statute to take title to land through the

Nuisance Abatement Program. Instead, the DLBA takes the position that:

> "because each property has been adjudicated to be a common-law public
> nuisance, **the DLBA need not rely on the nuisance abatement statute to
> take title**, and reporting requirements that apply to property taken under the
> statute, such as those imposed by MCL 600.3841, do not apply to the
> DLBA."

**Ex. 19**, pg. 8, n.2 (emphasis added).

86.     However, state law does not provide for the direct seizure of land from a

defendant as an available remedy in a common-law public nuisance action. The

remedies available to a prevailing plaintiff in a common-law public nuisance action

are set forth in another Michigan statute, MCL § 600.2940.

87.     MCL § 600.2940 provides that abatement of common-law public nuisances

shall be carried out by an officer, pursuant to a warrant, although the court may

grant the defendant property owner an opportunity to abate the nuisance himself if

he posts a bond. *See* MCL § 600.2940(3). If the defendant does not post a bond,

then the plaintiff's abatement expenses may only be recovered from the defendant

landowner via the collection procedures set forth in Chapter 60 of the Revised

Judicature Act, MCL 600.6001 et seq. *See Ypsilanti Charter Twp. v. Kircher*, 281

Mich. App. 251, 283 (2008).

88.     Chapter 60 of the Revised Judicature Act, among other things, prohibits plaintiffs from executing against a defendant's land without first attempting to execute against the defendant's personal property, *see* MCL § 600.6004; *Kircher*, 281 Mich. App. at 283, **and requires any excess proceeds of a judicial sale of Defendant's real property to be paid to the defendant, rather than retained by the plaintiff.** *See* MCL § 600.6044; *Kircher*, 281 Mich. App. at 285 n.13.

89.     Given that the DLBA disclaims reliance on the nuisance forfeiture statute, MCL §§ 600.3801-600.3841, and state law restricts the methods available for recovering abatement expenses in a common-law public nuisance action to the collection procedures set forth in Chapter 60 of the Revised Judicature Act, the only potential legal basis for the DLBA's practice of seizing allegedly "blighted" real property without compensating the owner, thereafter selling the property, and keeping all of the sales proceeds for itself is a Detroit City Council resolution approved on February 7, 2014. (**Ex. 20**).

90.     The February 7, 2014 Detroit City Council resolution declared a "Blight Emergency" in the City of Detroit. In response to the "Blight Emergency," resolution authorized the Detroit Land Bank Authority to exercise the City's power to bring public nuisance actions against local property owners. The resolution provides that, "[i]n the event that the outcome of the legal proceedings is in favor

of the Detroit Land Bank, title shall vest with the Detroit Land Bank." (**Ex. 20**, ¶ 4).

91.     The February 7, 2014 Detroit City Council resolution also provides:

"The Detroit Land Bank shall be entitled to retain any and all proceeds from the disposition or abatement of the properties that were acquired by the Detroit Land Bank through the nuisance abatement proceedings."

(**Ex. 20**, ¶ 5).

## Class Action Allegations

92.     Plaintiffs bring this action on their own behalf and on behalf of the following Classes and Subclasses pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4):

93.     **Class Definition.** Plaintiffs bring this claim for damages, equitable relief and disgorgement/restitution, on behalf of a class of former owners of real estate in Detroit. The Class shall be defined as former owners of real estate in the City of Detroit who meet each of the following criteria:

a) had their real property transferred to the Detroit Land Bank Authority as a result of a nuisance-abatement lawsuit brought by DLBA and Mike Duggan within the applicable limitations period, including any applicable tolling and/or savings provisions, *or* their real property was taken at any time since February 7 of 2014, and their former property was then sold by the DLBA within the applicable limitations period to bring an unjust-enrichment claim under Michigan law, including any applicable tolling and/or savings provisions;

b) whose real property was never included in DLBA's "Drug House Unit" (DHU) program;

c) who did not sign any pre-litigation or post-litigation settlement agreement or stipulated dismissal agreement with DLBA or cause a deed to be recorded conveying their interest in the property to the DLBA;

d) any residential structure on their former property was not demolished while the property was owned by the DLBA;

e) whose property has not been returned to them by the DLBA;

f) who did not appeal the judgment transferring title to their property to the DLBA and have not filed their own Takings claim in state or federal court;

g) who have not received compensation from the DLBA or the City of Detroit for their property, and have not received any portion of the proceeds from any subsequent sale of their property by the DLBA, or an opportunity to claim those proceeds.

