UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KASSANDRA LUDINGTON, et al.

               Plaintiffs,

                                 Case No. 2:25-cv-10307

v.

                                 Hon. Jonathan J.C. Grey

CITY OF DETROIT, a Michigan Municipal
Corporation, and THE DETROIT LAND        Mag. Judge David R. Grand
BANK AUTHORITY, a public body
corporate,

               Defendants.

---

**<u>PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT</u>**

i

## **TABLE OF CONTENTS**

Concise Statement of Issues Presented.......................................................iii

Controlling or Most Appropriate Authority...................................................iv

Table of Authorities.........................................................................v

ARGUMENT

I. The seizure of Plaintiffs' land is a 'physical taking' for which
 just compensation is required..............................................................1

II. Plaintiffs' claims do not implicate the *Rooker-Feldman* doctrine.....................13

III. Plaintiffs' claims are not barred by various preclusion doctrines..................17

IV. Plaintiffs' claims are not time-barred.............................................22

V. Plaintiffs' have stated a claim under § 1983.......................................25

VI. Plaintiffs have adequately pled that Defendants caused their injuries..............29

VII. Plaintiffs adequately pled a procedural due process claim.........................34

VIII. Plaintiffs' *Monell* allegations are sufficient..................................36

IX. Plaintiffs' state constitutional claims are viable................................38

X. Defendants are not immune from takings claims under the
 Michigan Constitution.................................................................40

XI. Plaintiffs' claim arising directly under the Fifth Amendment is pled in the
alternative, in the event that the Court finds that neither § 1983 nor Michigan law
provide a viable remedy...............................................................41

XII. Plaintiffs have stated claims for unjust enrichment..............................42

XIII. Defendants do not have immunity from unjust-enrichment claims...................43

ii

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

I.    Whether Defendants can confiscate land without compensation if a nuisance condition exists on the land.

**Plaintiffs state: No.**
**Defendants state: Yes.**
**This Court should state: No.**

II.    Whether Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine or various preclusion doctrines.

**Plaintiffs state: No.**
**Defendants state: Yes.**
**This Court should state: No.**

III.    Whether Defendants caused Plaintiffs' injuries, where Defendant DLBA took Plaintiffs' real estate, did not pay for it, sold the real estate to third parties without making any repairs or improvements, and kept all the resulting sales proceeds for itself.

**Plaintiffs state: Yes.**
**Defendants state: No.**
**This Court should state: Yes.**

IV.    Whether Defendants have immunity for claims alleging unjust enrichment or a taking without compensation in violation of the Michigan Constitution.

**Plaintiffs state: No.**
**Defendants state: Yes.**
**This Court should state: No.**

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

### <u>Federal Cases</u>

*Harrison v. Montgomery Cnty.,* 997 F.3d 643 (6th Cir. 2021)

*Hohenberg v. Shelby Cnty.,* 68 F.4th 336 (6th Cir. 2023)

*Cedar Point Nursery v. Hassid,* 594 U.S. 139, 149 (2021)

*Hall v. Meisner,* 51 F.4th 185 (6th Cir. 2022)

*Tyler v. Hennepin Cnty.,* 598 U.S. 631 (2023)

*Bowles v. Sabree,* 121 F.4th 539 (6th Cir. 2024)

*Palakurthi v. Wayne Cnty.,* 2022 U.S. Dist. LEXIS 56356 (E.D. Mich. Mar. 28, 2022)

### <u>State Cases</u>

*Ypsilanti Charter Twp. v. Kircher,*  281 Mich. App. 251 (2008)

*Bertwhistle v. Goodrich*, 53 Mich. 457 (1884)

*Proctor v. Saginaw Cnty. Bd. of Comm'rs,* 340 Mich. App. 1 (2022)

*Rafaeli, LLC v. Oakland Cnty.,* 505 Mich. 429 (2020)

*Jackson v. Southfield Neighborhood Revitalization Inititative,* 2025 Mich. LEXIS 1287 (Mich. Supreme Ct. July 16, 2025)

# TABLE OF AUTHORITIES

**Cases:**

**United States Supreme Court**

*Berman v. Parker*, 348 U.S. 26 (1954)……………………………………….    29

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021)……………………….    1, 5, 8

*Chicago, B. & Q. R. Co. v. City of Chicago*, 166 U.S. 226 (1897)…………..…..    13

*DeVillier v. Texas*, 601 U.S. 285 (2024)………………………………………..…    41, 42

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)………..…    13, 15

*Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984)………………………….…    1

*Horne v. Dep't of Agric.*, 576 U.S. 351 (2015)….……………………………..…    5, 6, 8

*Kelo v. City of New London*, 545 U.S. 469 (2005)………………………….…    29

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987)…………    *passim*

*Knick v. Twp. of Scott*, 588 U.S. 180 (2019)………………………………….    19

*Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419 (1982)………..…    8

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)……………………………    7

*Migra v. Warren School Dist. Bd. of Education*, 465 U.S. 75 (1984)…………….    22

*Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226 (2021)……………..…    19

*Pearson v. Ray*, 386 U.S. 547 (1967)………………………………………..…    42

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978)……..…    5

*Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998)…………………    9, 12

*Sheetz v. Cnty. of El Dorado*, 601 U.S. 267 (2024)…………………………..…    42

*Stop the Beach Renourishment, Inc. v. Fla. Dep't. of Envtl. Prot.*, 560 U.S. 702 (2010)…..………………………….……………………….…..    8, 41

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002)……………………………………………………………    5, 6, 8

*Taylor v. Sturgell*, 553 U.S. 880 (2008)……………………………………..… 21

*Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023)………………….…..…………… *passim*

*Yee v. City of Escondido*, 503 U.S. 519 (1992)…………………………….…… 5

**United States Court of Appeals for the Sixth Circuit**

*Alexander v. Rosen*, 804 F.3d 1203 (6th Cir. 2015)……………………….… 16

*Bowles v. Sabree*, 121 F.4th 539 (6th Cir. 2024)…………………….………. *passim*

*Crow v. City of Springfield*, 15 F. App'x 219 (6th Cir. 2001)……………………. 1, 20

*Davet v. City of Cleveland*, 456 F.3d 549 (6th Cir. 2006)…………………………..… 1

*Freed v. Thomas*, 976 F.3d 729 (6th Cir. 2020)……………………………….… 30, 33

*Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022)……………………………………… *passim*

*Harrison v. Montgomery Cnty.*, 997 F.3d 643 (6th Cir. 2021)……………………..… *passim*

*Hohenberg v. Shelby Cnty.*, 68 F.4th 336 (6th Cir. 2023)……………………..… 14, 15, 16

*Howard v. Macomb Cnty.*, 133 F.4th 566 (6th Cir. 2025)…………………………… 29, 30

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)………………………..… 34, 36

*Kircher v. Charter Twp. of Ypsilanti*, 2021 U.S. App. LEXIS 33900
(6th Cir. Nov. 15, 2021)………………………………………………………….… 20

*Kircher v. City of Ypsilanti*, 809 F. App'x 284 (6th Cir. 2020)…………………..… 20

*Kovacic v. Cuyahoga County Dep't. of Children & Family Servs.*, 606 F.3d
301 (6th Cir. 2010)……………………………………………………………….… 15, 16

*Marks v. Tennessee*, 554 F.3d 619 (6th Cir. 2009)…………………………………… 16

*Marshall v. Caudill*, 2024 U.S. App. LEXIS 22789 (6th Cir. 2024)……………..… 15

*McCormick v. Braverman*, 451 F.3d 382 (6th Cir. 2006)……………………..…… 14

*Med Corp. v. City of Lima*, 296 F.3d 404 (6th Cir. 2002)……………………...…… 27

*Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016)…………………………… 36

*Powers v. Hamilton Cnty. Public Defender Comm'n*, 501 F.3d 592 (6th Cir. 2007).. 32

*Pratt v. Ventas, Inc.*, 365 F.3d 514 (6th Cir. 2004)…………………………………… 22

*Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590 (6th Cir. 2016)……. 25

*Republic Bldg. Co. v. Charter Twp. of Clinton*, 81 F.4th 662 (6th Cir. 2023)……… 17, 22

*Rose v. Oakland Cnty.*, 2023 U.S. App. LEXIS 8334 (6th Cir. 2023)……………... 17, 20

*Sinclair v. Meisner*, 2022 U.S. App. LEXIS 35922 (6th Cir. Dec. 19, 2022)………. 43

*Skatemore, Inc. v. Whitmer*, 40 F.4th 727 (6th Cir. 2022)…………………………... 13

*Slaybaugh v. Rutherford Cnty.*, 114 F.4th 593 (6th Cir. 2024)……………………... 38

*Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432 (6th Cir. 2006)…….. 13

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Shield of Mich.*,

552 F.3d 430 (6th Cir. 2008)………………………………………………………... 26, 39

*United States v. Asakevich*, 810 F.3d 418 (6th Cir. 2016)…………………………. 22

*Vanderkodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397 (6th Cir. 2020)……..…. 14

*Wershe v. City of Detroit*, 112 F.4th 357 (6th Cir. 2024)……………………..……. 24

**United States District Court for the Eastern District of Michigan**

*Arkona, LLC v. Cty. of Cheboygan*, 2021 U.S. Dist. LEXIS 8202

(E.D. Mich. Jan. 15, 2021)……………………………………………………………. 18

*Bowles v. Sabree*, 2022 U.S. Dist. LEXIS 8172 (E.D. Mich. Jan. 14, 2022)….……. 23, 24

*Bromley v. Michigan Educ. Association-NEA*, 178 F.R.D. 148 (E.D. Mich. 1998). 23

*Fox v. Cnty. of Saginaw*, 2021 U.S. Dist. LEXIS 6402 (E.D. Mich. Jan. 13, 2021). 18, 21

*Fox v. Cnty. of Saginaw*, 2025 U.S. Dist. LEXIS 162753 (E.D. Mich. Aug. 21,

2025)……………………………………………………………………………….…. 25, 27

*Kircher v. Charter Twp. of Ypsilanti*, 2020 U.S. Dist. LEXIS 137247 (E.D. Mich.