94.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), and, as applicable, (c)(4) and (c)(5), Plaintiffs seek certification in the alternative of the following separate Subclasses, defined as follows:

**"Fifth-Amendment Auction-Proceeds Subclass"** means members of the Class whose real property was sold by DLBA, within the applicable limitations period to bring a § 1983 claim in Michigan, including any applicable tolling and/or savings provisions, through one of the following DLBA sales programs: "Own-It-Now" or "Auction."

**"Unjust Enrichment Subclass"** means members of the Class whose real property was sold to a third party, for a price greater than $500, by the DLBA within the applicable limitations period for an unjust enrichment claim in Michigan, including any applicable tolling and/or savings provisions.

**"Fifth Amendment Equity Subclass"** means members of the Class for whom both of the following apply:

> a) had their real property transferred to the Detroit Land Bank Authority as a result of a default judgment in a nuisance-abatement lawsuit brought by DLBA and Mike Duggan within the applicable limitations period to bring a § 1983 claim in Michigan, including any applicable tolling and/or savings provisions;

> b) whose real property has not been sold or transferred by the DLBA, *or* was sold for a price of $1 to a Delray property owner in exchange for that purchaser conveying real estate in Detroit's Delray neighborhood to the City of Detroit.

**"Michigan Constitutional Takings Equity Subclass"** means members of the Class for whom both of the following apply:

> a) had their real property transferred to the Detroit Land Bank Authority as a result of a nuisance-abatement lawsuit brought by DLBA and Mike Duggan within the applicable limitations period to bring an inverse condemnation claim in Michigan, including any applicable tolling and/or savings provisions;

38

b) whose real property has not been sold or transferred by the DLBA since the date of its acquisition by the DLBA, *or* was sold for a price of $1 to a Delray property owner in exchange for that purchaser conveying real estate in Detroit's Delray neighborhood to the City of Detroit.

Excluded from the Class and these Subclasses are the Detroit Land Bank Authority, the City of Detroit, any of their respective officers, directors, or employees, the judicial officers and their immediate family members, and Court staff assigned to this case. Plaintiffs reserve the right to modify or amend the Class Definitions, as appropriate, during the course of this litigation.

### Numerosity

95.    Plaintiffs have been able to identify the majority of the affected residential properties that fall into each class by cross-referencing various DLBA sales data from Detroit's Open Data Portal[9] with a dataset that the DLBA produced in response to a request from Detroit City Counsel Member Mary Waters in July of 2024 (**Ex. 2**). The Class thus consists of the owners of approximately 822 houses, excluding any owners who signed settlement agreements with the DLBA, and any owners whose houses were seized through the DLBA's Drug House Unit ("DHU") program. Per the data in the DLBA's quarterly reports, DHU properties should amount to less than 5% of the affected properties.

_____

[9] Available at: https://data.detroitmi.gov/

96.    Plaintiffs have been able to identify 367 properties whose former owners are likely to be members of the Fifth Amendment Equity Subclass, 385 properties whose former owners are likely to be members of the Michigan Constitutional Equity Subclass, 41 properties whose former owners are likely to be members of the Fifth Amendment Auction Proceeds Subclass, and 259 properties whose former owners are likely to be members of the Unjust Enrichment Subclass. All properties whose former owners fall within the Fifth Amendment Auction Proceeds Subclass will also fall into the Unjust Enrichment Subclass. All properties whose former owners fall within the Fifth Amendment Equity Subclass will also fall within the Michigan Constitutional Equity Subclass. The former owners of the 184 properties taken between July 13, 2024 and March 31, 2025 will likely fall within both the Fifth Amendment Equity Subclass and the Michigan Constitutional Equity Subclass, but Plaintiffs have not yet been able to identify the addresses of these additional 184 properties.

97.    The number of current members of each subclass is expected to be higher than the number of affected properties, given that it is common for multiple persons to share ownership of a single-family residential property. The sizes of all four classes are also expected to grow over the pendency of this litigation, as the DLBA continues to take houses via its NAP program, and continues to sell the

expropriated houses in its inventory without providing a mechanism for the former owners to claim the sales proceeds.

98.   Given the accessible and available public data, Plaintiffs have been able to identify most of the residential properties affected by Defendants' program, rather than the individual former owners of those properties. Identifying the former owners requires a paid title search for each affected property. The class members will be readily identifiable from Defendant DLBA's records, because the DLBA, a) completes title searches for each property in its Nuisance Abatement Program prior to filing suit, b) possesses records of which properties were part of the Drug House Unit program, and c) possesses records of all settlement agreements it entered into with the property owners that it sued.