Aug. 3, 2020)………………………...………………………………………….…… 20

*Ladrigue v. City of Bay City*, 2022 U.S. Dist. LEXIS 74064 (E.D. Mich. Apr. 22,

2022)……………………………………………………………………………….…. 23

vii

*Lee v. Belvoir Media Grp., LLC*, 2023 U.S. Dist. LEXIS 172920 (E.D. Mich.
Sept. 27, 2023)……………………………………………………...…   24

*Palakurthi v. Wayne Cnty.*, 2022 U.S. Dist. LEXIS 56356 (E.D. Mich. Mar. 28,
2022)……………………………………………………………………   18, 21, 22, 24

*Palakurthi v. Wayne Cnty.*, 2025 U.S. Dist. LEXIS 55248 (E.D. Mich. Mar. 25,
2025)…………………………………………………………...…..   23, 27, 44

*Wings as Eagles Deliverance Ministry v. City of Detroit*, 2022 U.S. Dist.
LEXIS 13773 (E.D. Mich. Jan. 25, 2022)……………………………………   17, 30

**State Court Cases**

*Bertwhistle v. Goodrich*, 53 Mich. 457 (1884)……………………………………   9, 11

*Cheboygan County Constr. Code Dep't v. Burke*, 384 N.W.2d 77
(Mich. Ct. App. 1985)……………………………………………………...…   9, 13

*City of Highland Park v. State Land Bank Auth.*, 340 Mich. App. 593 (2022)……   43

*Clark v. Lake St. Clair & New Up-River Ice Co*, 24 Mich. 508 (1872)…………….   11

*Coe v. Schultz*, 47 Barb. 64 (N.Y. Gen. Term 1866)…………………….…………   10

*Derderian v. Genesys Health Care Sys.*, 263 Mich. App. 364 (2004)…………….   31, 32

*Dextrom v. Wexford Cnty.*, 287 Mich. App. 406 (2010)……………………………   45

*Electro-Tech v. H. F. Campbell Co.*, 433 Mich. 57 (1989)…………………………   40-41

*Eno v. Burlington*, 125 Vt. 8 (1965)………………………………………………..   4

*Grover v. Huckins*, 26 Mich. 476 (1873)………………………………………...…   11

*Hyde v. University of Michigan Bd. of Regents*, 426 Mich. 223 (1986)…………....   44-45

*Jackson v. Southfield Neighborhood Revitalization Initiative*, 2025 Mich.
LEXIS 1287 (Mich. Supreme Ct. July 16, 2025)…………………………...…..   39, 41

*Kuban v. McGimsey*, 96 Nev. 105 (1980)…………………………………………   3

*Long Lake Twp. v. Maxon*, 15 N.W.3d 118 (Mich. 2024)…………………………   28

*MacLeod v. Takoma Park*, 257 Md. 477 (1970)……………………..……………… 4

*Manhattan Mfg. & Fertilizer Co. v. Van Keuren*, 23 N.J. Eq. 251 (N.J. Eq. 1872).. 10, 11

*Mays v. Snyder*, 323 Mich. App. 1 (2018)……………………..……………….. 40

*Merkur Steel Supply, Inc. v. City of Detroit*, 261 Mich. App. 116 (2004)…….…… 40

*Mick v. Kent Cnty. Sheriff's Dep't (In re Estate of Bradley)*, 494 Mich. 367 (2013) 44

*Nassr v. Commonwealth*, 394 Mass. 767 (1985)………………..………………... 4

*People ex. rel. Thrasher v. Smith*, 275 Ill. 256 (1916)……………….………… 4

*Pompano Horse Club, Inc. v. State ex rel. Bryan*, 93 Fla. 415 (1927)…………….. 4

*Proctor v. Saginaw Cnty. Bd. of Comm'rs*, 340 Mich. App. 1 (2022)……………... 41, 43, 44

*Rafaeli, LLC v. Oakland Cnty.*, 505 Mich. 429 (2020)…………………………… 35, 39, 41

*Schafer v. Kent Cnty.*, 2024 Mich. LEXIS 1438 (Mich. July 29, 2024)…………... 43

*Welch v. Stowell*, 2 Doug. 332 (Mich. 1846)……………………………………… 11

*Wright v. Gennessee Cnty.*, 504 Mich. 410 (2019)………………………………… 43, 44

*Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. 251 (2008)……………..…… *passim*

*Ypsilanti Fire Marshall v. Kircher*, 273 Mich. App. 496 (2007)…………..……… *passim*

**Constitutional Provisions:**
U.S. Const. amend. V…………………………..…………………………………… *passim*

Mich. Const. art. X, § 2………………………..…………………………………... 38, 41

**Statutes:**
MCL § 600.2940…………………………………………………………………….. 9, 37

MCL § 600.5852…………….…………………………………………………….... 25

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### I. The seizure of Plaintiffs' land is a 'physical taking' for which just compensation is required

The Takings Clause to the Fifth Amendment to the United States Constitution prohibits state and local governments from taking private property for other than a public purpose, regardless of whether the property owner is compensated. *See Haw. Hous. Auth. v. Midkiff,* 467 U.S. 229, 241 (1984). If a taking is for a public purpose, "the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021).

In arguing that "compensation is not required where a municipality acts to abate a nuisance," ECF No. 19, PageID.578-582, Defendants have failed to cite any case, from any jurisdiction, in which a government entity seized real estate without compensation because the landowner allowed a nuisance to exist on their property. A municipality may *remove* or *abate* a nuisance that exists on privately-owned land, for example, by demolishing a building, *See Davet v. City of Cleveland,* 456 F.3d 549, 553 (6th Cir. 2006), removing accumulated junk from the property, *See Crow v. City of Springfield,* 15 Fed. Appx. 219, 220-222 (6th Cir. 2001), or by making necessary repairs to stabilize a dilapidated structure. *See Ypsilanti Fire Marshall v. Kircher,* 730 N.W.2d 481, 512 (Mich. Ct. App. 2007). A

1

municipality can also obtain a money judgment against the landowner for its costs of nuisance-abatement. It can collect that judgment via ordinary post-judgment collection procedures, including, if necessary, a judicial sale of real property. *See Ypsilanti Fire Marshall v. Kircher,* 730 N.W.2d at 508-509 (Mich. Ct. App. 2007). But if there is a sale, the property owner is entitled to any surplus proceeds of the sale in excess of their debt to the municipality for its nuisance-abatement costs. *See Ypsilanti Charter Twp. v. Kircher,* 281 Mich. App. 251, 282-285 & n.13 (2008); *Ypsilanti Fire Marshall v. Kircher,* 730 N.W.2d 481, 509 (Mich. Ct. App. 2007).

In this case, the DLBA did not abate nuisances, obtain money judgments for its abatement costs, and then execute against the Plaintiffs' real property to recover on those judgments, with any surplus proceeds of a judicial sale turned over to the Plaintiffs. It did something entirely different. It seized absolute title to Plaintiffs' real estate first, without either abating any nuisances on Plaintiffs' land or obtaining money judgments against Plaintiffs for its abatement expenses. ECF No. 13, PageID 315-316, ¶¶ 43-45. It did not abate any nuisances on the land after taking title. ECF No. 13, PageID 317-318, ¶¶ 48-49. Instead, it left the properties to sit vacant for several years, then sold the properties, in the same or worse condition as when it acquired them, and retained all of the sales proceeds for itself. ECF No. 13, PageID.313, ¶ 38. The DLBA's NAP program does not "diminish[] or destroy[] the value of property by stopping illegal activity or abating a public

2

nuisance." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470 492 n.22 (1987). Rather than "diminishing or destroying" the value of Plaintiffs properties, the DLBA merely ***transferred*** the value of the properties, from the Plaintiffs to itself.

In arguing that their conduct is legal, Defendants rely heavily on footnote 22 of *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470 (1987), which noted that "[c]ourts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance[,]" and cites six cases for this proposition. *Id.* at 492 n.22. But neither *DeBenedictis* itself nor any of the cases cited in Footnote 22 involved an actual physical taking of property. In *Kuban v. McGimsey,* 95 Nev. 105 (1980), for example, voters in a Nevada county where prostitution had previously been legal passed a ballot initiative to ban prostitution. *Kuban* at 107. Brothel owners did not lose title to their brothels, but after the initiative passed, the establishments could only sell alcohol. *Id.* The Nevada Supreme Court held that the ordinance was not a taking, since "the ordinance, although having a significantly adverse economic impact upon appellants' ventures, does not deprive appellants of all reasonable uses of their property." *Id.* at 112.

*People ex. rel. Thrasher v. Smith,* 275 Ill. 256 (1916) also involved state action to stop prostitution in a building, without confiscating the real estate. *See Thrasher*, 275 Ill. at 259 ("the nuisance is not in the property itself but in the manner in which it is used, and that the unlawful use may be prevented without the confiscation or destruction of the property itself. The statute does not undertake to confiscate or destroy property."). *Pompano Horse Club, Inc*. v. *State ex rel. Bryan*, 93 Fla. 415 (1927) concerned a state's action to enjoin illegal gambling at a racetrack. The state did not confiscate the racetrack, or even seek to "enjoin the running of horse races." *Id.* at 421. *Eno v. Burlington,* 125 Vt. 8 (1965) and *MacLeod v. Takoma Park*, 257 Md. 477 (1970) both concerned municipalities demolishing buildings that were at risk of collapse, again, without disturbing the owners' titles to the land on which the buildings sat. *Nassr v. Commonwealth*, 394 Mass. 767 (1985) concerned an industrial property where the plaintiffs' tenant had been illegally dumping toxic chemicals in the soil. *Id.* at 769. State officials, with permission from the property owners, entered onto the property and conducted a cleanup operation. *Id.* The owners never lost title to their industrial property; the court merely rejected the owners' claim that the state owed them rent for the several months it occupied their property while it was cleaning up the toxic waste. *Id.* at 771. These cases all involved the State removing something from the land, like toxic waste or a collapsing structure, or prohibiting an activity on the property,

like prostitution. In none of these cases did the government seize title to the nuisance-containing realty.