## Commonality and Predominance

99.   As to each Class and Subclass, this action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. The answers to questions common to the Class will drive the resolution of this litigation. Specifically, the common questions include:

a) Whether the Takings Clause of the Fifth Amendment to the United States Constitution is violated when the government takes title to blighted real property without thereafter compensating the owner;

b) Whether the Takings Clause of the Fifth Amendment to the United States Constitution is violated when the government sells blighted real property that it

41

has taken without compensating the owner, and retains all of the sale proceeds for itself, without providing any mechanism for the former owners to claim the proceeds;

c) Whether the Detroit Land Bank Authority's Nuisance Abatement Program is a civil forfeiture program, such that its seizures of privately-owned houses under the program constitute "punishment" for purposes of the Excessive Fines Clause of the Eighth Amendment;

d) Whether the Detroit Land Bank Authority's retention of the proceeds from public auctions of real estate it seized through the Nuisance Abatement Program, without providing notice of the auctions to the former owners, or any mechanism for the former owners to claim the auction proceeds, violates the Due Process Clause of the Fourteenth Amendment;

e) Whether the Excessive Fines Clause of the Eighth Amendment prohibits seizure of a house as punishment for a municipal civil infraction;

f) Whether a February 7, 2014 Resolution passed by the Detroit City Council was the moving force behind the DLBA's violations of the Class Members' constitutional rights, such that the City of Detroit is liable for the DLBA's conduct under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658;

g) Whether Article I, § 16 of the Constitution of Michigan is violated when the government seizes a house as punishment for a municipal civil infraction;

h) Whether Article X, § 2 of the Constitution of Michigan is violated when the government takes real property "for the eradication of blight" without compensating the property owner;

i) If the government sells property that has been taken without compensation in violation of the Fifth Amendment to the U.S. Constitution and/or Article X, § 2 of the Constitution of Michigan via a process other than a public auction, whether the proper measure of damages is the sale proceeds actually received and retained by the government, or the fair-market value of the property on the date of the taking;

j) Whether the Detroit Land Bank Authority was unjustly enriched when it retained the proceeds from the sales of real estate it seized under its Nuisance Abatement Program;

k) Whether the Class Members are constitutionally entitled to interest, and if so, whether interest runs from the date the property was taken or the date it was sold by the DLBA.

100. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** As to the Class and Subclasses, Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way. Each Plaintiff suffered an uncompensated seizure of their residential real estate in the City of Detroit through the DLBA's Nuisance Abatement Program, and each Plaintiff seeks to be compensated for the government's taking of their house. Plaintiffs' damages and injuries are akin to those of other Class Members and Plaintiffs seek relief consistent with the relief of the Class.

101. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against the City of Detroit and the Detroit Land Bank Authority to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and experienced in complex civil-rights litigation and in

Michigan public-nuisance litigation. Plaintiffs' counsel have dedicated substantial resources to investigating the DLBA's Nuisance Abatement Program, intend to vigorously prosecute this case, and will fairly and adequately protect the Class's interests.

102. **Predominance & Superiority: Federal Rule of Civil Procedure 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against the DLBA and the City of Detroit.

103. For example, in the Fifth Amendment Auction Proceeds Subclass, the average winning bid to purchase a seized property at public auction was only $16,512.20. While sixteen thousand dollars is undoubtedly a significant sum for

many of the hundreds of low-income Detroiters whose houses were confiscated through the DLBA's program, it is a relatively modest potential recovery compared to the cost of litigating the complex legal questions at issue in this case. Given the potential damages sustained by each Class Member, individual litigation to redress the Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

104. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for the DLBA, or would be dispositive of the interests of members of the proposed Class.

105. **Ascertainability.** The Class and Subclasses are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. The Class and Subclasses consist of the titleholders of approximately 822 specific parcels of real estate on the dates that those properties

were taken from their owners through the DLBA's Nuisance Abatement Program (less certain categories of excluded owners, such as those who signed settlement agreements with the DLBA). Because the DLBA conducts title searches on each property included in the Nuisance Abatement Program prior to filing suit, the members of the Class and all Subclasses can be readily ascertained from the DLBA's own records.

### Count I: § 1983 Uncompensated Taking of Property in Violation of the Takings Clause of the Fifth Amendment to the United States Constitution (Fifth Amendment Equity Subclass and Auction Proceeds Subclass against All Defendants)

106.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

107.   Plaintiffs bring this claim individually and on behalf of the other members of the Fifth Amendment Equity Subclass and the Fifth Amendment Auction Proceeds Subclass.