Takings claims come in two flavors: physical takings and regulatory takings. *See Tahoe-Sierra Pres. Council. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321-22 (2002); *See also, Yee v. City of Escondido*, 503 U.S. 519, 522-523 (1992). A physical taking occurs when "the government has physically taken property for itself or someone else—by whatever means," while a regulatory taking may occur when the government "has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 149 (2021). Physical-takings claims and regulatory-takings claims are evaluated under different frameworks. Regulatory takings are analyzed under the balancing test of *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978), which involves consideration of "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Horne v. Dep't of Agric.,* 576 U.S. 351, 360 (2015). Actual physical takings, however, are assessed "using a simple, *per se* rule: The government must pay for what it takes." *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 148 (2021).

"This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents

5

for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 323 (2002); *See also, Horne v. Dep't of Agric.,* 576 U.S. 351, 361 (2015). So *DeBenedictis,* like all of the nuisance cases it cites in Footnote 22, is inapposite, because it is a regulatory-takings case. *See DeBenedictis,* 480 U.S. at 488 n.18 ("While the Court has almost invariably found that the permanent physical occupation of property constitutes a taking, the Court has repeatedly upheld regulations that destroy or adversely affect real property interests. **This case, of course, involves land use regulation, not a physical appropriation of petitioners' property**."). (emphasis added) (internal citations omitted).

The regulation at issue in *DeBenedictis* sought to limit subsidence damage from subsurface coal mining. When underground coal is removed, the surface of the land above the coal mine sinks, which can destabilize the foundations of buildings on the surface. *See DeBenedictis*, 480 U.S. at 474-75. The plaintiff in *DeBenedictis*, a coal-mining trade group, challenged a Pennsylvania law that prohibited mining in a manner that would cause subsidence damage to homes, public buildings, and cemeteries. *Id.* at 476-77. The law and its implementing regulations generally required the plaintiffs to leave 50% of the coal in the ground underneath such structures, although the 50% requirement could be waived if the mine operator was able to demonstrate that alternative measures would prevent

6

subsidence damage. *Id.* at 477 n.7. Because the vast majority of the plaintiffs' subsurface coal was not located under a house, cemetery, or public building, the effect of the regulation was to require the mining companies to leave less than 2% of their coal in the ground. *Id.* at 496.

The Court analogized the requirement to leave less than 2% of the coal in the ground to "a setback ordinance requiring that no structure be built within a certain distance from the property line," holding that "[t]here is no basis for treating the less than 2% of petitioners' coal as a separate parcel of property." *Id.* at 498. In holding that the regulation did not effect a taking, Court also noted:

> We do not suggest that the State may physically appropriate relatively small amounts of private property for its own use without paying just compensation. The question here is whether there has been any taking at all **when no coal has been physically appropriated**, and the regulatory program places a burden on the use of only a small fraction of the property that is subjected to regulation.

*Debenedictis,* 480 U.S. at 499 n.27 (emphasis added).

Here, the Detroit Land Bank Authority did not merely impose land-use regulations, like the coal-mining regulation at issue in *DeBenedictis*. Instead, it engaged in "*outright physical appropriation* of land without compensation," which is "out of accord with *any* plausible interpretation" of the Fifth Amendment. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028 n.15 (1992) (emphasis in original). Actual confiscation of land by the government <u>always</u> constitutes a taking. *See*

*Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147-149 (2021); *Horne v. Dep't of Agric.,* 576 U.S. 351, 357-58 (2015); *Loretto v. Teleprompter Manhattan Catv Corp.,* 458 U.S. 419, 427 & n.5 (1982) ("[w]hen faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking."); *Tahoe-Sierra Pres. Council,* 535 U.S. at 322 (1992) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.") (internal citation omitted).

It does not matter whether Defendants' program provides important benefits to the community; "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto v. Teleprompter Manhattan Catv Corp.,* 458 U.S. 419, 426 (1982). It does not matter that the land acquisitions did not involve the exercise of eminent domain: "though the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing." *Stop the Beach Renourishment, Inc. v. Fla. Dep't. of Envtl. Prot.,* 560 U.S. 702, 713 (2010).

Nor does it matter whether any nuisances existed on Plaintiffs' land. The Fifth Amendment "'protects rather than creates property interests,' which means

8

that 'the existence of a property interest,' for purposes of whether one was taken, 'is determined by reference to existing rules or understandings that stem from an independent source such as state law.'" *Hall v. Meisner*, 51 F.4th 185, 189 (6th Cir. 2022) (quoting *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998)). Michigan law recognizes property interests in real estate even when the landowner has created or maintained a public nuisance on his land. *See Ypsilanti Charter Twp v. Kircher*, 281 Mich. App. 251, 282-285 & n.13 (2008) (holding that defendant landowner entitled to surplus proceeds, in excess of plaintiff municipality's abatement expenses, of any judicial sale of nuisance apartment complex); *Ypsilanti Fire Marshall v. Kircher*, 273 Mich. App. 496, 538-540 (2007) (same); *see also, Cheboygan County Constr. Code Dep't v. Burke*, 384 N.W.2d 77, 78-79 (Mich. Ct. App. 1985) (bank's mortgage lien on parcel containing abandoned collapsing supermarket could not be extinguished by municipality's nuisance-abatement action).

Michigan even recognizes property interests in *personal property* that *constitutes a nuisance*: MCL § 600.2940 provides that while the plaintiff in a nuisance-abatement action may sell "the materials of any buildings, fences, or other things that may be removed as a nuisance," if the proceeds of the sale exceed the expenses of removal, the plaintiff "shall pay over the balance thereof, if any, to the defendant upon demand." MCL § 600.2940(4); *See also, Bertwhistle v.*

9

*Goodrich*, 53 Mich. 457, 460 (1884) (holding that plaintiff's cows grazing on a public highway were a nuisance, but defendant was not entitled to abate the nuisance by confiscating the cows).

Defendants argue, in a footnote, that this case is allegedly distinguishable from *Hall v. Meisner,* 51 F.4th 185 (6th Cir. 2022) and *Tyler v. Hennepin Cnty.,* 598 U.S. 631 (2023) because,

> "[t]he principle that the owner of a property subject to foreclosure for failure to satisfy a debt retains an equitable interest in the property (equal to the difference between the debt owed and the value of the property) has deep roots in Anglo-American law. . . . [t]here is no comparable tradition regarding the rights of property adjudicated to be a public nuisance. Rather, it is the principle that no compensation is owed where the government acts to abate a public nuisance that has deep roots in American legal history."

ECF No. 19, PageID.581. This argument is both factually wrong and legally irrelevant. It is factually wrong because Michigan's[1] historical common law

---

1   The two 19th-century cases cited by Defendants are state-court decisions from New Jersey and New York, respectively. Neither case involved a seizure of real estate. *Coe v. Schultz,* 47 Barb. 64 (N.Y. Gen. Term 1866) concerned a temporary injunction barring enforcement of a Board of Health order requiring a chemical manufacturing facility to cease production, "until the mode of conducting said manufacture should be so altered as that no odor or fumes could escape into the external air;" *Coe,* 47 Barb. at 65, while *Manhattan Mfg. & Fertilizer Co. v. Van Keuren,* 23 N.J. Eq. 251 (N.J. Eq. 1872) involved a temporary injunction to prevent the defendant from shutting down the plaintiff's fertilizer factory before the question of whether the factory was a public nuisance could be litigated. *Manhattan Mfg.,* 23 N.J. Eq. at 252. In vacating the injunctions, both courts relied on the old common-law rule that *any citizen* had the right, "without official authority, to abate a public nuisance, and without waiting to have it adjudged such by a legal tribunal." *Manhattan Mfg.,* 23 N.J. Eq. at 255; *see also, Coe,* 47 Barb. at 67. But neither court held that the common-law right to take the law into one's own hands when abating a public

10

tradition has, in fact, respected the property rights of people who use their property to maintain public nuisances. *See Welch v. Stowell*, 2 Doug. 332 (Mich. Supreme Court 1846) (holding that plaintiff landowner who operated illegal brothel out of her house could recover against the City of Detroit for demolishing her house to abate the nuisance); *Bertwhistle v. Goodrich*, 53 Mich. 457, 460 (1884) (cows wandering in public highway constituted a nuisance, but could not be confiscated from their owner); *Grover v. Huckins*, 26 Mich. 476, 483 (1873) (nuisance livestock found running loose in public streets could be seized and sold, but sale proceeds in excess of abatement costs were payable to former owner).

The argument is also legally irrelevant, because an examination of historical practice and "traditional property law principles" is only necessary when the relevant state's law provides that the plaintiff does not have a cognizable property interest in the asset that was taken. *See Hall v. Meisner,* 51 F.4th 185, 189-190 (6th Cir. 2022); *Tyler v. Hennepin Cnty.,* 598 U.S. 631, 638-639 (2023). An examination of historical practice is required in that circumstance because "a State may not

nuisance involved the right to confiscate real estate, or even the right to engage in unfettered property destruction. *See Manhattan Mfg.,* 23 N.J. Eq. at 253 ("It may be lawful to purge premises of a nuisance, and unlawful to burn or destroy them. How much force, or what kind, may be permissible in abating it, is obviously a different inquiry from the permissibility of any."). Michigan's 19th-century courts also expressly rejected the rule, relied on in these two cases, that every citizen has a right to unilaterally abate whatever he deems to be a public nuisance without any prior judicial process. *See Clark v. Lake St. Clair & New Up-River Ice Co,* 24 Mich. 508, 511-512 (1872).

sidestep the Takings Clause by disavowing traditional property interests long recognized under state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998). In *Tyler*, Minnesota attempted to sidestep the Takings Clause "by enacting a law providing that an owner forfeits her interest in her home when she falls behind on her property taxes." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 639 (2023). In *Hall*, the "Michigan General Property Tax Act created an exception" to the generally-applicable rule that former owners of real estate are entitled to the surplus proceeds following a foreclosure sale, "for just a single creditor: namely, the State itself (or a county thereof), which alone among all creditors may take a landowner's equitable title without paying for it, when it collects a tax debt." *Hall v. Meisner*, 51 F.4th 185, 187 (6th Cir. 2022). These kinds of self-serving state-law definitions of property rights are not respected in Takings jurisprudence, because "the Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take." *Hall v. Meisner*, 51 F.4th 185, 190 (6th Cir. 2022).