108.   From February of 2014 to the present, Defendant DLBA has operated and continues to operate its Nuisance Abatement Program, which transfers title to privately-owned residential properties in the City of Detroit to the DLBA, because the properties are allegedly vacant and blighted and for the purpose of eradicating blight.

109.   On or about June 5, 2019, Defendant DLBA took title to Plaintiff Ward's House, LLC's house at 6094 Evergreen St. via its Nuisance Abatement Program because the house at 6094 Evergreen St. was allegedly vacant and blighted.

110.   After taking title, Defendant DLBA did not renovate or demolish the house at 6094 Evergreen. Instead, for the next three and a half years, Defendant DLBA left the house at 6094 Evergreen to sit vacant in the same condition as when it was taken.

111.   On or about January 31, 2023, Defendant DLBA sold the house at 6094 Evergreen via an online auction for $25,100.00.

112.   Defendant DLBA kept all of the proceeds from the sale of 6094 Evergreen for itself and did not remit any of the auction proceeds to Plaintiff Ward's House, LLC.

113.   Defendant DLBA has never compensated Plaintiff Ward's House, LLC for its property at 6094 Evergreen, and it has not provided any mechanism for Ward's House, LLC to claim the auction proceeds.

114.   On or about June 22, 2023, Defendant DLBA took title to Plaintiff Kassandra Ludington's house at 8205 Dexter Ave. via its Nuisance Abatement Program, because the house at 8205 Dexter Ave. was allegedly vacant and blighted.

47

115.   Since taking title, Defendant DLBA has not renovated or demolished the house at 8205 Dexter, and the house at 8205 Dexter remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

116.   Defendant DLBA has not compensated Plaintiff Kassandra Ludington for her house at 8205 Dexter.

117.   On or about March 8, 2024, Defendant DLBA took title to Plaintiff Andre Baker's house at 15891 Holmur St. via its Nuisance Abatement Program, because the house at 15891 Holmur St. was allegedly vacant and blighted.

118.   Since taking title, Defendant DLBA has not renovated or demolished the house at 15891 Holmur, and the house at 15891 Holmur remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

119.   Defendant DLBA has not compensated Plaintiff Andre Baker for his house at 15891 Holmur.

120.   On or about April 12, 2024, Defendant DLBA took title to Plaintiff Darnell Jackson's house at 14294 Roselawn St. via its Nuisance Abatement Program, because the house at 14294 Roselawn St. was allegedly vacant and blighted.

121.   Since taking title, Defendant DLBA has not renovated or demolished the house at 14294 Roselawn, and the house at 14294 Roselawn remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

122.   Defendant DLBA has not compensated Plaintiff Darnell Jackson for his house at 14294 Roselawn.

123.   On or about March 8, 2024, Defendant DLBA took title to Plaintiff Peggy Starks' house at 5250 Bewick Street via its Nuisance Abatement Program, because the house at 5250 Bewick Street was allegedly vacant and blighted.

124.   Since taking title, Defendant DLBA has not renovated or demolished the house at 5250 Bewick, and the house at 5250 Bewick remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

125.   Defendant DLBA has not compensated Plaintiff Peggy Starks for her house at 5250 Bewick Street.

126.   On or about May 3, 2024, Defendant DLBA took title to Plaintiff Jeannette Gordon's house at 18541 Fielding Street via its Nuisance Abatement Program, because the house at 18541 Fielding Street was allegedly vacant and blighted.

127.   Since taking title, Defendant DLBA has not renovated or demolished the house at 18541 Fielding Street, and the house at 18541 Fielding Street remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

128.   Defendant DLBA has not compensated Plaintiff Jeannette Gordon for her house at 18541 Fielding Street.

129.   On or about July 17, 2015, Defendant DLBA took title to Plaintiff Sheila Todd's house at 961 E. Savannah Street via its Nuisance Abatement Program, because the house at 961 E. Savannah Street was allegedly vacant and blighted.

130.   After taking title, Defendant DLBA did not renovate or demolish the house at 961 E. Savannah Street. Instead, Defendant DLBA left the house at 961 E. Savannah Street to sit vacant and continue deteriorating for approximately ten years.

131.   On or about August 15, 2024, Defendant DLBA sold the house at 961 E. Savannah Street via an online auction for $2,100.00.

132.   Defendant DLBA kept all of the proceeds from the sale of 961 E. Savannah Street for itself and did not remit any of the auction proceeds to Plaintiff Sheila Todd.