A historical analysis is not necessary in this case, because Michigan has not enacted a statute providing that a landowner has no property interest in his real estate when he maintains a public nuisance. Michigan instead recognizes the property rights of both landowners and lienholders in realty, even when a public nuisance exists on the land. *See Ypsilanti Charter Twp v. Kircher*, 281 Mich. App.

251, 282-285 & n.13 (2008); *Cheboygan County Constr. Code Dep't v. Burke*, 384 N.W.2d 77, 78-79 (Mich. Ct. App. 1985). Since Michigan law recognizes the property right at issue, Plaintiffs possessed legally-cognizable property interests in the real estate that they used to own, and Defendants' citations to 19th-century state-court decisions from New York and New Jersey are irrelevant.[2]

## II. Plaintiffs' claims do not implicate the *Rooker-Feldman* doctrine

Defendants argue that the Court lacks jurisdiction over all of Plaintiffs' claims under the *Rooker-Feldman* doctrine, allegedly because, "Plaintiffs' claims for compensation necessarily depend on a finding that their properties were not, in fact, public nuisances." ECF No. 19, PageID.582. Defendants also appear to argue that *Rooker-Feldman* divests this Court of jurisdiction because the state court judgments "caused" Plaintiffs' injuries. ECF No. 19, PageID.583-584.

Defendants are wrong, for several reasons. First, as explained *supra*, a former landowner is entitled to compensation when the government expropriates her real estate regardless of whether any nuisances existed on her land. So Plaintiffs' claims do not depend on a finding that no nuisances existed on their properties. Second, even if all of Plaintiffs' claims *did* necessarily require the Court to deny legal conclusions reached in state court judgments, that would not mean

---

2  These cases also predate *Chicago, B. & Q. R. Co. v. City of Chicago*, 166 U.S. 226 (1897), which first incorporated the Fifth Amendment's Takings Clause against state and local governments via the Fourteenth Amendment. *See Skatemore, Inc. v. Whitmer,* 40 F.4th 727, 736 (6th Cir. 2022).

that the *Rooker-Feldman* doctrine applies. A federal plaintiff may raise "some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party," without implicating *Rooker-Feldman*. *See Todd v. Weltman, Weinberg & Reis Co., L.P.A.,* 434 F.3d 432, 436 (6th Cir. 2006) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 293 (2005)).

Defendants' *Rooker-Feldman* analysis, which merely asks whether the state-court judgments were a but-for cause of the Plaintiffs' injuries, betrays a fundamental misunderstanding of the modern scope of the *Rooker-Feldman* doctrine. The Supreme Court has made clear "that the *Rooker-Feldman* doctrine— which prohibits the lower federal courts from reviewing appeals of state-court decisions—applies only to an exceedingly narrow set of cases." *Vanderkodde v. Mary Jane M. Elliott, P.C.,* 951 F.3d 397, 400 (6th Cir. 2020). "The Supreme Court, again and again, has seen fit to prune [*Rooker-Feldman*] back." *Hohenberg v. Shelby Cnty.,* 68 F.4th 336, 340 (6th Cir. 2023).

The *Rooker-Feldman* doctrine no longer applies to claims that are merely "inextricably intertwined" with state court decisions. "In *Exxon,* the Supreme Court implicitly repudiated the circuits' post-*Feldman* use of the phrase "inextricably intertwined" to extend *Rooker-Feldman* to situations where the source of the injury was not the state court judgment." *McCormick v. Braverman,*

14

451 F.3d 382, 394 (6th Cir. 2006). In other words, "the phrase 'inextricably intertwined' has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil." Id.* (quoting *Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 86-87 (2nd Cir. 2005)); *See also, Hohenberg v. Shelby Cnty.,* 68 F.4th 336, 341-342 ("in *Exxon,* the Court pointedly ignored the phrase "inextricably intertwined," suggesting an imminent retirement date.").

Additionally, application of *Rooker-Feldman*'s bar to federal jurisdiction now requires more than a but-for causal relationship between a state-court judgment and the federal plaintiff's injury. Application of the doctrine instead "requires two unusual things. It requires a challenged "judgment" in the new action. And it requires an effort to "review" that judgment, namely to "undo" or "overturn" it in the new action." *Hohenberg v. Shelby Cnty.,* 68 F.4th 336, 340 (6th Cir. 2023) (quoting *Exxon* at 287 & n.2, 293) (internal citation omitted).

The first requirement, a "challenged judgment," is not met when the federal plaintiff, a state-court loser, sues the state-court winners for "allegedly wrongful actions and omissions that led to" the state-court judgment. *Hohenberg,* 68 F.4th at 340 (6th Cir. 2023). For example, the claims of an aggrieved parent who sues Child Protective Services' employees for conspiring to take away her children via a judicial proceeding are not barred by *Rooker-Feldman*, even though "the juvenile

15

court's decision to award temporary custody to the County" was clearly a but-for cause of the injury. *See Kovacic v. Cuyahoga County Dep't. of Children & Family Servs.* 606 F.3d 301, 310 (6th Cir. 2010); *see also, Marshall v. Caudill*, 2024 U.S. App. LEXIS 22789 at *7 (6th Cir. 2024). The same is true of a claim alleging that a family-court judge conspired with various parties to impose allegedly wrongful child support obligations on the federal plaintiff via a state-court proceeding. *See Alexander v. Rosen*, 804 F.3d 1203, 1206-1207 (6th Cir. 2015). Because such a claim is "focused on antecedent wrongdoing," not on the judgment itself, it does not "challenge" the state-court judgment for *Rooker-Feldman* purposes. *See Hohenberg*, 68 F.4th at 340 (discussing *Alexander*). This was true in *Alexander*, even though the plaintiff asked the federal court to "abate" his child support obligation. *See Alexander*, 804 F.3d at 1206.

The second requirement to implicate *Rooker-Feldman* is an effort by the federal plaintiff to seek "review and rejection" of the state-court judgment. *Hohenberg*, 68 F.4th at 340. The Sixth Circuit has repeatedly held that, "a complaint demanding "compensatory damages" does not "seek review or reversal" of a court order awarding relief not measured by money." *Hohenberg,* 68 F.4th at 341 (citing *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 606 F.3d 301, 309-10 (6th Cir. 2010) and *Marks v. Tennessee*, 544 F.3d 619, 623 (6th Cir. 2009)). In fact, both the Sixth Circuit and courts in this district have specifically

16

held that takings claims against local governments arising from state-court foreclosure judgments do not implicate *Rooker-Feldman* where the federal plaintiff is seeking financial compensation, rather than the return of their real estate. *See Rose v. Oakland Cnty.*, 2023 U.S. App. LEXIS 8334 at *23 (6th Cir. 2023) ("While the request for the court to "strike down the foreclosure" is a direct attack on the state court foreclosure judgment, Rose's claim for just compensation is independent and therefore not barred by *Rooker-Feldman*."); *see also, Wings as Eagles Deliverance Ministry v. City of Detroit,* 2022 U.S. Dist. LEXIS 13773 at *11 (E.D. Mich. Jan. 25, 2022) ("the alleged source of injury was not the foreclosure, but the subsequent sale and retention of surplus. Therefore, a claim under *Rafaeli* is independent from claims which seek to invalidate a state court judgment as it is a post-judgment claim for relief. Relatedly, a claim for unjust enrichment does not seek to invalidate a state court judgment and may proceed.").

### III. Plaintiffs' claims are not barred by various preclusion doctrines

The kitchen sink of preclusion doctrines[3] invoked by Defendants do not bar a takings claim, raised for the first time in federal court, after a state-court decision

---

3   "Res judicata is an umbrella term that refers to two distinct concepts: issue preclusion (also called collateral estoppel), and claim preclusion (confusingly also called res judicata). Claim preclusion "involves preclusion of entire claims," while issue preclusion "focuses on specific issues within an action."" *Rose v. Oakland Cnty.*, 2023 U.S. App. LEXIS 8334 at *13 (6th Cir. 2023) (internal citation omitted). Dismissal of a claim as a "collateral attack" on a state-court judgment is merely another term for res judicata. *See Republic Bldg. Co. v. Charter Twp. of Clinton,* 81 F.4th 662, 667 (6th Cir. 2023).

has divested the federal plaintiff of her real estate. *See Harrison v. Montgomery Cnty.,* 997 F.3d 643, 647-651 (6th Cir. 2021)[4]; *Palakurthi v. Wayne Cnty.,* 2022 U.S. Dist. LEXIS 56356 at *9-*13 (E.D. Mich. Mar. 28, 2022) (same); *Arkona, LLC v. Cty. of Cheboygan*, 2021 U.S. Dist. LEXIS 8202 at *12-*14 (E.D. Mich. Jan. 15, 2021) (same); *Fox v. Cnty. of Saginaw,* 2021 U.S. Dist. LEXIS 6402 at *23-*28 & n.8 (E.D. Mich. Jan. 13, 2021) (same).

Res judicata does not apply in this circumstance because the third element of res judicata under Michigan law, that "the matter in the second case was, or could have been, resolved in the first[,]" is not present. *See Fox v. Cnty. of Saginaw,* 2021 U.S. Dist. LEXIS 6402 at *24-*26 (E.D. Mich. Jan. 13, 2021). **A federal takings claim is not ripe** until there has been a "final decision to transfer the property to the land bank." *Harrison v. Montgomery Cnty.,* 997 F.3d 643, 650 (6th Cir. 2021). So any federal takings claim cannot be litigated until *after* the entry of the state-court judgment seizing the property. *Id.*

Defendants, and their lawyers, know this. In *Joyner v. City of Detroit, et. al.,* Case No. 23-cv-10715 (E.D. Mich.), a Detroit homeowner tried to bring a takings claim against the Detroit Land Bank Authority before the entry of judgment seizing

---

4  Although the *Harrison* preclusion analysis was governed by Ohio law, there is no material difference between Michigan's and Ohio's common law of claim preclusion in this context. *Compare Harrison,* 997 F.3d at 648, *with Palakurthi v. Wayne Cnty.,* 2022 U.S. Dist. LEXIS 56356 at *11 (E.D. Mich. Mar. 28, 2022).

title to her house. In it's motion to dismiss that case, the DLBA argued (while

represented by the same counsel) that:

> Even if there were some legal basis to support Plaintiffs' Takings claim
> against the Land Bank (and there is not), it would still fail because it is not
> ripe for adjudication where, as here, Plaintiffs fail to allege a final decision
> by the Land Bank regarding the Property. *See Pakdel v. City & Cnty. of San
> Francisco, California*, 141 S. Ct. 2226, 2228, 210 L. Ed. 2d 617 (2021) ("a
> federal court should not consider [a Takings] claim before the government
> has reached a 'final' decision.")