133.  Defendant DLBA has not compensated Plaintiff Sheila Todd for her house at 961 E. Savannah Street, and it has not provided any mechanism for Sheila Todd to claim the auction proceeds.

134.  On or about June 28, 2024, Defendant DLBA took title to Plaintiff Darin McLeskey's house at 14128 Orleans Street via its Nuisance Abatement Program, because the house at 14128 Orleans Street was allegedly vacant and blighted.

135.  Since taking title, Defendant DLBA has not renovated or demolished the house at 14128 Orleans Street, and the house at 14128 Orleans Street remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

136.  Defendant DLBA has not compensated Plaintiff Darin McLeskey for his house at 14128 Orleans Street.

137.  On or about June 14, 2024, Defendant DLBA took title to Plaintiff Clarence Day's house at 5163 Garland Street via its Nuisance Abatement Program, because the house at 5163 Garland Street was allegedly vacant and blighted.

138.  Since taking title, Defendant DLBA has not renovated or demolished the house at 5163 Garland Street, and the house at 5163 Garland Street remains vacant and in approximately the same physical condition it was in at the time that the DLBA took title to the property.

139.   Defendant DLBA has not compensated Plaintiff Clarence Day for his house at 5163 Garland Street.

140.   Defendant City of Detroit authorized Defendant DLBA to take title to blighted houses in Detroit, to sell them, and to retain the sales proceeds for itself in a February 7, 2014 Resolution of the Detroit City Council. The City's policy, as embodied in the February 7, 2014 Resolution, was the moving force behind the violations of the Plaintiffs' and Class Members' Fifth Amendment rights.

### Count II: § 1983 Violation of the Right to be Free of Excessive Fines Guaranteed by the Eighth Amendment to the United States Constitution (Fifth Amendment Equity Subclass and Auction Proceeds Subclass against All Defendants)

141.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

142.   Plaintiffs bring this claim individually and on behalf of the other members of the Fifth Amendment Equity Subclass and the Fifth Amendment Auction Proceeds Subclass.

143.   In the alternative, if the seizures of property effectuated through Defendant DLBA's Nuisance Abatement Program constitute civil forfeitures, then they are subject to constitutional scrutiny under the Eighth Amendment's Excessive Fines Clause. *See Austin v. United States*, 509 U.S. 602, 622 (1993).

144.   In October of 1988, Plaintiff Jeannette Gordon purchased the home at 18541 Fielding Street in Detroit for $5,700.00.

145.   Ms. Gordon owned the Fielding Street home for over thirty-five years, until it was taken from her in May of 2024 via the DLBA's Nuisance Abatement Program.

146.   The City of Detroit Assessor set the assessed value of 18541 Fielding for tax year 2024 at $30,900.00. Michigan law provides that the assessed value of real property cannot exceed 50% of the true cash value of the real property, so the City of Detroit's 2024 tax assessment for 18541 Fielding indicates that the City believed that the true cash value of the house was not less than $61,800.00 in 2024.

147.   The house at 18541 Fielding Street is a detached single-family home. Ms. Gordon allegedly committed a municipal civil infraction by failing to maintain a vacant building or structure in accordance with the requirements of Section 8-15-113 of the Detroit City Code.

148.   The applicable fine for failing to maintain a vacant building or structure in accordance with the requirements of Section 8-15-113 of the Detroit City Code, for a single-family dwelling, is $500. This is less than 1% of the City of Detroit's estimate of the true cash value of the house at 18541 Fielding.

149.   On or about May 3, 2024, to punish Ms. Gordon for committing a municipal civil infraction, Defendant DLBA took Ms. Gordon's house at 18541 Fielding.

150.   On information and belief, except for the small percentage of seized homes in the "Drug House Unit" program, the DLBA lacked any specific evidence that any of the property owners whose houses it took via the Nuisance Abatement Program had either purchased their houses with the proceeds of criminal activity, or had used their houses to commit any offense more serious than a municipal civil infraction.

151.   Forfeiture of a person's house is a grossly-disproportionate punishment for a municipal civil infraction. Municipal civil infractions are among the least serious violations of the law that it is possible to commit, and houses are usually the most valuable asset that an average person owns. If a local government could forfeit a person's house as punishment for offenses as minor as covering a window with a plywood board, or failing to mow the lawn, then there would be virtually no government conduct prohibited by the Excessive Fines Clause.