ECF No. 1-18, PageID.168 (Docketed in *Joyner* at ECF No. 15, PageID.184).

According to the Land Bank's reasoning, a federal court cannot consider a

homeowners' takings claim arising from NAP *before* a state court enters a final

judgment awarding title to the property to the Land Bank, because such a claim

would be unripe. But as soon as judgment is entered in the Land Bank's favor in

state court, the federal takings claim is purportedly extinguished by various

preclusion doctrines. Per Defendants' logic, there is no right time to sue: no Detroit

homeowner can *ever* obtain an adjudication, on the merits, of a takings claim

arising from the DLBA's Nuisance Abatement Program in a federal district court.

This is not the law. In *Knick v. Twp. of Scott,* 588 U.S. 180 (2019), the

Supreme Court recognized, and eliminated, the "preclusion trap" that previously

prevented federal-court review of takings claims. *See Harrison v. Montgomery

Cnty.,* 997 F.3d 643, 649-650 (6th Cir. 2021). After *Knick*, a "property owner today

may bring a § 1983 federal takings claim in federal court as soon as their property

19

has been taken." *Harrison*, 997 F.3d at 649 (internal quotations omitted). Property owners now have "no obligation to invoke the federal takings clause" in the state-court proceeding "to stop title transfer in the first place." *Harrison*, 997 F.3d at 650. Instead, a property owner can "d[o] nothing" in response to a state-court's "decision to transfer her property to a land bank," then "go directly to federal court" as soon as the state-court judgment is entered. *Harrison*, 997 F.3d at 649.[5]

Res judicata still applies to takings claims after *Knick,* **if** the federal plaintiff "actually litigated her takings claim in state court[.]" *Rose v. Oakland Cnty.,* 2023 U.S. App. LEXIS 8334 at *17 (6th Cir. Apr. 7, 2023). This is one reason why the *Kircher* cases cited by Defendants are distinguishable. The pro-se plaintiff in those cases, David Kircher, actually litigated his takings claims in state courts, either by appealing the judgments of the state trial court, or by filing new, standalone state-court lawsuits. *See Kircher v. City of Ypsilanti*, 809 Fed. Appx. 284, 300 (6th Cir. 2020) (applying res judicata where, "the state appeals court reviewed and decided the takings claims Kircher raised before it"); *Kircher v. Charter Twp. of Ypsilanti,* 2020 U.S. Dist. LEXIS 137247 at *10-*11 (E.D. Mich. Aug. 3, 2020) (applying res judicata where "Kircher raised, or could have raised, each of these four claims in

---

5   The case cited by Defendants that comes to the opposite conclusion,  *Crow v. City of Springfield,* 15 Fed. Appx. 219 (6th Cir. 2001), (*see* ECF No. 19, PageID.587) was decided before *Scott* and is no longer good law.

the state court case he filed in 2007") (*Aff'd, Kircher v. Charter Twp. of Ypsilanti,* 2021 U.S. App. LEXIS 33900 (6th Cir. Nov. 15, 2021)).

Unlike David Kircher, the Plaintiffs in this matter did not litigate takings claims in direct appeals of the state-court judgments transferring title to their properties to the DLBA. Nor did they file state-court lawsuits against the DLBA after their properties were taken. Instead, just like the federal plaintiffs in *Harrison v. Montgomery Cnty.,* 997 F.3d 643 (6th Cir. 2021), *Palakurthi v. Wayne Cnty.,* 2022 U.S. Dist. LEXIS 56356 (E.D. Mich. Mar. 28, 2022), and *Fox v. Cnty. of Saginaw,* 2021 U.S. Dist. LEXIS 6402 (E.D. Mich. Jan. 13, 2021), the Plaintiffs "did nothing" in response to the state court litigation initiated against them, then went "directly to federal court" after their property was taken. *Harrison,* 997 F.3d at 649 (6th Cir. 2021). Neither res judicata, nor collateral estoppel, *see Fox v. Cnty. of Saginaw,* 2021 U.S. Dist. LEXIS 6402 at *28 n.8 (E.D. Mich. Jan. 13, 2021), bar their claims.

Defendants' "collateral attack" argument is similarly unavailing. When the prior judgment is a state-court judgment, the "collateral attack" theory is indistinguishable from res judicata. Although "the preclusive effect of a federal-court judgment is determined by federal common law[,]" *Taylor v. Sturgell,* 553 U.S. 880, 891 (2008), the preclusive effect of a state-court judgment in a federal court proceeding is not. Instead, a state-court judgment receives "the same

21

preclusive effect" in a federal proceeding as it would "under the law of the State in which the judgment was rendered." *Migra v. Warren School Dist. Bd. of Education,* 465 U.S. 75, 81 (1984); *see also, Harrison v. Montgomery Cnty.,* 997 F.3d 643, 648 (6th Cir. 2021); *Palakurthi v. Wayne Cnty.,* 2022 U.S. Dist. LEXIS 56356 at *10-*11 (E.D. Mich. Mar. 28, 2022). Two of the cases cited by Defendants in support of their "collateral attack" theory, *United States v. Asakevich*, 810 F.3d 418 (6th Cir. 2016), and *Pratt v. Ventas, Inc.,* 365 F.3d 514 (6th Cir. 2004), involved the preclusive effect of federal judgments under federal common law, and so are inapplicable here.

   Dismissal of a claim as a "collateral attack" on a state-court judgment is "more in the nature of res judicata" and "requires [the court] to look to the rules of res judicata in the forum that decided the first case." *Republic Bldg. Co. v. Charter Twp. of Clinton*, 81 F.4th 662, 667 (6th Cir. 2023). Defendants' "collateral attack" theory thus fails for the same reasons that their res judicata argument fails.

## IV. Plaintiffs' claims are not time-barred

   Those Plaintiffs whose real estate was sold at public auction following its seizure by the DLBA were deprived of two separate property rights: a real-property right when title to their land was taken, and "a separate property right" in the proceeds from the auction of their former real estate, which, although it "flows

from the sale of real property, is not itself an interest in real property. It's personal property." *Bowles v. Sabree,* 121 F.4th 539, 549-550 (6th Cir. 2024). "Michigan recognizes that real property and personal property aren't just different—they're mutually exclusive." *Bowles,* 121 F.4th at 550 n.2.

Where a plaintiff brings a takings claim premised on the defendant's retention of auction proceeds from the sale of real property, "[t]he limitation periods beg[i]n to run when the [defendant] retained the surplus proceeds." *Palakurthi v. Wayne Cnty.,* 2025 U.S. Dist. LEXIS 55248 at *7 (E.D. Mich. Mar. 25, 2025); *see also, Bowles v. Sabree,* 2022 U.S. Dist. LEXIS 8172 at *23 (E.D. Mich. Jan. 14, 2022) (holding limitations period for takings claim runs from date of auction, not date of title transfer). So for those Plaintiffs whose property was sold at public auction, the limitations period needs to be calculated from the date that the DLBA received the proceeds of the public auction.

In addition to using the wrong claim accrual date, Defendants are referencing the wrong filing date for certain Plaintiffs. In a case filed as a putative class action under Rule 23, the claims of new putative class representatives who are added for the first time via an amended complaint relate back to the filing date of the original class-action complaint. *See Ladrigue v. City of Bay City,* 2022 U.S. Dist. LEXIS 74064 at *6-*11 (E.D. Mich. Apr. 22, 2022); *see also, Bromley v. Michigan Educ. Association-NEA,* 178 F.R.D. 148, 158-159 (E.D. Mich. 1998).

The relevant filing date for all Plaintiffs is thus February 1, 2025, not May 11, 2025.

The relevant sale dates for the Plaintiffs whose houses were sold at public auction are January 10, 2019 (Estate of Mary Terrell) (ECF No. 13, PageID.303), February 5, 2019 (Ruby Washington) (ECF No. 13, PageID.301), January 31, 2023 (Ward's House LLC) (ECF No. 13, PageID.302), and August 15, 2024 (Sheila Todd) (ECF No. 13, PageID.305). All of these dates are within the six-year statute of limitations for state-law takings and unjust-enrichment[6] claims, when taking into account the relevant tolling provisions. The tolling analysis is the same for state-law claims and § 1983 claims, because the applicable tolling provisions for § 1983 claims are borrowed from state law. *See Wershe v. City of Detroit,* 112 F.4th 357, 366 (6th Cir. 2024).

Claims accruing prior to March 10, 2020 benefit from 101 days of tolling due to a pair of Michigan Supreme Court administrative orders suspending the statute of limitations in response to the COVID-19 pandemic. *See Lee v. Belvoir Media Grp., LLC*, 2023 U.S. Dist. LEXIS 172920 at *15 (E.D. Mich. Sept. 27, 2023); *see also, Bowles v. Sabree,* 2022 U.S. Dist. LEXIS 8172 at *23-*24 (E.D.

---

6  The statute of limitations for a Michigan-law unjust-enrichment claim, premised on retention of surplus proceeds from the defendant's post-title-transfer sale of real estate that was previously owned by the plaintiff, is six years. *Palakurthi v. Wayne Cnty.,* 2022 U.S. Dist. LEXIS 56356 at *14 (E.D. Mich. March 28, 2022).

Mich. Jan. 14, 2022) (applying 101 days of COVID tolling to § 1983 takings claim). Thus, Morgan Tate & Brewer, LLC's claim, even if it accrued on the date of title transfer (December 19, 2018) is timely.[7]

Mary Terrell is entitled to additional tolling because she died on June 8, 2018, approximately one year and one month after the DLBA took her home, and seven months before the DLBA sold her home in an auction. ECF No. 13, PageID.303, ¶ 10. Ms. Terrell thus died "before the period of limitations has run," MCL § 600.5852(1), which entitles her Estate to bring the claim within "3 years after the period of limitations has run.[8]" MCL § 600.5852(4). The period of limitations for Mary Terrell's § 1983 claims expired three years and 101 days after January 10, 2019, which is April 21, 2022. All of the Estate's claims are thus timely, because the class-action filing date, February 1, 2025, occurred less than three years after April 21, 2022.