152.   Defendant City of Detroit expressly authorized Defendant DLBA to violate the Excessive Fines Clause via the February 7, 2014 Resolution of the Detroit City Council. The City's policy, as embodied in the February 7, 2014 Resolution, was the moving force behind the violations of the Plaintiffs' Eighth Amendment rights.

**Count III: Inverse Condemnation**
**(All Plaintiffs against all Defendants)**

153.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

154.   Plaintiffs bring this claim individually and on behalf of the other members of the Class.

155.   Article X, § 2 of the Constitution of Michigan of 1963 provides that "[p]rivate property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law[,]"[10] and that, ""Public use" does not include the taking of private property for transfer to a private entity for the purpose of economic development or enhancement of tax revenues."

156.   Michigan's Constitution also provides:

> In a condemnation action, the burden of proof is on the condemning authority to demonstrate, by the preponderance of the evidence, that the taking of a private property is for a public use, **unless the condemnation action involves a taking for the eradication of blight, in which case the burden of proof is on the condemning authority to demonstrate, by clear and convincing evidence, that the taking of that property is for a public use.**

Mich. Const. Art. X, § 2 (emphasis added).

---

[10]"Michigan recognizes the theory of inverse condemnation as a means of enforcing the constitutional ban on uncompensated takings of property." *Proctor v. Saginaw Cnty. Bd. of Comm'rs*, 340 Mich. App. 1, 16 n.10 (2022).

157.   The Detroit Land Bank Authority took Plaintiffs' property for the purpose of eradicating blight. When asked by a City Counsel member to identify the specific reason(s) why it considered each property it took to be a public nuisance, the DLBA proffered the same rationale for all 1,309 properties it had taken to date: "Vacant and Blighted." **Ex. 2**.

158.   Municipal governments in Michigan may lawfully take title to blighted private property for the purpose of eradicating blight. *See, e.g. County of Wayne v. Hathcock,* 471 Mich. 445, 475-76 (2004). A taking of private property for the eradication of blight is a taking for a "public use" under Article X, § 2 of the Michigan Constitution.

159.   If a government entity takes private property for the purpose of eradicating blight, the Michigan Constitution requires the government entity to compensate the former owner of the property.

160.   After the Detroit Land Bank Authority took Plaintiffs' properties for the purpose of eradicating blight, it did not tender compensation to the Plaintiffs.

161.   In addition to the property rights that the Plaintiffs held in their real property at the time it was taken, Michigan recognizes an additional, separate property right in the proceeds of any subsequent sale of real property that the government has taken. *See Bowles v. Sabree,* 121 F.4th 539, 549-50 (6th Cir.

2024). The proceeds of such a sale are personal property, not real property, and belong to the former owner of the land. *Id.* at 550.

162.   After the Detroit Land Bank Authority took houses away from Ruby Washington, Mary Terrell, Sheila Todd, Ward's House, LLC, and Morgan Tate & Brewer LLC, it sold the houses it took from these Plaintiffs for $7,000.00, $13,750.00, $2,100.00, $25,100.00, and $12,000.00, respectively.

163.   The Detroit Land Bank Authority kept all of the proceeds of these sales and did not remit any of the sale proceeds to Ruby Washington, Mary Terrell, Sheila Todd, Ward's House, LLC, or Morgan Tate & Brewer LLC. For properties taken via the Nuisance Abatement Program and sold within six years and 101 days from the commencement of this case, the Detroit Land Bank Authority has retained for itself more than $3.5 million in sales proceeds.

164.   The Detroit Land Bank Authority has not provided any mechanism for the former owners of the houses taken via its Nuisance Abatement Program to claim the sales proceeds.

165.   The Detroit Land Bank Authority's retention of the proceeds from the sale of Plaintiffs' and Class Members' real property violates Article X, § 2 of the Michigan Constitution.

166.   The Detroit Land Bank Authority's retention of the proceeds from the sale of Plaintiffs' and Class Members' real property, without providing any mechanism for Plaintiffs and Class Members to claim the sale proceeds, also violates the Takings Clause of the Fifth Amendment to the United States Constitution.

167.   The City of Detroit expressly authorized the Detroit Land Bank Authority to violate the Michigan Constitution and the U.S. Constitution in this manner via a February 7, 2014 City Council Resolution. The Resolution declared a "blight emergency" in the City of Detroit, and authorized the Detroit Land Bank Authority "to retain any and all proceeds from the disposition" of real property it acquired through the Nuisance Abatement Program.