## V.  Plaintiffs have stated a claim under § 1983

Plaintiffs have adequately pled that they suffered constitutional violations. A takings claim "requires proof of two elements: (1) a cognizable property interest, and (2) a government taking of that interest without just compensation." *Fox v.*

---

7  Although the DLBA sold Morgan Tate & Brewer, LLC's property for $12,000.00, the sale was not via a public auction.

8  So long as the claim is also filed within two years after letters of authority are issued to the Personal Representative, or within one year after they are issued to a successor personal representative. *See* MCL § 600.5852(1)-(3).

*Cnty. of Saginaw,* 2025 U.S. Dist. LEXIS 162753 at *26 (E.D. Mich. Aug. 21, 2025) (citing *Puckett v. Lexington-Fayette Urban Cty. Gov't,* 833 F.3d 590, 609 (6th Cir. 2016)). Plaintiffs have pled that they held cognizable property interests in specific Detroit real estate. *See, e.g.,* ECF No. 13, PageID.303, ¶ 8 ("In 2009, Mary Terrell purchased the home at 17213 Forrer Street in Detroit for $7,900.00 and moved in."). Plaintiffs also pled that Defendant DLBA took their property interests without compensation. *See Id.* at ¶¶ 9-10 ("On or about May 16, 2017, Mary's home at 17213 Forrer was taken from her for no consideration through the Detroit Land Bank Authority's NAP program."). This is sufficient to state a Fifth Amendment takings claim.

Defendants have not cited any case, from any jurisdiction, holding that a municipality can engage in outright physical appropriation of land without compensation merely because a nuisance exists on the land. In support of their argument that Plaintiffs have failed to state a takings claim, Defendants cite only footnote 22 of *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470 (1987). *DeBenedictis* is inapposite because it is a "regulatory takings" case, not a "physical takings" case, as explained in detail in Part I, *supra.*

In addition, Plaintiffs have pled that the DLBA is not, in fact, engaged in diminishing or destroying the value of property by abating nuisances, because **the DLBA does not actually abate any nuisances** at the properties it acquires through

its Nuisance Abatement Program. *See* ECF No. 13, PageID.317, ¶ 48. Instead, the DLBA totally neglects the houses it acquires, allowing them to sit vacant for years and deteriorate. *See* ECF No. 13, PageID.318, ¶ 49. The DLBA then sells the houses in 'as-is' condition and uses the sale proceeds to fund its own operations. *See* ECF No. 13, PageID.317, ¶ 48. These allegations "must be presumed to be true" at the motion-to-dismiss stage. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Shield of Michigan*, 552 F.3d 430, 434 (6th Cir. 2008).

The Auction-Proceeds-Subclass Plaintiffs have also adequately pled a procedural due process claim. "A procedural due process claim requires (1) a protected property interest, (2) a deprivation of that interest by the government, and (3) inadequate procedural protections before the deprivation." *Fox v. Cnty. of Saginaw,* 2025 U.S. Dist. LEXIS 162753 at *26 (E.D. Mich. Aug. 21, 2025) (citing *Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002)). The Auction-Proceeds-Subclass Plaintiffs pled that they have property interests in the proceeds that were generated when the DLBA sold their former properties at public auction. *See* ECF No. 13, PageID.357, ¶ 173. They do, in fact, have a property interest in those auction proceeds. *See Bowles v. Sabree,* 121 F.4th 539, 545, 549-550 (6th Cir. 2024); *Palakurthi v. Wayne Cnty.*, 2025 U.S. Dist. LEXIS 55248 at *8 (E.D. Mich. Mar. 25, 2025) ("United States Supreme Court, Michigan Supreme Court, and Sixth Circuit precedent establish that the foreclosure judgment did not cut off

27

Plaintiff's right to the surplus proceeds."). Auction Proceeds Subclass Plaintiffs also pled that the DLBA retained 100% of the auction proceeds for itself, *see, e.g.* ECF No. 13, PageID.302, ¶ 7, and that the DLBA provided them no notice of the auctions and failed to provide any mechanism by which they could claim the proceeds. *See* ECF No. 13, PageID.357-358, ¶¶ 174-175.

Plaintiffs' (federal and state) Excessive-Fines claims are pled in the alternative, in the event that the Court finds that the seizures of Plaintiff's property are civil forfeitures. ECF No. 13, PageID.350, ¶ 143. Plaintiffs contend that the seizures of their houses were not civil forfeitures. *See* ECF No. 13, PageID.321-330. Defendant DLBA apparently agrees. *See* ECF No. 13-5, PageID.422.

In Michigan, "civil asset-forfeiture cases are unique because the government must prove that the asset to be forfeited is the product of a crime or was used to further a criminal act." *Long Lake Twp. v. Maxon*, 15 N.W.3d 118, 128 (Mich. 2024). A violation of a municipal nuisance or zoning ordinance is not a criminal act, *see Id.* at 128, which Defendants appear to concede in their Motion. *See* ECF No. 19, PageID.599 ("Plaintiffs do not, and could not, allege that transfer of title to their properties were forfeitures associated with criminal activity."). The parties thus appear to be in agreement that Defendants' seizures of Plaintiffs' real estate were not civil forfeitures.[9]

---

[9]   If the Court finds that Defendants' program is a civil forfeiture program, it should also find that the Excessive Fines Clause applies. *See Tyler v. Hennepin*

**VI. Plaintiffs have adequately pled that Defendants caused their injuries**

The constitutional injuries in this case were not caused by the judgments transferring title to the DLBA. It is not unconstitutional for a municipality to take land from private owners for the purpose of eradicating urban blight. *See, e.g. Berman v. Parker,* 348 U.S. 26, 33-36 (1954). The eradication of blight is unquestionably a "public purpose" under the Fifth Amendment, for which government entities may exercise their power to take land from private owners, provided they tender just compensation. *See Kelo v. City of New London,* 545 U.S. 469, 484 n.13 (2005). Nor is it unconstitutional to seize and sell property to satisfy a debt, *see Tyler v. Hennepin Cnty.,* 598 U.S. 631, 639 (2023), including a debt for the costs of nuisance abatement. *See Ypsilanti Charter Twp. v. Kircher,* 281 Mich. App. 251, 282-285 (2008).

Taking the property was not unconstitutional. What was unconstitutional was failing to provide a mechanism for former property owners to receive the excess value of their real estate after it has been taken. *See Howard v. Macomb Cnty.,* 133 F.4th 566, 572 (6th Cir. 2025) (holding that a municipal government "that allows property owners to obtain any surplus after a foreclosure and keeps the residual

---

*Cnty.,* 598 U.S. 631, 648-650 (2023) ("[e]conomic penalties imposed to deter willful noncompliance with the law are fines by any other name. And the Constitution has something to say about them: They cannot be excessive.") (Gorsuch, J. concurring).

only if the owners do not seek it does not commit a taking."); *see also, Wings as Eagles Deliverance Ministry v. City of Detroit,* 2022 U.S. Dist. LEXIS 13773 at *11 (E.D. Mich. Jan. 25, 2022) ("the alleged source of injury was not the foreclosure, but the subsequent sale and retention of surplus."); *Freed v. Thomas,* 976 F.3d 729, 734 (6th Cir. 2020) (allowing Takings claim to proceed where, "Freed does not quarrel with Michigan's authority to foreclose, sell his property, and satisfy his tax debt from the proceeds of the sale. . . . Instead, Freed challenges Michigan's post-collection failure to reimburse him for the excess proceeds from the sale of his property and the State's refusal to compensate him for the excess after-tax equity of his property."). If Defendants had offered post-judgment procedures that allowed former property owners to be paid the excess value of their real estate, they would not be *compensating* the property owners for a taking; they would "*prevent* a taking from happening in the first place." *Howard v. Macomb Cnty.,* 133 F.4th 566, 572 (6th Cir. 2025) (emphasis in original).

To illustrate how the DLBA's post-judgment conduct, and not the judgments, caused the constitutional injuries, consider Ward's House, LLC's claim. The order transferring title to Ward's House, LLC's house at 6094 Evergreen Street provides, in relevant part:

Plaintiffs are hereby granted the authority and right to enter the subject property and remove and/or abate the declared nuisance.

IT IS FURTHER ORDERED that the property interests held by WARD'S HOUSE, LLC in the Property located at 6094 EVERGREEN Detroit, Michigan, . . . is awarded to Plaintiff Detroit Land Bank Authority **as compensation and in order to equitably defray the costs of abatement of the nuisance, actual attorney fees and court costs**. . . .

IT IS FURTHER ORDERED that Plaintiff is granted, **upon its presentment of supporting documentation to the Court**, a money judgment in its favor and against Defendant(s) **for any deficiency remaining from the costs incurred by Plaintiffs**, . . . **in abating the nuisance**, actual attorneys fees and court costs, and property taxes, liens and levies due and owing by the Defendant Owner(s) and Interest Holder(s) of the Defendant Property."

ECF No. 19-10, PageID.659-660 (emphasis added). The order transferring title to the house at 6094 Evergreen to the DLBA thus presumes that there will be a "deficiency," meaning that the costs the DLBA will incur, after the judgment, in abating the nuisance at 6094 Evergreen will exceed the value of the property. The order purports to grant the DLBA a money judgment against Ward's House, LLC in the amount of this deficiency, "upon presentment of supporting documentation to the Court." ECF No. 19-10, PageID.660.

In its motion for default judgment, the DLBA represented to the state court that it would incur costs to remove or abate the nuisance that would greatly exceed the post-abatement value of the real estate. *See* ECF No. 13, PageID.315-316, ¶¶ 43-45. Plaintiffs have alleged that at the time it made those representations,[10] the

_____

10 Defendants citation to *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 157 (Mich Ct. App. 2004) is totally inapposite. The cited passage refers to the standard for pleading a Michigan-common-law innocent-misrepresentation claim, which is not at issue in this case. And *Derderian* does not even suggest

DLBA had no intention of actually removing or abating any nuisances at 6094 Evergreen. *See* ECF No. 13, PageID.317, ¶¶ 46-48. And the DLBA did not, in fact, incur any costs to renovate or demolish the house at 6094 Evergreen. ECF No. 13, PageID.345, ¶ 110. The DLBA did incur attorneys fees and court costs to bring its lawsuit, but these were modest: not more than $290 in attorneys fees and $37 in court costs, and probably even less. *See* ECF No. 13, PageID.318-321, ¶¶ 50-54.