**Count IV: Claim for Compensation Arising Directly under the Fifth Amendment to the United States Constitution**
**(Fifth Amendment Equity Subclass and Auction Proceeds Subclass against All Defendants)**

168.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

169.   Plaintiffs bring this claim in the alternative per Fed. R. Civ. P. 8(d), individually and on behalf of the other members of the Fifth Amendment Equity Subclass and the Fifth Amendment Auction Proceeds Subclass.

170. In the event that the Court finds that neither 42 U.S.C. § 1983 nor Michigan's inverse-condemnation cause of action provide a viable procedural vehicle for enforcement of Plaintiffs' Fifth-Amendment rights against Defendants, Plaintiffs assert the claims pled in Counts I and III via a cause of action arising directly under the Fifth Amendment, which they contend is self-executing. *See DeVillier v. Texas*, 601 U.S. 285, 292-93 (2024).

### Count V: § 1983 Violation of the Right to Procedural Due Process
### (Auction Proceeds Subclass against All Defendants)

171. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

172. Plaintiffs bring this claim individually and on behalf of the other members of the Fifth Amendment Auction Proceeds Subclass.

173. Plaintiffs and Class Members have cognizable property interests in the proceeds generated when Defendant DLBA sells their real property at public auctions. This interest survives the transfer of legal title to the properties to the DLBA.

174. Defendant DLBA did not provide any notice to former property owners of when it intended to auction their property, nor did it provide any procedure by

which former property owners could claim the auction proceeds after their real estate was sold at public auction.

175.   Defendant DLBA violated the procedural due process rights of Plaintiffs and members of the Auction Proceeds Subclass when it deprived them of their interest in the auction proceeds without any notice or process. *See Palakurthi v. Wayne Cnty.,* 2025 U.S. Dist. LEXIS 55248 at *8 (E.D. Mich. 2025).

176.   In the alternative, if Defendant DLBA retained the proceeds from the sale of Plaintiffs' houses to satisfy or offset purported debts that Plaintiffs and Class Members owed to DLBA for attorneys fees or abatement costs, Defendant DLBA violated Plaintiffs' due process rights by unilaterally seizing property to satisfy these purported debts, without:

a) quantifying its purported attorney fees or abatement expenses;

b) providing notice to Plaintiffs and Class Members of the amount that DLBA claimed that each of them owed, or any itemization of its purported expenses; or

c) affording Plaintiffs any opportunity to challenge the reasonableness or amount of its claimed attorneys fees and/or abatement expenses, including "whether each repair or expenditure was necessary to abate an actual nuisance condition," and "whether the expenses of abating that nuisance

condition were reasonable and justified." *See Ypsilanti Charter Twp. v. Kircher,* 281 Mich. App. 251, 279 (2008).

177.   Defendant City of Detroit authorized Defendant DLBA to retain the auction proceeds for itself in a February 7, 2014 Resolution of the Detroit City Council. The City's policy, as embodied in the February 7, 2014 Resolution, was the moving force behind the aforementioned violations of the Plaintiffs' Due Process rights.

## Count VI: Violation of Article I, § 16 of the Michigan Constitution
### (All Plaintiffs against All Defendants)

178.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

179.   Plaintiffs bring this claim individually and on behalf of the other members of the Class.

180.   In the alternative, if the seizures of property effectuated through Defendant DLBA's Nuisance Abatement Program constitute punitive civil forfeitures, then they are subject to constitutional scrutiny under Article I, § 16 of the Michigan Constitution of 1963, which provides that "excessive fines shall not be imposed."

181.   Defendants' forfeitures of Plaintiffs' houses as punishment for municipal civil infractions violate Article I, § 16 of the Michigan Constitution of 1963 for the

same reasons that they violate the Excessive Fines Clause of the United States

Constitution, as set forth in Count II.

## Count V: Unjust Enrichment
### (Unjust Enrichment Subclass vs. Defendant DLBA)

182.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set

forth herein.

183.   Plaintiffs bring this claim individually and on behalf of the other members of

the Unjust Enrichment Subclass.

184.   The Detroit Land Bank Authority obtained a benefit, to wit: $59,950.00,

when it retained for itself the proceeds of the sales of the five houses it took from

Ruby Washington, Mary Terrell, Sheila Todd, Ward's House, LLC, and Morgan

Tate & Brewer LLC.

185.   The Detroit Land Bank Authority obtained a benefit, to wit: more than $3.5

million dollars, when it retained for itself the proceeds of the sales of several

hundred houses that it took from private owners via NAP and sold in the six years

and 101 days prior to the commencement of this case.