Rather than abating a nuisance at 6094 Evergreen, submitting documentation to the state court supporting its abatement costs, and obtaining a money judgment against Ward's House, LLC for the "deficiency" between its abatement costs and the property's value, the DLBA simply neglected its property at 6094 Evergreen for more than three years. ECF No. 13, PageID.345, ¶ 110. The DLBA then sold

─────────────

that the DLBA's conduct was not tortious; a promise of future conduct can constitute a *fraudulent misrepresentation,* rather than an innocent misrepresentation, if the "promise is made in bad faith without the intention to perform it." *Derderian*, 689 N.W.2d at 156. Nor, as Defendants argue, is an "egregious factual misrepresentation," ECF No. 19, PageID.593, necessary to create § 1983 liability when the plaintiffs' injury stems from a prosecutorial or judicial act. In *Powers v. Hamilton Cnty. Public Defender Comm'n,* 501 F.3d 592 (6th Cir. 2007), the case Defendants primarily rely on for this "superseding cause" argument, a public defender agency was held liable when its clients were jailed for failure to pay fines without indigency hearings. The public defender did not make *any factual representations at all* to the court, let alone "egregious" misrepresentations. It's challenged conduct merely consisted of failing to request indigency hearings, i.e., doing nothing. *See Powers*, 501 F.3d at 609-610.

the property, without having made any improvements, for $25,100.00; this was nearly five times what Ward's House, LLC paid for the property in 2017.[11] ECF No. 13, PageID.302, ¶ 7.

Instead of a "deficiency" for 6094 Evergreen, there was a surplus: the DLBA received $25,100.00 for the property, far more than the $0 it spent abating the nuisance and the few hundred dollars it spent bringing its boilerplate lawsuit. Because the value of the property exceeded the DLBA's abatement expenses, the DLBA should have refunded the surplus to Ward's House, LLC. *See Ypsilanti Fire Marshall v. Kircher,* 273 Mich. App. 496, 538-540 (2007). But instead of returning this money, the DLBA kept it for itself. ECF No. 13, PageID.302, ¶ 7.

In other words, the DLBA "forcibly took property worth vastly more than the debts these plaintiffs owed, and failed to refund any of the difference. In some legal precincts that sort of behavior is called theft." *Hall v. Meisner,* 51 F.4th 185, 196 (6th Cir. 2022). The DLBA's wrongful retention of 100% of the auction proceeds, not the state-court judgment, was the cause of Ward's House, LLC's injury. *See Freed v. Thomas,* 976 F.3d 729, 735 (6th Cir. 2020) ("Freed's feud with the State arises from *post-collection* actions, specifically Michigan's refusal to

---

11 Ward's House, LLC purchased the 6094 Evergreen property in a 2017 auction for $5,100.00. The fact that the same house sold at auction in 2023 for $25,100.00 reflects the value of the substantial improvements that Ward's House, LLC made to the property before the DLBA seized it. *See* ECF No. 13, PageID.302, ¶ 7.

refund the excess proceeds of the sale of Freed's property and failure to reimburse Freed for the surplus equity in his home.") (emphasis in original).

The City of Detroit's conduct is also a proximate cause of Plaintiffs' injuries. "[A] city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written," *Jackson v. City of Cleveland,* 925 F.3d 793, 830 (6th Cir. 2019), and permitting the constitutional violations at issue is exactly what the City of Detroit did. In its February 7, 2014 City Council resolution, Detroit authorized the DLBA to do the following:

> "The Detroit Land Bank shall be entitled to retain any and all proceeds from the disposition or abatement of the properties that were acquired by the Detroit Land Bank through the nuisance abatement proceedings."

ECF No. 13, PageID.334, ¶ 91. The unlawful conduct at issue is not bringing lawsuits, abating nuisances, or procuring involuntary transfers of real estate to the government. The unlawful conduct is retaining money that belongs to the former property owners. *See Hall v. Meisner*, 51 F.4th 185, 187-188 (6th Cir. 2022). When the City of Detroit expressly authorized the DLBA to "retain" the proceeds from the disposition of the properties it acquired through nuisance abatement proceedings, Detroit authorized the DLBA to violate the Fifth Amendment.

**VII. Plaintiffs adequately pled a procedural due process claim**

34

Plaintiffs have stated a viable procedural due process claim, for the reasons set forth in Part V, *supra*. Defendants argue, citing only footnote 22 of *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 492 n.22 (1987), that the due process claim fails "because Defendants had no obligation to pay compensation to Plaintiffs." ECF No. 19, PageID.595. *DeBenedictis* is inapposite for the reasons discussed in detail in Part I, *supra*.

Defendants also argue, without citation to authority, that "Plaintiffs had no interest in the properties after title was transferred to the DLBA, which occurred prior to any sale." ECF No. 19, PageID.595. However, when real estate is seized to satisfy a debt, the former owner's "right to collect surplus proceeds" is "not extinguish[ed]" by the "vesting of fee simple title to the real property" in the creditor. *See Bowles v. Sabree,* 121 F.4th 539, 549 (6th Cir. 2024) (quoting *Rafaeli v. Oakland Cnty.,* 505 Mich. 429, 475-476 (2020)).

Defendants further argue that Plaintiffs had the opportunity to challenge the reasonableness of the amount of its claimed attorney's fees and abatement expenses in the nuisance abatement actions. ECF No. 19, PageID.595. But this is simply untrue, because the DLBA never ***quantified*** its attorneys fees or abatement expenses in those actions. *See* ECF No. 13, PageID.358, ¶ 176. How could Ward's

House, LLC have possibly challenged the reasonableness of the DLBA's attorney fees, when the DLBA never submitted a fee petition?

The DLBA should have specified the dollar amount it believed it was owed, submitted "supporting documentation to the Court" for each of its claimed expenses, *See* ECF No. 19-10, PageID.660, afforded Ward's House, LLC an opportunity to challenge the reasonableness of those expenses, *See Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. 251, 279 (2008), deducted any costs approved by the state court from the $25,100.00 in auction proceeds, and refunded the balance of the proceeds to Ward's House, LLC. Instead, the DLBA simply kept the entire $25,100.00, with no notice or process at all.

### VIII. Plaintiffs' *Monell* allegations are sufficient

Defendant City of Detroit argues that Plaintiffs' claims are inadequately pled because Plaintiffs supposedly failed to allege that the February 7, 2014 City Counsel resolution was unlawful. *See* ECF No. 19, PageID.597.

Plaintiffs did, in fact, allege that the February 7, 2014 City Counsel resolution was unlawful. *See* ECF No. 13, PageID.355-356, ¶¶ 165-167 ("[t]he City of Detroit expressly authorized the Detroit Land Bank Authority to violate the Michigan Constitution and the U.S. Constitution in this manner via a February 7, 2014 City Council Resolution."). Authorizing, approving, or knowingly acquiescing in another party's unconstitutional conduct can qualify as a proximate

cause of a constitutional injury. *See Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016). Further, "a city may be liable under *Monell* for a policy of permitting constitutional violations[.]"  *Jackson v. City of Cleveland*, 925 F.3d 793, 830 (6th Cir. 2019).

Defendants argue that their conduct is somehow consistent with MCL § 600.2940, because nuisance-abatement actions are "equitable" in nature. *See* ECF No. 19, PageID.597. The Michigan Court of Appeals, in a published decision, has interpreted MCL § 600.2940 to require plaintiffs in nuisance-abatement actions to collect their expenses of abatement only "in the same manner as damages and costs are generally collected on execution." *Ypsilanti Charter Twp. v. Kircher,*  281 Mich. App. 251, 283 (2008); *see also, Ypsilanti Fire Marshal v. Kircher*, 273 Mich. App. 496, 550-551 (2007). This means that "in the case of execution against defendant's realty, **any surplus proceeds remaining after satisfaction of the judgment must be paid over to defendant.**" *Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. at 285 n.13 (emphasis added). The *Ypsilanti Charter Twp.* panel reached this conclusion despite acknowledging that, "[n]uisance-abatement proceedings brought in the circuit court are generally equitable in nature. MCL 600.2940(5)." *Id.* at 270. So Defendants' argument that the "equitable" nature of nuisance-abatement proceedings permits municipal plaintiffs to simply expropriate real

estate is contrary to the way that Michigan courts have interpreted the relevant statute.

The City of Detroit authorized the DLBA to "retain any and all proceeds from the disposition"[12] of Plaintiffs' properties. Municipal entities cannot seize and retain real estate, or the proceeds of subsequent auctions of that real estate, that is worth more than the former owner's debts to the municipality. *See Bowles v. Sabree,* 121 F.4th 539, 545 (6th Cir. 2024) ("This Court, the Michigan Supreme Court, and the United States Supreme Court all agree that this kind of scheme is an unconstitutional taking.").

### IX. Plaintiffs' state constitutional claims are viable

Defendants appear to concede that if Plaintiffs' properties were taken "for the purpose of eradicating blight," compensation would be required under Art. X, § 2 of the Michigan Constitution.[13] *See* ECF No. 19, PageID.598. Defendants then

---

12 Defendants argue that the resolution cannot be unconstitutional because it "simply authorizes the DLBA to exercise the City's police power by filing civil nuisance abatement actions." ECF No. 19, PageID.597. It doesn't matter whether the DLBA was exercising the City's police power. As the Sixth Circuit has recognized, "the government's exercise of its police powers can, in some circumstances, amount to a taking." *Slaybaugh v. Rutherford Cnty.,* 114 F.4th 593, 597 (6th Cir. 2024). In any event, the resolution authorizes more than just filing nuisance lawsuits. It allows the DLBA to "**retain all proceeds from the sale of such land.**" ECF No. 13-21, PageID.503 (emphasis added).