186.   The Detroit Land Bank Authority also obtained and continues to obtain an

additional benefit in the form of 5/50 revenue, or 50% of the property taxes paid on

a parcel for a five-year period, for the five years following each sale of a NAP-acquired property to a private owner.

187.   The Detroit Land Bank Authority received a benefit from Ruby Washington, Mary Terrell, Sheila Todd, Ward's House, LLC, and Morgan Tate & Brewer LLC, because the five houses it sold for a total of $59,950.00 had belonged to those Plaintiffs, and the Detroit Land Bank Authority never compensated Ms. Washington, Ms. Terrell, Ms. Todd, Ward's House, LLC, or Morgan Tate & Brewer LLC for their real property.

188.   The Detroit Land Bank Authority received a benefit from each member of the Unjust Enrichment Subclass, because the hundreds of homes it sold for millions of dollars had belonged to the members of the Unjust Enrichment Subclass, and the Detroit Land Bank Authority has never compensated any of the members of the Unjust Enrichment Subclass for their real property.

189.   An inequity results to Ruby Washington, Mary Terrell, Sheila Todd, Ward's House, LLC, Morgan Tate & Brewer LLC, and all other members of the Unjust Enrichment Subclass as a result of the retention of millions of dollars of sales proceeds by the Detroit Land Bank Authority.

**Prayer For Relief**

WHEREFORE, Plaintiffs request that judgment be entered against Defendants on all claims and request the Court order the following relief:

(a.) A determination that this action may proceed as a class action under Rule 23(b)(3), or in the alternative, Fed. R. Civ. P. 23(b)(1) or (b)(2);

(b.) Designation of each of Plaintiffs as a Class Representative and designation of Plaintiffs' counsel as Class Counsel;

(c.) A Declaration that the Defendants, and each of them, have violated the Fifth Amendment to the United States Constitution and Article X, § 2 of the Michigan Constitution by failing to compensate Plaintiffs and Class Members for their property after taking it from Plaintiffs via the Nuisance Abatement Program;

(d.) A Declaration that the Defendants, and each of them, have violated the Fifth Amendment to the United States Constitution and Article X, § 2 of the Michigan Constitution by retaining, or authorizing the retention, of the proceeds of subsequent dispositions of real property that was taken from Plaintiffs and Class Members via the Nuisance Abatement Program, without providing any mechanism for Plaintiffs and Class Members to claim the proceeds;

(e.) A Declaration that the Defendants, and each of them, have violated the Due Process rights of Plaintiffs and Class Members under the Fourteenth

Amendment by deprived them of their interest in auction proceeds from the sales of Class Members' real property without any notice or process.

(e.) An Order requiring Defendant Detroit Land Bank Authority to pay restitution to each Class Member whose property it took and subsequently sold to a third party, in the amount of the sales proceeds received by the Detroit Land Bank Authority for that Class Member's property, as well as prejudgment interest from the date of the sale, or, if the Class Member's property was sold via a method other than a public auction, the greater of the fair-market value of the property on the date of sale or the sales proceeds received by the Detroit Land Bank Authority, in either case with prejudgment interest from the date of sale, or alternatively, from the date of the taking;

(f.) An Order requiring Defendants to pay just compensation to each Class Member whose former property either remains in the possession of the Detroit Land Bank Authority, or whose former property was transferred to a Delray property owner for $1, in the amount of the true cash value of the property on the date it was taken, as well as prejudgment interest from the date of the taking;

(g.) An award of an incentive fee to the named Plaintiffs for having the courage to come forward and challenge the DLBA's unlawful practices;

(h.) Award the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and costs; and

(i.) Award any such other and further declaratory, injunctive, and equitable relief as the Court deems appropriate, just and proper.

Dated: May 11, 2025                          Respectfully Submitted,

                                             */s/ Ian T. Cross*
                                             Ian T. Cross (P83367)
                                             Laurence H. Margolis (P69635)
                                             Attorneys for Plaintiffs
                                             402 W. Liberty St.
                                             Ann Arbor, MI  48103
                                             (734) 994-9590
                                             larry@lawinannarbor.com
                                             ian@lawinannarbor.com

## DEMAND FOR TRIAL BY JURY

NOW COME Plaintiffs, by and through their counsel, and hereby demand a trial by jury as to all those issues triable as of right.

Dated: May 11, 2025                          Respectfully Submitted,

                                             */s/ Ian T. Cross*
                                             Ian T. Cross (P83367)
                                             Laurence H. Margolis (P69635)
                                             Attorneys for Plaintiffs