13 Defendants' reference to footnote 22 of *DeBenedictis,* 480 U.S. at 492 (1987) is inapposite for the reasons discussed in detail in Part I, *supra.* Additionally, *DeBenedictis* did not address the Takings Clause of the Michigan Constitution, which was most recently amended in 2006. A takings analysis based on cases

argue that Plaintiffs' state-constitutional claims are inadequately pled, because "Plaintiffs' properties were not condemned for the purpose of eradicating blight[.]" Yet Plaintiffs alleged, in their First Amended Complaint:

> The Detroit Land Bank Authority took Plaintiffs' property for the purpose of eradicating blight. When asked by a City Counsel member to identify the specific reason(s) why it considered each property it took to be a public nuisance, the DLBA proffered the same rationale for all 1,309 properties it had taken to date: "Vacant and Blighted."

ECF No. 13, PageID.354, ¶ 157. This factual allegation about Defendants' purpose for taking the properties "must be presumed to be true" at the motion-to-dismiss stage. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Shield of Michigan*, 552 F.3d 430, 434 (6th Cir. 2008). As such, Defendants' argument that they did not take the properties "for the purpose of eradicating blight" is more appropriate for a motion for summary judgment.

It is also a curious argument for Defendants to make, since they have strongly implied in their public statements, and even in the instant motion itself, that blight eradication was the primary purpose of the Nuisance Abatement

---

interpreting the U.S. Constitution does not necessarily control the outcome of a takings claim under the Michigan Constitution, because "the Michigan Constitution provides more expansive protection against takings than its federal counterpart[.]" *Jackson v. Southfield Neighborhood Revitalization Initiative,* 2025 Mich. LEXIS 1287 at *27 n.6 (Mich. Supreme Ct., July 16, 2025); *see also, Rafaeli, LLC v. Oakland Cnty.,* 505 Mich 429, 477 n.16 (2020).

Program.[14] The City Council resolution authorizing the program declares that it was created "to more effectively address the Blight Emergency" in the City. ECF No. 13-21, PageID.505. The DLBA's Q1 2025 quarterly report described the program as, "a successful tool in addressing private blight" and reports that in the first quarter of 2025, NAP notices were placed on "306 properties identified to be vacant and blighted." ECF No. 13-6, PageID.430. In the instant motion, Defendants proclaim that they "have acted vigorously to combat abandonment and blight through code enforcement actions and through the Land Bank's Nuisance Abatement Program (the "NAP")," and that the DLBA sued the Plaintiffs "[t]o carry out its mission to reduce promote [sic] the public welfare by eliminating blight and fostering the redevelopment of blighted properties[.]" ECF No. 19, PageID.560.

## X. Defendants are not immune from takings claims under the Michigan Constitution

Defendants' argument that they have immunity from takings claims brought pursuant to the Michigan Constitution borders on frivolous. Governmental immunity in Michigan does not apply to takings claims. *See Electro-Tech v. H. F.*

---

14 If Defendants' intent is to argue that the state constitutional takings claim fails because title was not acquired via a formal condemnation action, the argument lacks merit. Michigan's Constitution requires compensation "when a governmental agency effectively takes private property without a formal condemnation proceeding." *Mays v. Snyder,* 916 N.W.2d 227, 271 (Mich. Ct. App. 2018) (citing *Merkur Steel Supply, Inc. v. City of Detroit,* 261 Mich. App. 116, 125 (2004)).

*Campbell Co.,* 433 Mich. 57, 90-91 & n.38 (1989). Michigan courts have

repeatedly recognized that municipalities are subject to suit for taking property in

violation of Article X, § 2 of the Michigan Constitution, even when no federal

constitutional claim is at issue. *See, e.g. Rafaeli, LLC v. Oakland Cnty.,* 505 Mich.

429, 484-485 (2020); *Proctor v. Saginaw Cnty. Bd. of Comm'rs,* 340 Mich. App. 1,

20-21, 40 (2022); *Jackson v. Southfield Neighborhood Revitalization Inititative,*

2025 Mich. LEXIS 1287 at *27 (Mich. Supreme Ct. July 16, 2025).

### XI. Plaintiffs' claim arising directly under the Fifth Amendment is pled in the alternative, in the event that the Court finds that neither § 1983 nor Michigan law provide a viable remedy

It is unclear whether it is possible to bring a cause of action arising directly

under the Takings Clause of the Fifth Amendment. *See DeVillier v. Texas,* 601 U.S.

285, 292 (2024) ("Our precedents do not cleanly answer the question whether a

plaintiff has a cause of action arising directly under the Takings Clause.").

Plaintiffs pled this claim in the alternative, in the event the Court were to accept

Defendants' arguments that, 1) they are immune from a Michigan-law inverse

condemnation claim, *see* ECF No. 19, PageID.599-600, and 2) that they cannot be

held liable under § 1983 because state-court judges signed orders transferring title

to their properties to the DLBA. *See* ECF No. 19, PageID.593. To be clear,

Plaintiffs believe that neither of these arguments have merit, and that relief is

available for any constitutional violation under both § 1983 and Michigan law.

But assuming, *arguendo*, that a state court judge were solely responsible for Plaintiffs' injuries, they would still have suffered a constitutional violation. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* 560 U.S. 702, 714 (2010) ("It would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat"); *see also, Sheetz v. Cnty. of El Dorado,* 601 U.S. 267, 276 (2024) ("The Constitution's text does not limit the Takings Clause to a particular branch of government"). Yet relief for the unconstitutional taking would be unavailable under § 1983, because judges are immune from suit under § 1983 for judicial acts. *See Pearson v. Ray,* 386 U.S. 547, 553-554 (1967). In that circumstance, it would become necessary to answer the question the Supreme Court granted certiorari to decide, but then left open, in *DeVillier*: "what would happen if a property owner had no cause of action to vindicate his rights under the Takings Clause." *DeVillier v. Texas,* 601 U.S. 285, 292 (2024).

## XII. Plaintiffs have stated claims for unjust enrichment

Defendants argue that Plaintiffs failed to adequately plead an unjust-enrichment claim, allegedly because:

> Plaintiffs have failed to allege that the Land Bank received a benefit from Plaintiffs. Rather, they allege that the Land Bank received money from third parties from the sale of Plaintiffs' properties after title was transferred to the Land Bank.

ECF No. 19, PageID.601. Defendants cite no authority in support of this argument. Michigan courts and federal courts in this district have held that unjust-enrichment claims are viable when premised on the retention of money received from third parties, from the sale of real estate previously owned by the plaintiff, after title was transferred to the defendant. *See Proctor v. Saginaw Cnty. Bd. of Comm'rs,* 340 Mich. App. 1, 20-21, 40 (2022); *Sinclair v. Meisner,* 2022 U.S. App. LEXIS 35922 at *13 (6th Cir. Dec. 19, 2022).

### XIII. Defendants do not have immunity from unjust-enrichment claims

Defendants misread *Wright v. Gennessee Cnty.,* 504 Mich. 410 (2019). *Wright* unambiguously holds that unjust-enrichment claims are not tort claims, and therefore, unjust-enrichment claims are not barred by governmental immunity. *See Wright,* 504 Mich. at 422 ("Both the nature of an unjust-enrichment action and its remedy—whether restitution at law or in equity—separate it from tort and contract."). This is how *Wright* has been subsequently interpreted in Michigan courts. *See City of Highland Park v. State Land Bank Auth.,* 340 Mich. App. 593, 603-604 (citing *Wright* for the proposition that governmental immunity does not shield government entities from unjust-enrichment claims); *see also, Schafer v. Kent Cnty.,* 2024 Mich. LEXIS 1438 at *27 & n.93 (Mich. Supreme Ct. July 29, 2024). *Wright* does not distinguish between different types of unjust-enrichment claims based on the relief requested, or hold that any type of unjust-enrichment

claim is a tort claim "in substance." *Wright* distinguished unjust-enrichment claims, which by definition seek restitution rather than tort damages, from the claim at issue in *Mick v. Kent Cnty. Sheriff's Dep't (In re Estate of Bradley),* 494 Mich. 367 (2013), in which the personal representative of an individual who committed suicide sued a sheriff's department for wrongful-death damages for failing to timely execute a probate court order to take the plaintiff's decedent to a psychiatric hospital. *See Id.* at 371-374.

Defendants also do not explain why they believe that payment to former property owners of the value of the property at the time of title transfer would constitute "restitution," while payment of the proceeds generated by the DLBA's subsequent sales of the Plaintiffs' property would constitute "damages," and somehow render the unjust-enrichment claim a tort claim. Michigan and federal courts in this district have held that unjust-enrichment claims seeking identical relief against a municipal entity, i.e., surplus proceeds from a subsequent sale of the plaintiff's former real estate, are viable. *See Proctor v. Saginaw Cnty. Bd. of Comm'rs*, 340 Mich. App. 1, 20-21 (2022); *Palakurthi v. Wayne Cnty.*, 2025 U.S. Dist. LEXIS 55248 at *7-*8 (E.D. Mich. Mar. 25, 2025).

Even if Plaintiffs' claims were tort claims (they are not), governmental immunity is not available in Michigan when "the activity at issue constituted the performance of a proprietary function." *Hyde v. University of Michigan Bd. of*

44

*Regents,* 426 Mich. 223, 254 (1986). A 'proprietary function' is "*any activity which is conducted primarily for the purpose of producing a pecuniary profit* for the governmental agency" and which is not normally supported by taxes or fees. *Dextrom v. Wexford Cnty.,* 287 Mich. App. 406, 420 (2010) (emphasis in original). Plaintiffs have alleged that over the course of the program, the DLBA has generated at least $5,194,543.00 in cash through sales of NAP-acquired houses, ECF No. 13, PageID.313, ¶ 38, and has acquired at least 522 additional properties via NAP since January 1, 2022, of which 368 identifiable parcels are collectively worth no less than $14,210,150.00 per current tax-assessment data. ECF No. 13, PageID.315, ¶¶ 41-42. It is at least 'plausible' that a program which has, to date, generated an eight-figure windfall for the DLBA is being conducted for the purpose of producing a pecuniary profit.

Dated: September 11, 2025

Respectfully submitted,

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Lawrence H. Margolis (P69635)
*Attorneys for Plaintiffs*
402 W Liberty St.
Ann Arbor MI 48103
734-994-9590
ian@lawinannarbor.com
larry@lawinannarbor.com

45